



Honorable Laurel E. Babero
United States Bankruptcy Judge

Entered on Docket
June 01, 2018

Jason A. Imes, Esq., NV Bar No. 7030
Schwartzer & McPherson Law Firm
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146-5308
Telephone:     (702) 228-7590
Facsimile:     (702) 892-0122
E-Mail:        bkfilings@s-mlaw.com
*Attorneys for Lenard E. Schwartzer, Trustee*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No. BK-S-18-12662-LEB |
| MEDIZONE INTERNATIONAL, INC., | Chapter 7 |
| Debtor. | **INTERIM ORDER GRANTING EMERGENCY MOTION FOR INTERIM ORDER AUTHORIZING TRUSTEE TO OBTAIN POST-PETITION FINANCING (11 U.S.C. §364)** |
| | Hearing Date:   May 30, 2018 (OST)<br>Hearing Time:   2:30 p.m.        (OST) |

The Trustee's *Emergency Motion For Interim Order Authorizing Trustee To Obtain Post-Petition Financing (11 U.S.C. §364)* (the "Financing Motion") [ECF No. 24] having come before this Court on May 30, 2018, pursuant to an Order Shortening Time [ECF No. 31];  Lenard E. Schwartzer (the "Trustee"), Chapter 7 Trustee, appearing by and through his counsel, Jason A. Imes., Esq., of the Schwartzer & McPherson Law Firm;  other parties appearing as noted on the record;  the Court finding that notice has been given to all creditors and parties in interest as required by law, there being no opposition, the Court having made its findings of fact and conclusions of law upon the record which are incorporated herein pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7052, and for good cause appearing,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**IT IS HEREBY ORDERED** that the Trustee's Financing Motion is GRANTED; and

**IT IS FURTHER ORDERED** that the Trustee is given INTERIM authorization to obtain secured post-petition credit pursuant to 11 U.S.C. §364(c) in the sum of up to Two Hundred Thousand dollars ($200,000.00) from creditors Edwin G. Marshall and Jill Marshall (the "Marshalls") pursuant to the terms set forth with more particularity in the Loan Agreement, Security Agreement, and Secured Promissory Note (collectively the "Loan Agreement") attached to this Interim Order as **Exhibit "1;"** and

**IT IS FURTHER ORDERED** that as security for this post-petition credit, the Trustee may grant to the Marshalls a superpriority interest in the collateral as described in the Loan Agreement pursuant to 11 U.S.C. §364(c); and

**IT IS FURTHER ORDERED** that this financing has been negotiated in good faith and at arm's length between the Trustee and the Marshalls, and any credit extended pursuant to the Loan Agreement is deemed to have been extended, issued or made in good faith by the Marshalls as required by and within the meaning of 11 U.S.C. §346(e); and

**IT IS FURTHER ORDERED** that the terms of this financing appear to be fair and reasonable, are ordinary and appropriate for secured financing to the Trustee, reflect the Trustee's exercise of prudent business judgment consistent with his fiduciary duties, and are supported by reasonably equivalent value and fair consideration; and

**IT IS FURTHER ORDERED** that this financing is necessary to avoid immediate and irreparable harm to the estate, and is in the best interest of the estate and creditors, because it will provide necessary funds for the orderly operation of the Debtor's business by the Trustee to maximize the value of the estate's assets for the benefit of creditors and the estate; and

**IT IS FURTHER ORDERED** that funds advanced pursuant to the Loan Agreement shall only be used by the Trustee for the continued operation of the Debtor's business as determined by the Trustee in his business judgment for the benefit of this bankruptcy estate; and

**IT IS FURTHER ORDERED** that the Trustee is authorized to perform all acts and execute any documents reasonably necessary to ensure his compliance with the terms of the Loan Agreement; and

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**IT IS FURTHER ORDERED** that a FINAL HEARING for approval of the Loan Agreement shall be held pursuant to Fed.R.Bankr.P. 4001(c) on **June 14, 2018, at the hour of 1:30 p.m.** Any opposition to final approval of the Loan Agreement shall be filed and served no later than _____ June 8, 2018 _____, and any reply to such opposition must be filed and served no later than _____ June 13, 2018 _____.

Submitted by:                                                    (APPROVED)/ DISAPPROVED

/s/ Jason A. Imes., Esq.,                          .            /s/ Merle C. Meyers, Esq.                          .
Jason A. Imes, Esq.                                             Merle C. Meyers, Esq.
SCHWARTZER & MCPHERSON LAW FIRM                                 MEYERS LAW GROUP, P.C.
2850 South Jones Blvd., Suite 1                                 44 Montgomery Street, Suite 1010
Las Vegas NV 89146                                              San Francisco, CA 94104
*Attorneys for Lenard E. Schwartzer, Trustee*                  *Attorney for Edwin Marshall and Jill Marshall*

### LR 9021 CERTIFICATION

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐    The court waived the requirement of approval under LR 9021(b)(1).

☐    No party appeared at the hearing or filed an objection to the motion.

☒    I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

**MERLE C. MEYERS, ESQ.:        APPROVED**

☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objection to the form or content of the order.

/s/ Jason A. Imes., Esq.,                          .
Jason A. Imes, Esq.
SCHWARTZER & MCPHERSON LAW FIRM

### # #

# EXHIBIT 1

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement"), dated as of May 17, 2018, is made by and between LENARD SCHWARTZER, as trustee ("Borrower" or "Trustee") of the chapter 7 estate of MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "Debtor"), and EDWIN G. MARSHALL and JILL C. MARSHALL, N.M.D., individuals (collectively, "Lenders").

### RECITALS

A.      Borrower is the trustee appointed in the chapter 7 case of *In re Medizone International, Inc.*, no. 18-12662 (the "Chapter 7 Case"), pending in the United States Bankruptcy Court for the District of Nevada, Las Vegas Division ("Bankruptcy Court"), commenced by the Debtor's filing of a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") on May 8, 2018 ("Petition Date").

B.      Borrower has determined that it is in the best interests of creditors to operate the Debtor's business for a limited period of time, pursuant to Section 721 of the Bankruptcy Code. Accordingly, Borrower intends to file a motion (the "Section 721 Motion") for authority to operate the Debtor's business for a period of approximately 90 days.

C.      In order to operate the Debtor's business for a limited period of time, Borrower requires postpetition financing for the purpose of funding operations in the Debtor's laboratory in Ontario, Canada, in accordance with the terms of a budget (as it may be modified by mutual written consent), a copy of which is attached hereto as **Exhibit "A"** (the "Budget"), without which the estate will suffer immediate and irreparable harm.

D.      Lenders, who are shareholders and creditors of the Debtor, have agreed to provide such postpetition financing on the terms and conditions set forth herein.

E.      Any Advances (as defined in Section 2 below) made under this Agreement shall be evidenced by a Note of even date herewith made by Borrower in favor of Lenders in the original principal amount of $200,000 (as amended, restated, supplemented, modified, extended, or renewed from time to time, the "Note"), a security agreement (the "Security Agreement") and such other documents, agreements, filings and instruments reasonably required by the Lender in Lender's sole and absolute discretion (collectively with this Agreement, the "Loan Documents").

F.      Other than the funding to be made available pursuant to the post-petition financing proposed hereunder, Borrower has been unable to obtain sufficient funding, including unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, and Borrower believes that it cannot obtain credit from any other lender on terms better than those set forth in this Agreement.

### AGREEMENT

NOW THEREFORE, the parties hereto ("Parties") enter into the following agreement:

1.      Recitals Incorporated. The foregoing recitals are hereby acknowledged as true and correct by Borrower and Lenders.

1

31413.DOC

2.    <u>Court Approval</u>.  This Agreement, and the loans and advances made by Lenders hereunder (the "Loan"), is conditioned upon entry of orders of the Bankruptcy Court approving the Section 721 Motion and a motion seeking approval of this Agreement under Section 364 of the Bankruptcy Code (the "Section 364 Motion"), in form and substance approved in advance by Lenders, on or before May 31, 2018.

3.    <u>Loan Advances</u>.  Subject to the provisions of Section 13 herein, Lenders shall make advances (each such extension of credit being herein called an "Advance" and collectively, the "Advances") to Borrower under this Agreement of up to the principal amount of $200,000.00.  Interest of 10% per annum shall be charged against Advances, calculated on the basis of a 360-day year and actual days elapsed from Borrower's receipt of funds until the date of repayment.

4.    <u>Repayment</u>.  Subject to the provisions of Section 5(a) below, repayment of all Advances, together with accrued interest and all other agreed-upon charges, shall be due and payable on the earliest of the following dates (the "Due Date"):  (a) September 30, 2018; (b) the date of an Event of Default, as defined herein; or (c) the date of any sale, abandonment or other disposition of any of property of the Debtor's estate.  Any amount owing under the Loan that is not paid on or before the Due Date shall accrue interest after the Due Date at the rate of fourteen percent (14%) per annum until paid.

5.    <u>Cost of Loan</u>.

(a)    All reasonable attorneys' fees and costs incurred by Lenders in documenting, negotiating, monitoring and enforcing this Agreement (including without limitation (i) obtaining Bankruptcy Court approval of the Loan and of the Section 721 Motion, and (ii) requesting Bankruptcy Court approval of such fees and costs) shall be deemed Advances due on the Due Date, *provided* that such fees and costs shall be paid by Borrower within fifteen (15) days following entry of an order of the Bankruptcy Court approving such fees and expenses pursuant to Section 506(b) of the Bankruptcy Code. Interest shall continue to accrue on account of fees, to the extent approved by the Bankruptcy Court, from the Due Date until paid.

(b)    A one-time loan fee of $25,000.00 shall also be charged to Borrower, and shall be deemed an Advance as of the date of the first Advance under this Agreement, shall accrue interest as an Advance, and shall be due on the Due Date, *provided* that in the event that Lenders unreasonably, materially and willfully fail or refuse to timely make any Advance pursuant to a valid Loan Request from Borrower, then such loan fee shall be deemed forfeited and disallowed in its entirety.  All such legal fees and expenses and the one-time loan fee, until paid, shall be secured by the Loan.

6.    <u>Lender Records</u>.  The amount of each Advance shall be recorded on the books and records of Lenders, and such record shall constitute proof of such Advance, and shall be admissible in evidence on such issue.

7.    <u>Borrower's Business Operations</u>.  Borrower shall operate the Debtor's business pursuant to the Budget, and may use the Advances only for the purposes described in and up to

2

31413.DOC

the amounts listed in the Budget (or according to deviations from the Budget approved by Lenders in writing). Such operations shall be conducted under the direction of Michael E. Shannon, M.D., the Debtor's former president, and no other former officer or director of the Debtor shall be allowed any role or participation in such operations.

8.    Grant of Superpriority Administrative Expense Claim and Liens. As security for repayment of the Loan, and subject only to the provisions of Section 10 below, Borrower hereby grants to Lenders, and the Lenders shall have, the following: (a) a superpriority administrative expense claim for Advances, pursuant to Section 364(c)(1) of the Bankruptcy Code (the "Superpriority Claim"), and (b) a fully perfected, first priority security interest in and lien under Section 364(c)(2) of the Bankruptcy Code on all Collateral, as defined below (the "Liens"). The Liens and the perfection thereof shall be effective upon entry of an order granting the Section 364 Motion, and can be (but need not be) further evidenced and accomplished by a security agreement executed by Borrower and the filing of such UCC-1 Financing Statements and such other instruments, filings and actions as Lenders reasonably determine to be necessary or appropriate in order to properly grant and perfect such security interests under applicable law and to otherwise protect Lenders.

9.    Waiver of Section 506(c) Surcharges. Borrower hereby waives irrevocably and completely any right of the trustee, estate or others to surcharge the Collateral pursuant to the provisions of Section 506(c) of the Bankruptcy Code.

10.    Limited Subordination. The Liens shall be subordinated to Borrower's chapter 7 fees and expenses up to the maximum amount of $15,000 with respect to the proceeds of any sale of the Collateral by Borrower. Such subordination shall not be effective or valid in the event of foreclosure upon the Collateral by or on behalf of Lenders.

11.    Collateral Defined. "Collateral" means all of the property, assets or interests in property or assets of the Debtor or its estate, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including without limitation all causes of action, accounts, inventory, chattel paper, contract rights, instruments, documents, general intangibles (including all intellectual property, copyrights, deposit accounts, licensing agreements, patents, trademarks and trade names), machinery and equipment, real property, leases, cash, bank accounts and other investment property, together with all proceeds, rents, products and profits of any of the foregoing, all as more fully described and set forth in the Security Agreement, including the following exclusion shall apply: "Collateral" shall not include any claims or causes of action arising from the provisions of Sections 542 through 553 of the Bankruptcy Code (collectively, the "Avoidance Claims"). Any and all Avoidance Claims shall be excluded from the Collateral and preserved unencumbered in the Debtor's bankruptcy estate.

12.    Effect of Due Date. When the Due Date occurs, whether by reason of an Event of Default or otherwise, Lenders shall have a right to seek relief from the automatic stay on shortened notice, with a hearing on such relief to be held with seven (7) business days' notice to Borrower and the United States Trustee. In addition, upon the Due Date, (i) Lenders shall automatically have no further obligation to make advances to Borrower, (ii) any Advances then outstanding shall be immediately due and payable, and (iii) except as restrained, conditioned, affected or stayed by the provisions of Section 362(a) of the Bankruptcy Code or by other

3

provisions of the Bankruptcy Code, or as otherwise provided in this Agreement, Lender shall be permitted to pursue any and all available rights and remedies against Borrower and the Collateral granted as security for the Loan.

13.    Conditions to Advances under the DIP Loan.  All Advances under the Loan are conditioned upon the following:

(a)    Borrower shall obtain entry of an interim order of the Bankruptcy Court no later than May 31, 2018 approving the Loan and the granting of the Liens and Superpriority Claim (the "Loan Order"), in form and substance satisfactory to Lenders.

(b)    Borrower shall obtain entry of a final or interim order of the Bankruptcy Court no later than May 31, 2018 granting the Section 721 Motion, in form and substance satisfactory to Lenders.

(c)    Borrower shall obtain entry of orders of the Bankruptcy Court no later than June 22, 2018 (or such later date as Lenders approve in its sole discretion) approving the Loan and the granting of the DIP Liens and Superpriority Claim on a final basis, pursuant to Sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code, and granting the Section 721 Motion on a final basis if necessary, in form and substance satisfactory to Lenders.

(c)    Each Advance shall be made on a monthly basis (or more frequently at Lenders' discretion) only upon Lenders' receipt of a written request from Borrower (the "Loan Request"), detailed as to specific proposed disbursements and accompanied by written certification by Michael E. Shannon, M.D., that (a) no Event of Default has occurred or, with the passage of time, will occur; (b) the proposed disbursements are in full compliance with the terms of the Budget; and (c) no disbursements have been made at any time with funds from the Advances that are not identified in, and compliant with, the Budget.

(d)    No Event of Default shall have occurred and be continuing, and no Event of Default shall, with the passage of time, occur.

(h)    The Due Date shall not have occurred.

(i)    Execution and delivery of all Loan Documents required by Lenders in connection with this transaction shall have been completed by Borrower.

14.    Binding Effect.  This Agreement shall be binding upon Borrower and Lenders, their respective successors, assigns and heirs, including any subsequent trustee for the Debtor in the Chapter 7 Case, or in reorganization or otherwise, and shall inure to the benefit of Borrower, Lenders and their respective successors, assigns and heirs.  The terms of this Agreement and the balance of the Loan Documents shall be valid and enforceable obligations of Borrower, and all such obligations and the security interests, liens, rights and privileges granted to Lenders shall survive the termination of this Agreement.  If any or all of the provisions of this Agreement are hereafter modified, vacated or stayed by subsequent agreement, such action shall not affect the priority, validity, enforceability or effectiveness of any lien, security interest, priority or claim

4

31413.DOC

agreed to herein with respect to the obligation arising in the Loan Documents incurred by Borrower prior to the effective date of such subsequent agreement.

15. _Reasonableness of Terms_. The terms of this Agreement are fair and reasonable, were negotiated by the parties at arm's length and in good faith, and are the best terms available to Borrower under present market conditions and Borrower's financial circumstances. Any credit extended under the Loan by Lender is extended in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

16. _Representations and Warranties_. It is acknowledged that each party has read this Agreement and has consulted counsel, or knowingly chose not to consult counsel, before executing the same; each party has relied upon their own judgment and/or that of their counsel in executing this Agreement and has not relied on or been induced by any representation, statement or act by any party that is not referred to in this instrument; each party enters into this Agreement voluntarily, with full knowledge of its significance; and the Agreement is in all respects complete and final.

17. _Covenants by Borrower_. Borrower covenants and agrees that:

(a) He shall comply with all laws, rules, regulations and orders applicable to him and the Debtor's assets except as prohibited under the Bankruptcy Code or bankruptcy laws;

(b) He shall not seek or consent to any sale, lease or other disposition of any Collateral that does not provide, upon its effectiveness for full payment to Lenders of the Loan and all applicable interest, charges and fees hereunder, unless permitted in writing by the Lender;

(d) Borrower shall not incur any new, senior indebtedness other than as permitted by the Lender in writing; and

(e) Borrower shall permit Lenders, and their representatives and agents, to have access, during normal business hours and subject to reasonable time, to the books, records, property and premises of the Debtor.

18. _Reporting Covenants_. Unless waived in writing by Lenders, Borrower shall deliver to the Lenders by 5:00 p.m. (PT) on the tenth business day of each month:

(a) Line-by-line variance reports (in form and scope acceptable to the Lenders) by month for the immediately preceding month and on a cumulative basis from the beginning of the Budget period, of actual and forecasted cash disbursements under the Budget on a line-by-line basis. The variance report will include explanations of any variances;

(c) Prompt notice of any breach of covenant or other obligation of Borrower under or in connection with this Loan; and

5

31413.DOC

(d)    Such further reports and information as Lenders may reasonably request from time to time.

19.    Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default which can be declared by Lenders in writing, with a copy to be delivered to Borrower:

(a)    The non-payment of any costs, or any other amount due under the Loan, or the failure to perform as required under the Loan Documents (whether monetary or non-monetary in nature.

(b)    Expenditures beyond authorization under the Budget.

(c)    The entry of any Bankruptcy Court order that materially, adversely affects the Loan or Lenders' rights, remedies, liens, priorities, benefits and protections under any or all of the Bankruptcy Court orders or the Loan.  In the event of a dispute regarding the materiality of the adverse effect of such order, the Bankruptcy Court shall determine the dispute through a motion, and an adversary proceeding will not be required.

(d)    Violation, non-compliance or delinquency of Borrower with respect to any obligation, covenant or representation of Borrower under this Agreement or under any other Loan Document.

20.    Amendment of Agreement.  This Agreement shall not be amended except by a writing signed by all parties.

21.    Applicable Law and Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the internal laws in the State of Nevada without regard to its conflicts of law rules except to the extent superseded by the laws of the United States.  The Bankruptcy Court shall retain jurisdiction over performance of, or disputes arising from or related to, this Agreement.

22.    Entire Agreement.  This Agreement (together with the associated Loan Documents) sets forth the entire agreement between the parties, and there are no other agreements or understandings between them related to this Loan.

23.    Execution by Facsimile Signatures and in Counterparts.  The Parties agree that facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures.  This Agreement may be executed in one or more counterparts, each counterpart to be considered an original portion of this Agreement.

24.    Headings.  Paragraph headings in this Agreement are included herein for convenience of reference only, and shall not constitute a part of this Agreement for any other purpose.

6

31413.DOC

25.    <u>Dismissal of Involuntary Petition</u>.  Following timely entry of orders granting the Section 721 Motion and the Section 364 Motion, in conformity with the terms and conditions of this Agreement, Borrower and Lenders (together with other petitioners, as to whom Lenders will use their best efforts to obtain cooperation) shall stipulate to the dismissal of the involuntary petition filed against the Debtor in the Reno Division of the Bankruptcy Court, *provided* that such dismissal shall be without prejudice to (a) petitioners' right to seek reimbursement of fees and expenses in the Chapter 7 Case pursuant to Section 503(b) of the Bankruptcy Code; or (b) petitioners' right to seek conversion of the Chapter 7 Case to chapter 11 of the Bankruptcy Code.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BORROWER:

LENARD SCHWARTZER, as Trustee of
the chapter 7 estate of Medizone
International, Inc.

LENDER:

EDWIN G. MARSHALL

JILL C. MARSHALL, N.M.D.

31413.DOC

7

EXHIBIT "A" – BUDGET

(in Canadian Dollars)

| ITEM | JUNE | JULY | AUGUST | TOTALS |
|---|---|---|---|---|
| Payroll – D. Simpson | 3,000 | 3,000 | 3,000 | 9,000 |
| Payroll – J. Newton | 2,750 | 2,750 | 2,750 | 8,250 |
| Payroll – P. Uy | 3,500 | 3,500 | 3,500 | 10,500 |
| Payroll – M. MacLaren | 2,500 | 2,500 | 2,500 | 7,500 |
| Payroll – M. Shannon | 20,000 | 20,000 | 20,000 | 60,000 |
| Laboratory Rent | 4,012 | 4,012 | 4,012 | 12,036 |
| Supplies (oxoid, stericycle, Fisher) | 1,660 | 1,660 | 1,660 | 4,980 |
| FDA Materials Comp. Testing | 6,000 | 6,000 | 0 | 12,000 |
| Freight, postage | 500 | 500 | 500 | 1,500 |
| Liability insurance | 500 | 500 | 500 | 1,500 |
| Contingency | 1,000 | 1,000 | 1,000 | 3,000 |
| FDA Testing | 1,500 | 1,500 | 1,500 | 4,500 |
| Travel | 1,500 | 0 | 0 | 1,500 |
| Regulatory Counsel | 5,000 | 0 | 0 | 5,000 |
| Patent annuities | 7,000 | 0 | 0 | 7,000 |
| TOTALS: | 60,422 | 46,922 | 40,922 | 148,266 |

8

## SECURITY AGREEMENT

This Security Agreement ("**Agreement**") dated as of May 17, 2018, is entered into by and between LENARD SCHWARTZER, as trustee ("**Borrower**") of the chapter 7 estate of MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "**Debtor**"), and EDWIN G. MARSHALL and JILL C. MARSHALL, N.M.D., individuals (collectively, "**Secured Party**").

## RECITALS

A.      Borrower and Secured Party have entered into a Loan Agreement dated of even date herewith (the "**Credit Agreement**"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Credit Agreement.

B.      It is a condition to the Secured Party's agreement to advance loans under the Credit Agreement that Borrower grant to Secured Party a perfected security interest in all of its assets (including its real and personal property assets), as security for the payment and performance of all of Borrower's obligations ("**Obligations**") under and as defined in the Credit Agreement and all of the other Loan Documents (as defined in the Credit Agreement).

C.      This Agreement is contingent upon and subject to approval by the Bankruptcy Court of this Agreement and the Credit Agreement, by entry of an order on or before May 31, 2018, in the chapter 7 case of *In re Medizone International, Inc.*, case no. 18-12662.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and conditions herein, the parties hereby agree as follows:

1.      Grant of Security.    Subject to the exclusion set forth in Section 2(b) below, as security for and in further consideration for the obligation of Borrower to pay to Secured Party the Obligations, and as security for Borrower's obligations under this Agreement, Borrower hereby grants to Secured Party a security interest in all present and future right, title and interest of Borrower in or to the following assets of the bankruptcy estate of the Debtor (certain of the capitalized terms in this Section 1 are defined in **Exhibit "A"** hereto):

(a)      all personal property and assets of Borrower, including without limitation, all of Borrower's right, title and interest in and to the following property, whether now owned or hereafter acquired and wherever located: (a) all Accounts; (b) all Deposit Accounts; (c) all Equipment; (d) all Fixtures; (e) all General Intangibles; (f) all Receivables; (g) all Inventory; (h) all Rights to Payment; (i) all Investment Property and securities; (j) all Software; and (k) all other Goods and personal property of Borrower, whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or

1

31428.DOC

acquired by, Borrower and wherever located

       (b)     Any and all choses in action, causes of action, claims and entitlements, now existing or hereafter arising, including Commercial Tort Claims;

       (c)     Any and all claims, rights and interests in any of the above and all substitutions for, additions and accessions to any of the above;

       (d)     Any and all real property interests and improvements, including any and all leasehold interests; and

       (e)     Any and all Proceeds and products of each and all of the above.

2.     The property so described in Section 1 shall be referred to hereafter collectively as the "**Collateral**". With respect to the Collateral:

       (a)     The Collateral secures and will secure Borrower's Obligations.

       (b)     The Collateral shall not include any claims or causes of action arising from the provisions of Sections 542 through 553 of the Bankruptcy Code (collectively, the "**Avoidance Claims**"). Any and all Avoidance Claims shall be excluded from the Collateral and preserved unencumbered in the Debtor's bankruptcy estate.

3.     <u>Perfection of Security Interest</u>. The liens and security interests in the Collateral created herein shall be deemed automatically perfected upon entry of the an order, whether interim or final, approving the Credit Agreement, and Secured Party may, but shall not be required to, file or record any documents or take any further steps in order to perfect such liens and security interests. Borrower agrees to execute and deliver to Secured Party, and hereby authorizes Secured Party to prepare and file, all financing statements, deeds of trust, assignments of rents, notices, account control agreements, and other documents from time to time reasonably requested by Secured Party to maintain a perfected security interest in the Collateral in favor of Secured Party; perform such other acts, and execute and deliver to Secured Party such additional conveyances, assignments, agreements and instruments, as Secured Party may at any time reasonably request in connection with the administration and enforcement of this Agreement or Secured Party's rights, powers and remedies hereunder.

4.     <u>Representations, Warranties and Covenants</u>. Borrower hereby represents, warrants and covenants that, unless compliance is waived by Secured Party in writing:

       (a)     Borrower will notify Secured Party in writing prior to any change in Borrower's place of business, or, if Borrower has or acquires more than one place of business, prior to any change in Borrower's chief executive office, the office or offices where Borrower's books and records concerning the Collateral are kept, or where Borrower's inventory is kept;

31428.DOC

(b)    Borrower will immediately notify Secured Party of any proposed or actual change of Borrower's name, identity, jurisdiction of organization, or corporate structure;

(c)    Borrower will not sell, lease, contract for sale or lease, convey or otherwise dispose of any of the Collateral, absent Secured Party's written consent and an order of the Bankruptcy Court under Section 363(b) of the Bankruptcy Code approving such disposition;

(d)    Borrower will promptly notify Secured Party in writing of any event which affects the value of the Collateral in a material way, the ability of Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against the Collateral, and the entry of any order affecting the Collateral. Upon reasonable prior notice at reasonable times during normal business hours, Borrower hereby authorizes Secured Party's officers, employees, representatives and agents to inspect the Collateral and to discuss the Collateral and the Records relating thereto with Borrower's officers, and, in the case of any Right to Payment, with any Person which is or may be obligated thereon; and

(e)    Borrower will diligently collect all receivables and keep accurate books and records of the receivables and all collections thereof.

5.    Defaults.  Any one or more of the following shall be an "**Event of Default**" hereunder:

(a)    Subject to the notice and cure rights of Borrower under the Credit Agreement, Borrower shall fail to pay any of the Obligations in accordance with their terms;

(b)    There shall be an Event of Default under any Loan Document, including without limitation, the Credit Agreement; or

(c)    Borrower shall materially and adversely breach any term or provision of this Agreement.

6.    Remedies.  Upon the occurrence of an Event of Default, Secured Party may do any one or more of the following, subject to all provisions of the Credit Agreement and the automatic stay of Section 362(a) of the Bankruptcy Code and any other constraints or limitations set forth in other Loan Documents:

(a)    Declare all Obligations to be immediately due and payable;

(b)    Enforce the security interest given hereunder pursuant to the UCC or any other law or court order, and enforce any and all other rights and remedies of Secured Party under the the Credit Agreement, this Agreement or any of the other Loan Documents;

31428.DOC

3

(c)     Require Borrower to assemble the Collateral and the records pertaining to the Collateral and make them available to Secured Party at a place designated by Secured Party;

(d)     Enter any premises of Borrower and take possession of the Collateral and of the records pertaining to the Collateral;

(e)     Grant extensions, compromise claims and sell the Collateral for less than face value;

(f)     Use, in connection with any assembly or disposition of the Collateral, any trademark, trade name, trade style, copyright, patent right or technical process used or utilized by Borrower;

(g)     Proceed in the foreclosure of Secured Party's security interest and sale of the Collateral in any manner permitted by law, any other court order or this Agreement; and

(h)     Sell, lease or otherwise dispose of the Collateral at public or private sale. To the extent permitted by law, Borrower hereby specifically waives all rights of redemption and any rights of stay or appraisal which it has or may have under any applicable law in effect from time to time. Any such public or private sales shall be held at such times and at such place(s) as Secured Party may determine, and may be adjourned or continued from time to time with or without notice. In case of the sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser, but Secured Party shall not incur any liability in case of the failure of such purchaser to pay for the Collateral and, in case of any such failure, such Collateral may be resold. Secured Party may, instead of exercising its power of sale, proceed to enforce its security interest in the Collateral by seeking a judgment or decree of a court of competent jurisdiction.

7.     Additional Covenants. Subject to the automatic stay of Section 362(a) of the Code, Borrower hereby agrees that, in addition to the provisions of Section 6, Secured Party may, in compliance with the Credit Agreement, at any time and its option do any one or more of the following, and Borrower hereby agrees to promptly comply with any of the following:

(a)     Require Borrower to segregate all collections and proceeds of the Collateral so that they are capable of identification, and deliver daily such collections and proceeds to Secured Party in kind;

(b)     Require Borrower to periodically deliver to Secured Party records and schedules which show the status and condition of the Collateral, where it is located and such contracts or other matters which affect the Collateral;

(c)     Verify the Collateral and inspect the books and records of Borrower and make copies thereof or extracts therefrom;

4

31428.DOC

(d)    Require Borrower to obtain Secured Party's prior written consent to any sale, lease, contract of sale or lease, or other disposition of any inventory or of any products, or any other goods covered by any document of title (except for sales of inventory in the ordinary course of business prior to the occurrence of an Event of Default);

(e)    Notify any account Borrowers, any buyers of the Collateral or any other persons of Secured Party's interest in the Collateral and the proceeds thereof;

(f)    Require Borrower to direct all account Borrowers to forward all remittances, payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control; and

8.    <u>Miscellaneous</u>.

(a)    If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.

(b)    All notices, requests, demands, approvals, consents, waivers and other communications required or permitted to be given under this Agreement shall be directed and received as set forth in the Credit Agreement.

(c)    The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

(d)    This Agreement, together with the other Loan Documents, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

(e)    This Agreement may be executed (including by facsimile transmission) with counterpart signature pages or in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

(f)    THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING AS TO VALIDITY, INTERPRETATION AND EFFECT, BY THE INTERNAL LAWS OF THE STATE OF NEVADA WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS RULES THEREOF. EACH OF SECURED PARTY AND BORROWER AGREE THAT ANY AND ALL ACTIONS TO INTERPRET OR ENFORCE THE PROVISIONS OF THIS AGREEMENT AND ANY OTHER DOCUMENTS REFERRED TO IN THIS AGREEMENT SHALL BE BROUGHT IN THE

5

31428.DOC

BANKRUPTCY COURT (AS DEFINED IN THE CREDIT AGREEMENT). EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT, AND IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING FOR THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT OR SUCH OTHER DOCUMENT THAT IT IS NOT SUBJECT THERETO OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SAID COURT OR THAT THE VENUE THEREOF MAY NOT BE APPROPRIATE OR THAT THIS AGREEMENT OR ANY SUCH OTHER DOCUMENT MAY NOT BE ENFORCED IN OR BY SAID COURT. EACH OF BORROWER AND SECURED PARTY HEREBY CONSENTS TO AND GRANTS ANY SUCH COURT JURISDICTION OVER THE PERSON OF SUCH PARTIES AND OVER THE SUBJECT MATTER OF ANY SUCH DISPUTE AND AGREES THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED IN SECTION 8(b), OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF.

(g)     This Agreement shall not be assignable or otherwise transferable by Borrower without the prior written consent of Secured Party.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including any subsequent representative or trustee appointed within the Debtor's bankruptcy case.

(h)     Nothing in this Agreement shall confer any rights upon any person other than the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

(i)     No discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the discharge or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time.  Neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  No amendment or modification of this Agreement shall be effective unless in a writing executed by all the parties hereto.

(j)     Borrower shall, at its cost and expense, upon request of Secured Party, duly execute and deliver, or cause to be duly executed and delivered, such further instruments and do and cause to be done such further acts as may be

6

necessary or proper in the reasonable opinion of Secured Party to carry out more effectively the provisions and purposes of this Agreement and the other Loan Documents.

BORROWER:                                 SECURED PARTY:

_____          _____
LENARD SCHWARTZER, as Trustee             EDWIN G. MARSHALL
of the chapter 7 estate of Medizone
International, Inc.

                                          _____
                                          JILL C. MARSHALL, N.M.D.

7

31428.DOC

Exhibit "A"

Collateral Definitions

"**Collateral**" means, subject to the last sentence of this paragraph, all personal property and assets of the chapter 7 estate of the Debtor, including without limitation, all of Borrower's right, title and interest in and to the following property, whether now owned or hereafter acquired and wherever located: (a) all Accounts; (b) all Deposit Accounts; (c) all Equipment; (d) all Fixtures; (e) all General Intangibles; (f) all Receivables; (g) all Inventory; (h) all Rights to Payment; (i) all Investment Property and securities; (j) all Software; and (k) all other Goods and personal property of Borrower, whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, Borrower and wherever located, including, any and all choses in action, causes of action, claims and entitlements, now existing or hereafter arising, including Commercial Tort Claims; any and all claims, rights and interests in any of the above and all substitutions for, additions and accessions to any of the above; and any and all Proceeds and products of each and all of the above. Notwithstanding anything to the contrary in this paragraph or elsewhere in this Exhibit "A," any and all Avoidance Claims, as defined in Section 2(b) of the above Security Agreement, shall be excluded from the Collateral and preserved unencumbered in the Debtor's bankruptcy estate

Capitalized terms used in the definition of Collateral are defined as follows:

"**Account**" means any "account," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to Borrower (including, without limitation, under any trade name, style or division thereof) whether arising out of goods sold or services rendered by Borrower or from any other transaction, whether or not the same involves the sale of goods or services by Borrower (including, without limitation, any such obligation that may be characterized as an account or contract right under the UCC) and all of Borrower's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, and all of Borrower's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and all monies due or to become due to Borrower under all purchase orders and contracts for the sale of goods or the performance of services or both by Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of Borrower), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any person with respect to any of the foregoing.

8

31428.DOC

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Nevada, Las Vegas, Nevada, or other court of competent jurisdiction.

"**Chattel Paper**" means any "chattel paper," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Commercial Tort Claims**" means any "commercial tort claim," as such term is defined in the UCC, now or hereafter arising or acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Copyright License**" means any written agreement granting any right to use any Copyright or Copyright registration now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Copyrights**" means all of the following now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest: (i) all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof or of any other country; (ii) all registrations, applications and recordings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (iii) all continuations, renewals or extensions thereof; and (iv) any registrations to be issued under any pending applications.

"**Credit Agreement**" is defined in Recital A of this Agreement.

"**Deposit Accounts**" means any "deposit accounts," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Documents**" means any "documents," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Equipment**" means any "equipment," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"**Financial Assets**" has the meaning given it in the UCC.

"**Fixtures**" means any "fixtures," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**General Intangibles**" means any "general intangibles," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest and, in any event, shall include, without

31428.DOC

limitation, all right, title and interest that Borrower may now or hereafter have in or under any contract, interests in partnerships, joint ventures and other business associations, permits, goodwill, claims in or under insurance policies, including unearned premiums, uncertificated securities, money, cash or cash equivalents, deposit, checking and other bank accounts, rights to receive tax refunds and other payments and rights of indemnification.

"**Goods**" means any "goods," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Instruments**" means any "instrument," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Intellectual Property**" means all Copyrights, Trademarks, Patents, Licenses, trade secrets, source codes, customer lists, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, skill, expertise, experience, processes, models, drawings, materials, records and goodwill associated with the foregoing.

"**Inventory**" means any "inventory," as such term is defined in the UCC, wherever located, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest, and, in any event, shall include, without limitation, all inventory, goods and other personal property that are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in Borrower's business, or the processing, packaging, promotion, delivery or shipping of the same, and all finished goods, whether or not the same is in transit or in the constructive, actual or exclusive possession of Borrower or is held by others for Borrower's account, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all such property first may be in the possession or custody of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other Persons.

"**Investment Property**" means any "investment property," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Letter of Credit Rights**" means any "letter of credit rights," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest, including any right to payment under any letter of credit.

"**License**" means any Copyright License, Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by Borrower or in

10

which Borrower now holds or hereafter acquires any interest and any renewals or extensions thereof.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, any lease in the nature of a security interest, and the filing of any financing statement (other than a precautionary financing statement with respect to a lease that is not in the nature of a security interest) under the UCC or comparable law of any jurisdiction.

"**Obligations**" means with respect to each Borrower, all debts, obligations and liabilities of such Borrower to Secured Party arising under the Credit Agreement or hereafter made, incurred or created under, pursuant to or in connection with the Credit Agreement or any other Loan Document (as defined in the Credit Agreement) whether voluntary or involuntary and however arising or evidenced, whether direct or acquired by Secured Party by assignment or succession, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether such Borrower may be liable individually or jointly, or whether recovery upon such debt may be or become barred by any statute of limitations or otherwise unenforceable; and all renewals, extensions and modifications thereof; and all attorneys' fees and costs incurred by Secured Party in connection with the collection and enforcement thereof as provided for in any Loan Document.

"**Patent License**" means any written agreement granting any right with respect to any invention on which a Patent is in existence now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Patents**" means all of the following property now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest: (a) all letters patent of, or rights corresponding thereto in, the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto in, the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, continuations, continuations-in-part or extensions thereof; (c) all petty patents, divisionals, and patents of addition; and (d) all patents to be issued under any such applications.

"**Proceeds**" means "proceeds," as such term is defined in the UCC and, in any event, shall include, without limitation, (a) any and all Accounts, Chattel Paper, Instruments, cash or other forms of money or currency or other proceeds payable to Borrower from time to time in respect of the Collateral, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral, (c) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by

11

any governmental authority (or any Person acting under color of governmental authority), and (d) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Receivables**" means all of Borrower's Accounts, Instruments, Documents, Chattel Paper, Supporting Obligations, and letters of credit and Letter of Credit Rights.

"**Records**" means all Borrower's computer programs, software, hardware, source codes and data processing information, all written documents, books, invoices, ledger sheets, financial information and statements, and all other writings concerning Borrower's business.

"**Rights to Payment**" means all Borrower's accounts, instruments, contract rights, documents, chattel paper and all other rights to payment, including, without limitation, the Accounts, all negotiable certificates of deposit and all rights to payment under any Patent License, any Trademark License, any contract or any commercial or standby letter of credit.

"**Software**" means computer software which is integrated or necessary to the operation or functionality of Equipment.

"**Supporting Obligations**" means any "supporting obligations," as such term is defined in the UCC, now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Trademark License**" means any written agreement granting any right to use any Trademark or Trademark registration now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest.

"**Trademarks**" means all of the following property now owned or hereafter acquired by Borrower or in which Borrower now holds or hereafter acquires any interest: (a) all trademarks, tradenames, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof and (b) reissues, extensions or renewals thereof.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of California; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Secured Party's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of California, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to

12

31428.DOC

such provisions.  Unless otherwise defined herein, terms that are defined in the UCC and
used herein shall have the meanings given to them in the UCC.

31428.DOC

## SECURED PROMISSORY NOTE
### (For Loan Obligations)

$200,000.00

May 17, 2018

For value received, the obligor, LENARD SCHWARTZER, as trustee ("Obligor") of the chapter 7 estate of Medizone International, Inc., a Nevada corporation (the "Debtor"), promises to pay to the order of EDWIN G. MARSHALL and JILL C. MARSHALL, N.M.D., individuals (collectively, "Obligees"), the principal amount of Two Hundred Thousand Dollars ($200,000.00), or such lesser amount as may be owed to Obligees under the terms of the Loan Agreement of even date herewith (the "Loan Agreement") entered into by Obligor and Obligees, upon the following terms (all capitalized terms, unless otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement):

     1.    All principal amounts owing under this Secured Promissory Note shall be due and payable on the Due Date.

     2.    Interest of 10% per annum shall be charged against Advances, calculated on the basis of a 360-day year and actual days elapsed from Borrower's receipt of funds until the date of repayment. Any amount owing under the Loan that is not paid on or before the Due Date shall accrue interest after the Due Date at the rate of fourteen percent (14%) per annum until paid.

     3.    Also payable hereunder on the Due Date are all reasonable attorneys' fees and costs, a one-time loan fee, and all other costs, to the extent identified or described in the Loan Agreement.

     4.    All payments to Obligees shall be paid by check, in lawful money of the United States, in immediately available funds payable to the Obligees.

     5.    This Secured Promissory Note is secured by, and entitled to the benefit of each of the following:

          (a)    a superpriority administrative expense claim for Advances, pursuant to Section 364(c)(1) of the Bankruptcy Code ("Superpriority Claim"); and

          (b)    a fully perfected, first priority security interest in and lien under Section 364(c)(2) of the Bankruptcy Code on all Collateral of the Debtor's estate.

The Liens shall be subordinated to a limited extent to Borrower's chapter 7 fees and expenses, as set forth in Section 10 of the Loan Agreement.

     6.    Reference is made to the Loan Agreement and to that certain Security Agreement of even date herewith (the "Security Agreement"), by and between Obligor and Obligees, each of which grants security interests to Obligees to secure obligations under this Note.

1

31427.DOC

7.      Each payment made by Obligor shall be credited by Obligees first to accrued interest and then to fees, costs, and expenses which may be due Obligees, and then to the outstanding principal balance due under this Secured Promissory Note.

8.      Obligor may at its election prepay without penalty all or any part of the principal and interest due hereunder at any time or from time to time.

9.      All agreements, covenants, conditions, and provisions of the Secured Promissory Note shall be binding upon and inure to the benefit of the successors and assigns of each of the parties hereto.

10.     Obligor hereby waives diligence, presentment, protest, and demand, notice of protest, dishonor, and nonpayment of this Secured Promissory Note, and expressly agrees that, without in any way affecting the liability of Obligor hereunder, Obligees or any holder hereof may extend the time for payment, accept additional security, release any payment due hereunder, release any party liable hereunder, and release any security hereafter securing this Secured Promissory Note. Obligor further waives, to the full extent permitted by law, the right to plead any and all statutes of limitation as a defense to any demand on this Secured Promissory Note.

11.     Each and every right, remedy, and power hereby granted to Obligees or allowed Obligees by law or other agreement shall be cumulative and not exclusive of one over the other, and may be exercised by Obligees from time to time.

12.     Except as expressly set forth herein, Obligees shall not be deemed to have waived any of its rights hereunder or under any other agreement, instrument, or document signed by Obligor or any endorser, unless such waiver is in writing and signed by Obligees.

13.     This Secured Promissory Note can be modified or rescinded only by a writing expressly referring to the Secured Promissory Note and signed by both Obligor and Obligees.

14.     No provision of this Secured Promissory Note or any other agreement between Obligees and Obligor shall alter or impair the obligation of Obligor, which is absolute and unconditional, to pay the principal of and any accrued interest on this Secured Promissory Note, at the place, at the respective times, and in the currency herein prescribed, unless such agreement is set forth in writing and signed by Obligees.

15.     Every provision of this Secured Promissory Note is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16.     If an action is instituted on this Secured Promissory Note for collection, Obligor promises to pay all costs of enforcement and collection, including, but not limited to, reasonable attorneys' fees, as well as all other costs and expenses incurred by the holder in the enforcement of its rights under this Secured Promissory Note, whether such

2

31427.DOC

enforcement and collection includes the filing of a lawsuit.

17.    This Secured Promissory Note shall be construed and enforced in accordance with, and governed by, the laws of the State of Nevada. The Bankruptcy Court shall retain jurisdiction over performance of, or disputes arising from or related to, this Agreement.

IN WITNESS WHEREOF, Obligor has executed this Secured Promissory Note as of the day and year set forth above.

LENARD SCHWARTZER, as Trustee of the Chapter 7
Estate of Medizone International, Inc.

3

31427.DOC