1  Jason A. Imes, Esq., NV Bar No. 7030
   Schwartzer & McPherson Law Firm
2  2850 South Jones Blvd., Suite 1
   Las Vegas NV 89146-5308
3  Telephone:    (702) 228-7590
   Facsimile:    (702) 892-0122
4  E-Mail:       bkfilings@s-mlaw.com
   *Attorneys for Lenard E. Schwartzer, Trustee*
5

6              **UNITED STATES BANKRUPTCY COURT**

7                    **DISTRICT OF NEVADA**

8  In re:                                  Case No. BK-S-18-12662-LEB

9  MEDIZONE INTERNATIONAL, INC.,           Chapter 7

10                              Debtor.
                                           **MOTION FOR APPROVAL OF**
11                                         **BID PROCEDURES AND TO APPROVE**
                                           **SALE OF ESTATE PROPERTY**
12                                         **FREE AND CLEAR OF ANY INTEREST**

13                                         Hearing Date:    (OST Pending)
                                           Hearing Time:    (OST Pending)
14

15         LENARD E. SCHWARTZER (the "Trustee"), Chapter 7 Trustee for the above-captioned

16  bankruptcy case, by and through his counsel, Schwartzer & McPherson Law Firm, hereby files

17  this *Motion For Approval of Bid Procedures to Approve Sale of Estate Property Free and Clear of*

18  *Any Interest* (the "Motion") pursuant to 11 U.S.C. §363.

19         The Trustee seeks to sell substantially all of the assets of the bankruptcy estate, including

20  but not limited to inventory, intellectual property, personal property, and goodwill,  pursuant to 11

21  U.S.C. §363 and the terms set forth with more particularity in the *Purchase and Sale Agreement*

22  attached to this Motion as **Exhibit "1."**  The assets will be sold "as is," without warranty, and free

23  and clear of any liens, claims or encumbrances, and the sale expressly excludes any avoidance and

24  recovery claims the Trustee may pursue pursuant to Chapter 5 of the Bankruptcy Code.  The

25  proposed buyers, EDWIN G. MARSHALL and JILL C. MARSHALL, N.M.D (collectively the

26  "Marshalls" or "Buyers") have offered to pay the Trustee $500,000.00 cash upon closing to

27  purchase the assets, **subject to overbids**.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

The Trustee therefore requests that the Court approve bid procedures and set a separate hearing on August 7, 2018, at 2:30 p.m. to conduct the auction, to confirm the results of the auction, and for final approval of the sale.  In general terms, the Trustee proposes that a party may qualify to overbid with a cash good faith deposit of no less than $100,000.00, that any overbid must be a minimum of $575,000.00, that further overbids must be in incremental increases of no less than $35,000, that the Marshalls will be entitled to match any overbid, and a breakup fee of $35,000 will paid to the Marshalls from the sales proceeds in the event of a successful overbid.  If the Marshalls are not the successful bidder, then any sales proceeds will be used by the Trustee to first satisfy the secured post-petition loan extended by the Marshalls to the Trustee for the temporary operation of the business.  *See* [ECF No. 53].

The Trustee recommends selling the assets pursuant to the proposed terms **or for such higher qualified bid as the Trustee may receive pursuant to the proposed bid procedures.** The Motion is based upon the attached points and authorities, the pleadings and papers on file herein, the *Declaration of Lenard E. Schwartzer* (the "Schwartzer Declaration") filed concurrently with this Motion, and any oral argument that may be heard on this Motion.

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

**A.    Case History and Proposed Sale Terms**

1.      On April 18, 2018, creditors Edwin G. Marshall and Dr. Jill C. Marshall (collectively, the "Marshalls"), and creditors Ushio America, Inc. and Engineering CPR, Inc. (together with the Marshalls, the "Petitioning Creditors"), filed an involuntary petition under Chapter 11 the Bankruptcy Code against Debtor MEDIZONE INTERNATIONAL, INC. (the "Debtor") in Reno, Nevada, thereby commencing bankruptcy case number 18-50412-GWZ (the "Involuntary Chapter 11 Case").

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

2.    On May 8, 2018, the Debtor filed its petition pursuant to Chapter 7 of the Bankruptcy Code in Las Vegas, Nevada, and Trustee Schwartzer was appointed to administer the Chapter 7 estate.

3.    The Trustee has been granted authorization to operate the business for approximately 90 days from June 1, 2018 through August 31, 2018 [ECF No. 36], and has been authorized to borrow up to $200,000.00 from the Marshalls to fund said operation [ECF No. 40].

4.    The Debtor is a publicly traded company and as noted in its most recent Form 10-K annual report filed March 20, 2018, with the United States Securities and Exchange Commission, the Debtor is a global provider of disinfection solutions and invented the AsepticSure® system of disinfecting non-porous surfaces in numerous settings, including hospitals, other healthcare facilities and non-hospital/healthcare facilities, utilizing a hydrogen peroxide vapor and ozone in a patented process.

5.    The Trustee has been contacted by the Marshalls based on their interest in purchasing substantially all of the assets of the bankruptcy estate.  The terms of the sale are set forth with more particularity in the *Purchase and Sale Agreement* (the "Sale Agreement") attached to this Motion as **Exhibit "1."**  The assets to be sold include all assets used for the operation of Debtor's business, including but not limited to the intellectual property, real property, fixtures, tangible and intangible personal property, inventory, goodwill, and other assets of the business (the "Assets").  An inventory list and schedule of trademarks and patents provided by the Debtor in its schedules [ECF No. 1] is attached as **Exhibit "2."**[1] *See* Schwartzer Declaration.

6.    The Trustee is not, however, selling or transferring any avoidance claims or causes of action arising from the provisions of Sections 542 through 553 of the Bankruptcy Code (collectively, the "Avoidance Claims").  Any and all Avoidance Claims are excluded from the Assets to be sold and will be retained by the Trustee.  *See* Schwartzer Declaration.

---

[1] To the extent any discrepancy exists between such list and schedules, on the one hand, and the definition of "Assets" in the Sale Agreement, on the other hand, the Sale Agreement definition shall control.

7. The proposed purchase price is $500,000.00 cash, **subject to higher bid.** The Trustee is selling these assets "as is," "where is," and without warranty of title except to warrant that the Trustee has not previously disposed of the bankruptcy estate's interest in the Assets.

8. The Trustee is not aware of any secured claims against the Debtor's assets, and none have been disclosed in Debtor's schedules [ECF No. 1], except for the post-petition operational loan from the Marshalls to the Trustee, not to exceed $200,000.00, that is secured by a super-priority claim and senior-most lien on the Assets [ECF No. 53]. *See* Schwartzer Declaration.

**B.    Proposed Overbid Procedure**

9. The Trustee believes that the proposed sale terms are fair and reasonable, but recommends accepting higher qualified bids (with all terms other than the purchase price remaining the same) pursuant to the following bidding procedures (the "Bid Procedures"):

a. Any overbid incorporates all other terms of the Purchase Agreement (except as to purchase price), including without limitation the absence of any financing or due diligence contingency;

b. Any overbid must be accompanied by a good-faith cash deposit in an amount no less than $100,000.00, delivered to the Trustee by certified funds no less than three (3) business days prior to the auction; and

c. Any overbid must offer a cash purchase price that is at least $575,000.00, and is at least $35,000 greater than any preceding overbid accepted by Trustee; and

d. The Marshalls have the right to match any overbid accepted by the Trustee as to purchase price, upon the same terms as the Purchase Agreement in all other respects, in which event the Marshalls shall become the accepted bidder, subject to further overbids; and

e. In the event that the Assets are sold to a purchaser other than the Marshalls, the Trustee shall pay the Marshalls a breakup fee in the amount of $35,000.00, at the close of such sale from the sales proceeds; and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

f.    The Trustee shall obtain Bankruptcy Court approval of an overbid/auction process that includes each of the foregoing terms, including without limitation the Marshalls' right to the breakup fee, prior to such overbids and auction occurring.

g.    In the event any party intends to overbid, the Trustee proposes that said auction be conducted in open court and under the supervision of the Bankruptcy Court, and that the second highest bidder, if consenting, be designated as the backup bidder.

*See* Schwartzer Declaration, and Agreement, ¶9.1, attached as **Exhibit "1."**

10.    Toward that end, the Trustee requests that this Court also set a separate hearing (the "Sale Hearing") no less than fourteen (14) days after oral approval of the proposed terms and bid procedures set forth in this Motion for the purpose of conducting the auction, to confirm the results, and for final approval of the sale.

**C.    Best Interest of the Estate and Creditors**

11.    The Trustee believes the proposed sale of the Assets on these terms is justified, and in his business judgment he has concluded the proposed sale is the most beneficial to the estate. *See* Schwartzer Declaration.

12.    All negotiations between the Trustee and the Marshalls have been made in good faith and there are no side agreements.  The Trustee believes that the sale price and other terms for the sale of the Assets represent the best terms available for the sale of the Assets, but the Court should still take higher qualifying bids pursuant to the proposed Bid Procedure.  *See* Schwartzer Declaration.

13.    The Trustee will file a Report of Sale with this Court when the proposed sale to the Buyer, or a higher qualified bidder, is completed.  No further confirmation of sale will be sought. *See* Schwartzer Declaration.

/ / /

/ / /

/ / /

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

### III.   MEMORANDUM OF LAW

**A.    Trustee's Duty to Reduce Assets to Money - 11 U.S.C. §704**

Pursuant to 11 U.S.C. § 704(1), a trustee "shall collect and reduce to money the property of the estate for which such trustee serves . . . ." "In principle, a trustee should liquidate estate assets only if the estate will benefit from the liquidation.  In so doing, the trustee should select the method of liquidation that is most beneficial to the estate." Yadkin Valley Bank & Trust Co. v. Northwestern Bank (In re Hutchinson), 132 B.R. 827, 831 (Bankr. M.D.N.C. 1991).

The Trustee requests approval to sell the Assets "as is" and without warranty, free and clear of liens, interests, encumbrances, and claims at auction to the Marshalls or to any other higher and better bidder as set forth herein.

**B.    Business Justification and Procedure for Sale of Assets - 11 U.S.C. § 363(b)**

Pursuant to 11 U.S.C. § 363(b)(1), "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ."  The Bankruptcy Code permits the sale of estate property outside the ordinary course after notice and a hearing, provided the trustee can demonstrate a "business justification" for the sale.  See In re 240 North Brand Partners, Ltd., 200 B.R. 653, 659 (9th Cir. BAP 1996); 11 U.S.C. §363(b)(1).

    1.    Business Justification

The proposed sale of the Assets, will allow the speedy liquidation of Debtor's estate at the maximum price, and the Trustee believes at the best purchase price obtainable.  The bankruptcy estate is not in a position to continue to operate Debtor's business but the inventory and other assets still have value to other parties (albeit diminishing), and that value may be monetized for the benefit of creditors.  The Trustee has undertaken extensive discussions with interested parties and interested buyers and he has concluded that the proposed sale of the Assets as proposed herein provides the best opportunity for a recovery by creditors.  If a sale is not approved, the Trustee anticipates liquidation of the Debtor's assets will result in substantially less benefit. *See* Schwartzer Declaration.

    2.    Notice of the Sale

Notice of this proposed sale of the Assets will be served in accordance with Fed.R. Bankr.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

P. 6004(a) on any parties/persons who have requested notice, and any parties known to the Trustee that have expressed an interest in purchasing the Assets.

       3.    Bid Procedures

The Trustee has determined that the adoption of the Bid Procedures will provide interested parties with the opportunity to present bids for the Assets and will facilitate the solicitation, submission and evaluation of qualified bids for the Assets by the Trustee and the Court. The Bid Procedures have been designed to maximize the value of the sale for the estate and creditors. The Bid Procedures expressly state the amount of initial overbid (no less than $575,000.00) and minimum bid increments ($35,000.00), and the method and deadlines for interested parties to timely qualify to bid. The terms are intended to maximize the purchase price for the estate and balanced to avoid chilling the bids.

       4.    Sale Hearing, Stalking Horse and Breakup Fee

The Trustee requests that the Court schedule a separate hearing (the "Sale Hearing") no less than fourteen (14) days from oral approval of this Motion to conduct the auction, to confirm the results of the auction, and for final approval of the sale.

The Trustee proposes that the Marshalls be the stalking horse bidder for the sale of the Assets. As set forth in the bid procedures and the attached Purchase Agreement, in the event the Marshalls are not the winning bidder the Marshalls will be paid a break-up fee of $35,000.00 (7% of the stalking horse purchase price). This breakup fee was negotiated by the Trustee and the Marshalls and reflects the reasonable expense and risk incurred by the Marshalls taking the lead in connection with the proposed sale. The Trustee believes this condition is an appropriate term of the proposed sale and will not chill bidding. *See* Schwartzer Declaration.

**C.    Sale of Assets Free and Clear of Liens and Encumbrances - 11 U.S.C. § 363(f)**

Once the Court determines that a valid business justification exists for the sale, the Court must determine whether such a sale can be made free and clear of existing liens, security interests, encumbrances, and claims. Section 363(f) of the Code governs the sale of property of the estate free and clear of liens and provides, in pertinent part, the following:

(f)   The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate only if –

    (1)   Applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    (2)   Such entity consents;

    (3)   Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)   Such interest is in bona fide dispute; or

    (5)   Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell the property free and clear of liens. See e.g., Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.), 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984).

The Assets are not subject to any known secured claims except for the loan extended post-petition by the Marshalls for temporary operation of the business [ECF No. 54]. The Trustee has no objection to the Marshall's secured claim, and more importantly the Marshalls fully support and consent to the proposed sale. See Schwartzer Declaration.

If no secured creditor or other alleged secured creditor, lien holder, or encumbrance holder receiving notice of this Motion files a written objection to this Motion, such parties should be deemed to have consented to the sale of the Assets. See In re Metropolitan Mortgage & Secs. Co., 2007 WL 2277573 at *4 (Bankr. E.D. Wash 2007); In re Congoleum Corp., 2007 WL 142844 at *1 (Bankr. D.N.J. 2007); Citicorp Homeowners Servs., Inv. v. Elliot (In re Elliot), 94 B.R. 345 (E.D. Pa. 1988). The only known secured creditors (the Marshalls) support and consent to the proposed sale, so pursuant to Section 363(f)(2) the Trustee may sell the Assets free and clear of any creditor's liens, encumbrances, or interests and the only known secured claim (the Marshalls' post-petition operating loan to the estate [ECF No. 53]) will be paid from the proceeds.

/ / /

/ / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**D.    Court Should Find Offer is in Good Faith for Purposes of § 363(m)**

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." In re Abbotts Diaries, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986;  In re 240 North Brand Partners, Ltd., 200 B.R. 653, 659 (9th Cir. BAP 1996). "'Good faith' encompasses fair value, and further speaks to the integrity of the transaction. Typical 'bad faith' or misconduct would include collusion between the seller and buyer, or any attempt to take unfair advantage of other potential purchasers." In re 240 North Brand Partners, Ltd., 200 B.R. at 659 (quoting Wilde Horse Enters., Inc., 136 B.R. at 842); see also Ewell v. Diebert (In re Ewell), 958 F.2d 276, 280 (9th Cir. 1992); Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985) ("[t]ypically, lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

The purpose of such a finding is to facilitate the operation of 11 U.S.C. § 363(m), which provides a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith." Specifically, Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this Section of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m); see Ewell v. Diebert (In re Ewell), 958 F.2d 276, 280 (9th Cir. 1992); Irvin v. Lincoln Heritage Life Ins. Co. (In re Irvin), 950 F.2d 1318, 1323 (7th Cir. 1991).

This provision serves the important purposes both of encouraging good faith transactions and of preserving the finality of the bankruptcy court's orders unless stayed pending appeal. In re Abbotts Dairies, Inc., 788 F.2d at 147; Hoese Corp. v. Vetter, 724 F.2d 52, 55 (7th Cir. 1992).

The Trustee is seeking to sell the Assets to the Marshalls and/or their assigns as set forth in the Offer, **or to any bidder for a higher and better amount subject to the terms set forth herein**. The Trustee believes that the sale price and other terms for the sale of the Assets represent

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 - Fax: (702) 892-0122

1    the best terms available for the required immediate sale of the Assets.

2         Edwin G. Marshall was former Chairman and Chief Executive Officer for more than a

3    decade, and Mrs. Marshall was the former Director of Operations for the company, and both

4    became creditors following their separation from the company.  Neither of the Marshalls,

5    however, has been a director or officer of the company, or involved in any respect in the

6    management or operation of the company, for more than 18 months.

7         Even if the Marshalls were considered to be insiders, however, such status would not

8    disqualify them as good faith purchasers in this situation because the Trustee proposes to offer the

9    Assets for sale by auction pursuant to the Bid Procedures which will allow other potential

10   interested parties to come forward and bid.  The Trustee is presenting the Marshalls' offer with

11   appropriate notice and the purchase terms will be tested in this Court since the sale will be subject

12   to overbid by any party pursuant to the Bid Procedures.  *See* Schwartzer Declaration.

13        Negotiations have been at all times conducted at arms' length and in good faith, and there

14   are no side agreements, arrangements, or understandings between the Trustee and the Marshalls or

15   any other parties except as disclosed in this Motion, and no consideration is being paid for the

16   Assets or in connection with the proposed sale other than as set forth in this Motion, so the Trustee

17   believes the terms of the sale accomplish the appropriate objectives.  *See* Schwartzer Declaration.

18        If the Court approves the purchase of the Assets as requested herein, there is no reason

19   why it should not also invoke §363(m) to protect the good faith actions of the parties from further

20   delay and prejudice in the event this Court's order were appealed without a stay.

21   **E.    Request for Immediate Relief and Waiver of Stay**

22        The Trustee requests that any stay of effectiveness of the order approving this Motion be

23   waived.  Pursuant to Fed.R. Bankr. P. 6004(h), "[a]n order authorizing the use, sale, or lease of

24   property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

25   unless the court orders otherwise."  Fed.R. Bankr. P. 6006(d) provides that "[a]n order authorizing

26   the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the

27   expiration of 14 days after the entry of the order, unless the court orders otherwise."

28

1    It is imperative that an order approving this Motion be effective immediately upon

2    confirmation of the sale by auction because the value of the inventory is diminishing and the

3    proposed sale may otherwise be lost. *See* Schwartzer Declaration.  The Trustee submits that ample

4    cause exists to justify a waiver of the fourteen (14) day stay imposed by Fed.R. Bankr. P. 6004(h)

5    and 6006(d).

6    ### IV.  CONCLUSION

7    Based upon the foregoing, the Trustee respectfully requests that the Court:

8    1.    Enter an Order approving the Sale Agreement, subject to overbids, and approving

9    the form and manner of the BID PROCEDURES (the "Bid Procedures Order")

10    including bidder qualification, overbid increments, and breakup fee, in the form

11    attached to this Motion as **Exhibit "2"**; and

12    2.    Set a SALE HEARING pursuant to the Bid Procedures Order for **August 7, 2018**

13    **at 2:30 p.m.** for the purpose of conducting the proposed auction in open court and

14    under the supervision of the Bankruptcy Court, to confirm the results of said

15    auction, for final approval of the sale free and clear of all liens, encumbrances,

16    interests and claims, to determine if the sale has been conducted in good faith for

17    purposes of 11 U.S.C. §363(m), and to consider waiving any stay of the final sale

18    order pursuant to Fed.R.Bankr.P. 6004; and

19    3.    For such other relief as the Court may grant.

20    Pursuant to Local Rule 9021, a proposed form of Bid Procedures Order is attached to this

21    Motion as **Exhibit "3."**

22    Dated: June 29, 2018.

23

24

25    Jason A. Imes, Esq.
     Schwartzer & McPherson Law Firm
26    2850 S. Jones, Blvd., Suite 1
     Las Vegas, NV 89146
27    *Counsel for Lenard E. Schwartzer, Trustee*

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of May 17, 2018 by and between LENARD SCHWARTZER, as trustee ("Seller") of the chapter 7 estate of MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "Debtor"), and EDWIN G. MARSHALL and JILL C. MARSHALL, N.M.D., individuals (collectively, the "Marshalls," and together with their nominees or assignees, "Buyer"), based upon the following:

## RECITALS

A.     Seller is the trustee of the chapter 7 estate of the Debtor (the "Estate"), in the chapter 7 case of *In re Medizone International, Inc.*, Case No. 18-12662 (the "Chapter 7 Case"), pending before the United States Bankruptcy Court for the District of Nevada, Las Vegas Division (the "Bankruptcy Court"). The Chapter 7 Case was commenced by the Debtor's filing of a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") on May 8, 2018 ("Petition Date").

B.     Prior to the Petition Date, the Debtor was engaged in business, primarily in a laboratory located at Medizone International Laboratories, Innovation Park, 245 Princess Street, Kingston, Ontario, Canada K7L 3N6 (the "Laboratory"), in which the Debtor developed disinfection solutions for use in hospitals, other healthcare facilities and other institutions (the "Business"). In particular, without limiting the foregoing, within the Business is a patented disinfection system named AsepticSure®, which utilizes hydrogen peroxide vapor and ozone in a process that achieves dramatic reductions of bacterial and viral pathogens.

C.     Edwin and Jill Marshall, N.M.D., are the former Chairman/C.E.O. and Director of Operations, respectively, of the Debtor. The Marshalls retired from those positions in February 2017, and entered into separation agreements with the Debtor pursuant to which the Debtor modified existing unsecured promissory notes owing to the Marshalls in an aggregate amount in excess of $1,500,000, to require monthly payments. The notes are in substantial default, for lack of monthly payments owed to the Marshalls in 2017 and 2018.

D.     Following the Marshalls' retirement, new management was hired by the Debtor: David A. Esposito became the Chairman, and David A. Dodd became the C.E.O.

E.     As of the Petition Date, the president of the Debtor was Dr. Michael E. Shannon ("Dr. Shannon"). Dr. Shannon had been employed by the Debtor since 2002 and was also the company's Chief Scientific Officer and its Director of Medical Affairs.

F.     On April 18, 2018, prior to the Petition Date, the Marshalls filed an involuntary chapter 11 petition (the "Involuntary Petition") against the Debtor, in the Reno Division of the Bankruptcy Court. The Debtor answered the Involuntary Petition, contesting material allegations. Buyer and Seller (collectively, the "Parties") anticipate jointly stipulating to the dismissal of the Involuntary Petition, upon mutually agreeable terms, in deference to the

1

31429.DOC

pendency of the Chapter 7 Case.

G.    Seller intends to request authority of the Bankruptcy Court to operate the Business, on a limited basis and for a limited period of time, pursuant to Section 721 of the Bankruptcy Code (the "Section 721 Motion").

H.    The Marshalls have agreed to lend to Seller, on a secured basis, funds sufficient for such limited operations of the Business, under certain terms and conditions, as set forth in a Loan Agreement and related documents (the "Loan"), and Seller intends to request authority of the Bankruptcy Court to borrow the Loan from the Marshalls pursuant to Section 364 of the Bankruptcy Code (the "Section 364 Motion").

I.    Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the assets of the Business, including the intellectual property, real property, fixtures, tangible and intangible personal property, inventory, goodwill, executory contracts (to the extent approved by Buyer as set forth below) and other assets of the Business, on the terms and conditions set forth in this Agreement.

J.    Buyer also desires to consider proposing a plan of reorganization in place of the sale contemplated in this Agreement, and Seller has agreed to terms, as described in this Agreement, that will allow Buyer a limited period of time to determine whether to pursue chapter 11 reorganization prior to any efforts by Seller to advance the sale or overbid process set forth in this Agreement.

K.    NOW, THEREFORE, in consideration of the mutual covenants, representations, and warranties contained in this Agreement, the Parties agree as follows:

1.    **ARTICLE 1. PURCHASE AND SALE OF ASSETS**

1.1    Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, at Closing (as defined below), all of Seller's right, title, and interest in and to all of the assets used by Debtor in connection with the operation of the Business (the "Assets"), including, without limitation, the following:

(a)    All tangible personal property, furnishings, fixtures, equipment, machinery, parts, accessories, inventory, including without limitation any and all personal property presently located or used in the Laboratory (the "Personal Property");

(b)    All contracts, agreements, equipment leases, warranties, and other rights or agreements, whether written or oral, and all executory contracts (as that term is used in Section 365 of the Bankruptcy Code) to which the Debtor is a party, but only to the extent approved by Buyer in a writing delivered to Seller no later than June 30, 2018 (the "Assumed Contracts");

(c)    All real estate leases to which the Debtor is a party, but only to the extent approved by Buyer in a writing delivered to Seller no later than June 30, 2018, together with all of Debtor's interest in any security deposits, prepaid rent, leasehold improvements, and appurtenances to the leased property (the "Real Property Leases");

2

31429.DOC

(d)    All of Seller's or Debtor's right, title, and interest in and to the trade names, logos, copyrights, service marks, trademarks, patents, patent applications, licenses, and goodwill associated with the Business, including without limitation those listed on Schedule 1.1(d) attached hereto (the "Intangible Property"); and

(e)    All of Debtor's books and records, accounting records and other financial or transactional documents, to the extent available to Seller with reasonable effort (the "Records").

1.2    Seller shall convey title to the Assets to Buyer free and clear of all liens, security interests, and encumbrances of any kind or nature.

1.3    Seller assumes all risk of loss or damage to the Assets prior to the Closing. In the event there is any material loss or damage to all or any portion of the Assets prior to the Closing, Buyer may either terminate this Agreement pursuant to Article 13, or negotiate with Seller for a proportionate reduction in the Purchase Price to reflect the loss or damage. For the purposes of this provision, the term "material loss or damage" shall mean any loss or damage to the Assets with an aggregate cost of $5,000.00.

## 2.    ARTICLE 2. ASSUMPTION OF LIABILITIES

2.1    Effective as of the Closing Date (as defined below), Buyer shall assume responsibility for the performance and satisfaction of all of the executory obligations and liabilities of Debtor under the Assumed Contracts (the "Assumed Liabilities").

2.2    Except as expressly provided in this Agreement, Buyer shall not assume or become liable for any obligations, commitments, or liabilities of Seller or Debtor, whether known or unknown, absolute, contingent, or otherwise, and whether or not related to the Assets, including, without limitation, any employment, business, sales, or use tax relating to Seller's or Debtor's operation of the Business and use and ownership of the Assets prior to the Closing.

## 3.    ARTICLE 3. PURCHASE PRICE

3.1    The purchase price to be paid by Buyer to Seller for the Assets (the "Purchase Price") shall be $500,000.00.

3.2    Buyer shall pay the Purchase Price to Seller at Closing in cash or immediately available funds, less the full amount of all principal, interest, fees and other charges owing as of the Closing under the Loan, which shall be deducted from the Purchase Price.

3.3    The Purchase Price shall be allocated among the Assets as designated in writing by Buyer within sixty (60) days following the Closing. The Parties agree to be bound by Buyer's allocation and to report these items for federal income tax purposes as allocated. The parties agree to execute and deliver Internal Revenue Service Form 8594 reflecting this allocation.

3.4    The parties agree to abide by the allocation of the Purchase Price specified in this Agreement, and agree to report the transaction as so allocated for income tax purposes.

3

4.    **ARTICLE 4. CLOSING**

4.1    The closing for the purchase and sale of the Assets (the "Closing") shall be held at the office of Seller, located at 2850 S. Jones Blvd., Suite 1, Las Vegas, Nevada 89146, on a date mutually agreed upon as soon as practicable following satisfaction of all conditions precedent to the Closing, or at such other time and place as the Parties may mutually agree in writing (the "Closing Date"). At Closing, Seller shall transfer and convey title to the Assets to Buyer as provided in this Agreement, free and clear of all liens, security interests and other encumbrances of any kind.

4.2    At the Closing, Seller shall execute, acknowledge, and deliver, as appropriate, each of the following items:

(a)    A duly executed bill of sale (the "Bill of Sale"), in form and substance acceptable to Buyer, conveying all of Seller's and Debtor's right, title, and interest in and to the Personal Property to Buyer.

(b)    A duly executed assignment of the Assumed Contracts (the "Assignment of Contracts"), in form and substance acceptable to Buyer, pursuant to which Seller shall assign to Buyer all of Seller's and Debtor's right, title and interest in and to the Assumed Contracts.

(c)    A duly executed assignment of leases (the "Assignment of Leases"), in form and substance acceptable to Buyer, pursuant to which Seller shall assign to Buyer all of Seller's and Debtor's right, title, and interest in and to the Real Property Leases.

(d)    A duly executed assignment of intangible property (the "Assignment of Intangible Property") in form and substance acceptable to Buyer,, assigning all of Seller's and Debtor's right, title, and interest in the Intangible Property to Buyer.

(e)    All other deeds, bills of sale, motor vehicle titles, warranty deeds, assignments, endorsements, licenses, and other good and sufficient instruments and documents of conveyance and transfer as shall be necessary and effective to transfer, convey, and assign to Buyer at the Closing all of Seller's and Debtor's right, title, and interest in and to the Assets, free and clear of any liens or encumbrances, as required by the terms of this Agreement.

4.3    At the Closing, Buyer shall execute, acknowledge, and deliver, as appropriate, each of the following items:

(a)    The amount of the Purchase Price, less the full amount of all principal, interest, fees and other charges owing as of the Closing under the Loan, in cash or immediately available funds, together with any funds as may be necessary to comply with Buyer's obligations regarding the payment of prorations, costs, and expenses under this Agreement.

(b)    Executed counterparts of any documents required to be signed by Buyer pursuant to this Agreement, including, but not limited to, the Assignment of Contracts and Assignment of Leases.

4.4    The expenses of Closing shall be paid as follows:

4

31429.DOC

    (a)    Buyer shall pay all sales and use taxes arising out of the transfer of the Assets, if any.

    (b)    Except as otherwise expressly provided in this Agreement, all other Closing fees and costs, including, but not limited to, legal fees, accounting fees, consulting fees, and other incidental expenses in connection with the transactions contemplated by this Agreement shall be borne by the party that incurs the expenses.

    (c)    Except as otherwise expressly provided in this Agreement, all expenses associated with the Assets being conveyed to Buyer, including, but not limited to, taxes, rent, insurance premiums, and utility charges, shall be apportioned ratably between the parties as of the Closing Date on the basis of a 30-day month. This obligation to make apportionments shall survive the Closing.

5.    **ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF SELLER**

    5.1    Seller makes the following representations and warranties to Buyer, each of which is true and correct as of the date of this Agreement, and will be true and correct as of the Closing Date:

    (a)    Seller is the duly appointed and qualified trustee of the Debtor's Estate, and has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms, subject to Bankruptcy Court approval as set forth elsewhere in this Agreement.

    (b)    The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Debtor is a party, or any law, judgment, or order of which Seller is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

    (c)    There are no actions, suits, proceedings, or claims now pending, or, to the best of Seller's knowledge, threatened against Seller or the Assets that would affect Seller's ability to fulfill its obligations under this Agreement or that would impair the value of the Assets.

    (d)    No representation or warranty of Seller in this Agreement or any other information furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, and other information provided by Seller to Buyer shall be true and correct on and as of the Closing Date as though made on that date.

    (e)    Seller will not begin any efforts to obtain approval or implementation of any sale or overbid process with respect to the Assets, including without limitation the filing of any motion for approval of any of the transactions contemplated herein, until July 1, 2018 at the earliest. Seller understands and approves that until June 1, 2018, Buyer will devote substantial time and effort to determining whether conversion of the Chapter 7 Case to chapter 11 of the Bankruptcy Code (with Seller remaining in place as trustee) is preferred, in which event Buyer may move the Bankruptcy Court for such conversion and will recommend and support the

31429.DOC

appointment of Lenard E. Schwartzer as Chapter 11 Trustee for the estate.  If such motion is pursued by Buyer, Seller's right to support or oppose conversion shall be preserved.  Seller further understands and approves that at any time prior to the Closing Date, Buyer may contact and solicit third persons, including without limitation shareholders, vendors, creditors or business partners to determine whether any of those parties wish to provide funding either for Buyer's obligations hereunder or for a reorganization plan in a converted chapter 11 plan, and Seller agrees that such communications and solicitations shall not constitute collusion, bid-rigging or any other improper conduct, *provided* that Buyer shall cease any communication with any party upon written notice from Seller that such party has contacted Seller directly to express an interest in purchasing the Assets independently of Buyer.

(f)        Seller shall conduct an overbid/auction process with respect to the Assets only in strict conformity with the provisions of Article 9 below.

6.        **ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF BUYER**

6.1        Buyer makes the following representations and warranties to Seller, each of which is true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date:

(a)        Buyer has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms.

(b)        The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Buyer is a party, or any law, judgment, or order of which Buyer is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

(c)        There is no action, proceeding, or claim pending, or, to Buyer's knowledge, threatened, against Buyer that would affect Buyer's ability to consummate the transactions contemplated by this Agreement.

(d)        No representation or warranty of Seller in this Agreement or any other information furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, and other information provided by Seller to Buyer shall be true and correct on and as of the Closing Date as though made on that date.

(e)        No representation or warranty of Buyer in this Agreement or any other information furnished by Buyer pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, exhibits, and other information provided by Buyer to Seller shall be true and correct on and as of the Closing Date as though made on that date.

6

31429.DOC

7.    **ARTICLE 7. SELLER'S PRE-CLOSING OBLIGATIONS**

7.1    At all times prior to the Closing Date, to the extent that funding is provided pursuant to the Loan, Seller shall continue to maintain the Assets and conduct operation of the Business in the same manner as they have been maintained and operated by Seller prior to the execution of this Agreement, and in full compliance with the terms and conditions of the Loan.

7.2    Seller shall promptly provide Buyer with all information concerning the Business and the Assets that Buyer may reasonably request, and Buyer and its attorneys and other representatives shall have access during normal business hours to all of the Assets and to the books and records of the Business.

7.3    Any and all liens, claims, charges, security interests, pledges, assignments, or encumbrances relating to the Assets shall be satisfied, terminated, and discharged by Seller on or prior to the Closing Date and evidence reasonably satisfactory to Buyer and its counsel of the satisfaction, termination, and discharge shall be delivered to Buyer at or prior to the Closing.

7.4    Seller shall terminate all of its employees working in the Business effective as of the Closing Date. Seller shall be responsible without exception for all compensation, taxes, insurance, and other benefits and amounts relating to its employees and shall indemnify and hold Buyer harmless from any claims made against Buyer with respect to the obligations. Buyer shall not assume or in any way become responsible or liable for any compensation, taxes, insurance, or other benefits and amounts payable by Seller on account of any of its employees.

7.5    Any claim by Buyer against the bankruptcy estate and/or Seller must be filed with the Bankruptcy Court within six (6) months following the Closing Date.

8.    **ARTICLE 8. MUTUAL COVENANTS**

8.1    Seller and Buyer shall, prior to Closing, execute any and all documents and perform any and all acts reasonably necessary, incidental, or appropriate to effect the transactions contemplated by this Agreement.

8.2    At any time after the Execution Date and prior to the Closing, if Seller becomes aware of any fact or circumstance that would materially change a representation or warranty made under this Agreement, or materially change the condition or value of the Business in any respect, Seller shall notify Buyer in writing as soon as possible after the discovery of the changed circumstances.

8.3    Each party represents and warrants that no broker, finder, or any other person or entity has any claim for any brokerage commissions or fees in connection with any of the transactions contemplated by this Agreement. Each party shall indemnify the other against any claim or loss suffered as a result of any claim for brokerage commissions or fees payable, or claimed to be payable, on the basis of any actions in connection with this Agreement.

7

31429.DOC

9.    **ARTICLE 9. OVERBID/AUCTION PROCESS**

9.1    Seller may conduct an overbid and auction process to determine whether a higher or better bid than the Purchase Price may be obtained for the Assets, *provided* that Seller strictly complies with each of the following provisions:

(a)    Seller shall accept no overbid that:

(i)    does not conform to all substantive terms of this Agreement, including without limitation the absence of a financing or due diligence contingency;

(ii)    is not accompanied by a good-faith cash deposit in an amount no less than $100,000.00, delivered to Seller no less than three (3) business days prior to an auction; and

(iii)    does not include a proposed cash purchase price that is at least $575,000.00, and is at least $35,000 greater than any preceding overbid accepted by Seller.

(b)    Seller shall allow Buyer to match any overbid accepted by Seller as to purchase price, upon the same terms as this Agreement in all other respects, in which event Buyer shall become the accepted bidder, subject to further overbids.

(c)    In the event that the Assets are sold to a purchaser other than Buyer, Seller shall pay to Buyer a breakup fee in the amount of $35,000.00, at the close of such sale.

(d)    Seller shall obtain Bankruptcy Court approval of an overbid/auction process that includes each of the foregoing terms, including without limitation Buyer's right to a breakup fee, no less than fourteen (14) days prior to such overbids and auction occurring.

10.    **ARTICLE 10. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

10.1    The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions:

(a)    Orders of the Bankruptcy Court granting the Section 364 Motion and the Section 721 Motion, in forms and substance acceptable to Buyer, shall have been entered on or before May 31, 2018, and a final order granting the Section 364 Motion, in form and substance acceptable to Buyer, shall have been entered on or before June 22, 2018, and shall not be stayed or enjoined as of the Closing Date.

(b)    An order of the Bankruptcy Court approving this Agreement and the transactions contemplated herein, and authorizing Seller to consummate all such transactions, and to transfer, sell and assign the Assets to Buyer free and clear of all liens, pursuant to Sections 363 and 365 of the Bankruptcy Code, in forms and substance acceptable to Buyer, shall have been entered on or before August 10, 2018, and shall not be stayed or enjoined as of the Closing Date.

8

(c)     No Event of Default shall have occurred under the Loan, except as may have been waived by Buyer in writing in its sole discretion.

(d)     The representations and warranties of Seller set forth in Article 5 shall be true and correct as of the Closing Date.

(e)     Seller shall have performed and complied with all of the agreements, covenants, and conditions required of Seller by this Agreement on or before the Closing Date.

(f)     No action, suit, or proceeding before any court or any governmental body or authority that would in any way affect the Assets or the ability of the parties to consummate the transactions contemplated by this Agreement shall have been instituted or threatened on or before the Closing Date.

(g)     The Assets shall be in substantially the same condition on the Closing Date as on the Execution Date, and there shall be no loss or damage to the property prior to the Closing.

10.2    Any of Buyer's conditions precedent may be waived in whole or in part by Buyer in writing at any time on or before the Closing Date. In the event all Buyer's conditions precedent have not been waived by Buyer or satisfied in full on or before the Closing Date, Buyer may elect to terminate this Agreement as provided in Article 13.

11.    **ARTICLE 11. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER**

11.1    The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions:

(a)     Orders of the Bankruptcy Court granting the Section 364 Motion and the Section 721 Motion, in forms and substance acceptable to Buyer, shall have been entered on or before May 31, 2018, and shall not be stayed or enjoined as of the Closing Date.

(b)     An order of the Bankruptcy Court approving this Agreement and the transactions contemplated herein, and authorizing Seller to consummate all such transactions, and to transfer, sell and assign the Assets to Buyer free and clear of all liens, pursuant to Sections 363 and 365 of the Bankruptcy Code, in forms and substance acceptable to Buyer, shall have been entered on or before August 10, 2018, and shall not be stayed or enjoined as of the Closing Date.

(c)     Seller shall have received the amount of the Purchase Price in cash or immediately available funds at Closing.

(d)     The representations and warranties of Buyer set forth in Article 6 shall be true and correct as of the Closing Date.

(e)     Buyer shall have performed and complied with all of the agreements, covenants, and conditions required of Buyer by this Agreement on or before the Closing Date.

9

31429.DOC

11.2    Any of Seller's conditions precedent may be waived in whole or in part by Seller in writing at any time on or before the Closing Date. In the event all Seller's conditions precedent have not been waived by Seller or satisfied in full on or before the Closing Date, Seller may elect to terminate this Agreement as provided in Article 13.

12.    **ARTICLE 12. POST-CLOSING OBLIGATIONS**

12.1    Each party agrees to do all acts and things and to make, execute, and deliver such written instruments as shall be reasonably necessary to carry out the terms and provisions of this Agreement. This covenant of further assurances shall survive the Closing.

13.    **ARTICLE 13. TERMINATION**

13.1    This Agreement may be terminated as follows:

(a)    By the mutual consent of Buyer and Seller at any time prior to the Closing.

(b)    By Buyer at any time prior to the Closing as expressly provided in this Agreement, or if any material condition precedent to Buyer's obligations set forth in Article 10 has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing.

(c)    By Seller at any time prior to the Closing as expressly provided in this Agreement, or if any material condition precedent to Seller's obligations set forth in Article 11 has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing.

(d)    By either party if the Closing has not occurred on or before September 1, 2018.

13.2    In the event of the termination of this Agreement pursuant to the provisions of Section 13.1, this Agreement shall become void and have no effect, without any liability on the part of any of the parties.

13.3    The remedies set forth in this Agreement are cumulative and not exclusive of any other legal or equitable remedy otherwise available to any party.

14.    **ARTICLE 14. INDEMNIFICATION**

14.1    In addition to any other agreement on the part of Seller to indemnify Buyer set forth in this Agreement, Seller shall indemnify and hold Buyer harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorneys' fees and costs, in any way arising from or related to (a) Seller's ownership or use of the Assets, or Seller's operation of the Business, prior to the Closing Date, (b) the failure or falsity of any representation or warranty of Seller contained in this Agreement, or (c) the failure by Seller to observe or perform any other covenant or agreement to be observed or performed by Seller under this Agreement.

31429.DOC

.14.2    In addition to any other agreement on the part of Buyer to indemnify Seller set forth in this Agreement, Buyer shall indemnify and hold Seller harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorneys' fees and costs, in any way arising from or related to Buyer's ownership or use of the Assets from and after the Closing Date.

14.3    The mutual agreements to indemnify set forth in this Article 13 shall survive the Closing.

## 15.    ARTICLE 15. GENERAL PROVISIONS

15.1    The terms and provisions of this Agreement shall be binding on and inure to the benefit of the successors and assigns of the parties.

15.2    This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral and written, between the parties hereto with respect to the subject matter of this Agreement.

15.3    This Agreement may not be amended, modified, or supplemented except by written agreement signed by the party against which the enforcement of the amendment, modification, or supplement is sought. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision. No waiver shall be binding unless executed in writing by the party making the waiver.

15.4    If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in the action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

15.5    Except as otherwise specifically provided in this Agreement, Seller and Buyer shall pay their own fees and expenses in connection with the negotiation and consummation of the transactions contemplated by this Agreement.

15.6    All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be (a) delivered in person or by courier, (b) mailed by first class registered or certified mail, or (c) delivered by facsimile transmission, as follows, or to such other address as a party may designate to the other in writing:

(a)    If to Seller:  Lenard E. Schwartzer, Chapter 7 Trustee, 2850 S. Jones Blvd., Suite 1, Las Vegas, NV 89146, email to: trustee@s-mlaw.com; with a copy to Schwartzer & McPherson Law Firm, 2850 S. Jones Blvd., Suite 1, Las Vegas, NV 89146, email to: bkfilings@s-mlaw.com.

(b)    If to Buyer: Edwin and Jill Marshall, 144 Buena Vista, Stinson Beach, CA 94970, email: medoz3int@yahoo.com; with a copy to:  Meyers Law Group, P.C., Attn: Merle C. Meyers, Esq., 44 Montgomery Street, Suite 1010, San Francisco, CA 94104, email: mmeyers@meyerslawgroup.com.

11

31429.DOC

(c)    If delivered personally or by courier, the date on which the notice, request, instruction, or document is delivered shall be the date on which the delivery is made, and if delivered by facsimile transmission or email as aforesaid, the date on which the notice, request, instruction, or document is received (unless a Federal holiday or weekend, in which event the next weekday that is not a Federal holiday) shall be the date of delivery.

15.7    All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement, and shall not affect in any way the meaning or interpretation of this Agreement.

15.8    This Agreement may be executed in two (2) or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one counterpart has been signed by each party and delivered to the other party hereto.

15.9    Time shall be of the essence with respect to the obligations of the parties to this Agreement.

15.10    This Agreement shall be governed by and construed under the laws of the State of California.

15.11    In the event any provision of this Agreement is deemed to be invalid, illegal, or unenforceable, all other provisions of the Agreement that are not affected by the invalidity, illegality, or unenforceability shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date of this Agreement.

SELLER:

LENARD SCHWARTZER, as Trustee of the chapter 7 estate of Medizone International, Inc.

BUYER:

EDWIN G. MARSHALL

JILL C. MARSHALL, N.M.D.

12

31429.DOC

SCHEDULE 1.1(d)

LIST OF PATENTS

United States:

§ Patent No. 5,052,382 – Apparatus for the Controlled Generation and Administration of Ozone

§ Patent No. 6,073,627 – External Application of Ozone/Oxygen for Pathogenic Conditions, a process patent for the treatment of external afflictions. This patent also describes equipment evolutions and treatment envelope design for external medical applications.

§ Provisional Patent Application serial no. 10/002943, for Method and Apparatus for Ozone Decontamination of Biological Liquids. This application deals with protocols for biological liquid decontamination as well as the devices for conducting decontamination.

§ Patent No. 8,551,399 – Healthcare Facility Disinfecting System (Oct 2013).

§ Patent No. 8,636,951 – Bio-terrorism Counteraction Using Ozone and Hydrogen Peroxide (Jan 2014).

§ Patent No. 8,992,829 – Sports Equipment and Facility Disinfection.

§ Patent No. 13/821,483 – Food Handling Disinfection Treatment covering the use of AsepticSure® in food processing plants and related facilities for the sterilization of food-borne pathogens such as Listeria, Salmonella, and other human harmful, food-poisoning-causing bacteria.

Europe:

§ Patent No. 252583B - Bio-Terrorism Counter Measures Using Ozone and Hydrogen Peroxide (June 2016).

Healthcare Facility Disinfection System (Aug 2016)

Canada:

§ Patent No. 2735739 – Healthcare Facility Disinfection Process and System with Oxygen/Ozone (Nov. 2011)

§ Patent No. 2846256 – Sports Equipment and Facility Disinfection

China:

§ Patent No. ZL 201080030657.2 - Healthcare Facility Disinfection System (Nov 2015)

13

31429.DOC

Singapore:

§ Patent No.176977 – Healthcare Facility Disinfecting Process and System with Oxygen/Ozone Mixture (Feb 2013)

Mexico:

§ Patent (allowed, but awaiting issuance) Healthcare Facility Disinfecting Process and System With Oxygen/Ozone Mixture (Nov 2016)

Applications are also pending in the 38 member countries that are parties to the EU Patent Treaty, as well as South Korea, India, Singapore, Brazil and Mexico.

14

# EXHIBIT "2"

Case 18-12662-leb   Doc 1   Entered 05/08/18 14:31:49    Page 41 of 127

EXHIBIT A

EXHIBIT A

**Medisone International, Inc.**
**Inventory Details/Costs**
**March 31, 2018**

| Vendor | Date of Purchase | |
|---|---|---|
| | | Original Quote - Direct Materials |
| | | Tooling Charges |
| | | Change Orders |
| Dr. Guenter B. Moldzio | 7/2014 | 4 Generators - upgrad from II to III |
| Dr. Guenter B. Moldzio | 8/14/15; 10/8/15; 11/1/15; 12/4/15 | 24 Ozone Generators - upgrade from II to III |
| C3 | 12/31/2015 | Generators - upgrade C2 units sold |
| KWJ Engineering | 2/4/2016 | EcoSensors calibrations (pd by Capital One CC) |
| DHL Express (CA) Ltd | 4/13/2016 | Freight to ship KWJ Eco Sensor (pd by Wells Fargo CC) |
| US Air Purifiers LLC | 2/25/2016 | airpura C600 220V white 3 at $899.98 |
| USHIO America | 2/23/16; 4/14/16; 6/17/16 | new ozone generator to replace existing ones on units |
| Best Buy (Capital One CC) | 6/4/2016 | 3 touch screen tablets - upgrade Gen II to Gen III |
| Pimoroni (Capital One CC) | 6/4/2016 | Touch screen frames - upgrade Gen II to Gen III |
| Quality Kits (Capital One CC) | 6/4/2016 | Boards (circuit) - upgrade Gen II to Gen III |
| Canada Computers (Capital One CC) | 6/4/2016 | computer parts for Mark 3 |
| Uline (Capital One CC) | 7/1/2016 | 3 24x48' aluminum platform truck - dollies for units sold to Chile to hold the various parts (i.e. ozone scrubbers) |
| Quality Kits (Capital One CC) | 7/4/2016 | Boards(circuit) |
| USHIO America | 8/1/2016 | new ozone generator |
| Geneq Inc | 8/24/2016 | portable ozone detector - purchased two and protective cases for Chile sale (third one being purchased and will be sent to chile) |
| Mouser electronics (Capital One CC) | 9/9/2016 | order of 2 USB hubs for the units |
| Robotshop.com (Capital One CC) | 9/9/2016 | two pieces - one per unit for Chile sale |
| Best Buy (Capital One CC) | 9/9/2016 | Samsung tablets to be used as the remote station - sold with units and are necessary for the unit to function - to operate machine from outside of room being cleaned |
| DKC Digi Key | 9/9/2016 | hardware/parts for units - for units sold to Chile |
| Global Industrial | 9/9/2016 | dehumidifier to be used with the machine |
| Machine sold - not inventory | | |
| Machine expensed - not inventory | | |
| Obsolete Generators | | |
| Units sold to Chile- Aug 2016 | | |
| USHIO America | 11/4/2016 | Conversion of 4 generators for use with the medical grade power supply (inventory at Cogmedix) |
| DKC Digi Key | 11/4/2016 | Fuses for machines |
| US Air Purifiers LLC | 12/5/2016 | airpura C600 white 2 prong plug type for Denmark (3) @ $899.98 |
| Capital One | 1/18/2017 | -MULTIPLE- |
| Wood Wyant | 1/20/2017 | Purchase of 5 wood wyant gen II units |
| Digi-Key Electronics | 1/27/2017 | machine parts for upgrade to wood wyant machines |
| Capital One | 2/1/2017 | Omega (temp probe usb); Cable Wholesale (ethernet cables); Digikey |
| Omega | 2/6/2017 | Omega - machine parts for wood wyant upgrade (exch rate 1.311592) |
| Digi-Key Electronics | 2/10/2017 | parts for machine upgrades |
| Capital One | 2/24/2017 | 2/7 Newark (2) touchscreens for machine upgrades (wood wyant) |
| Wells Fargo CC | 3/3/2017 | 1/17 mouser electronics for machine upgrades |
| Mouser Electronics | 3/8/2017 | Mouser electronics - machine parts for upgrade (exch rate 1.347967) |
| Digi-Key Electronics | 3/10/2017 | parts or machine upgrades |
| USHIO America - pmts for 17 generators (need to allocate these to the appropriate machines) | | |
| Wood Wyant upgrades | | |
| Dr. Guenter B. Moldzio | 8/14/15; 10/8/15; 11/1/15; 12/4/15 | 24 Ozone Generators - upgrade from II to III - per inventory observation at year end 17, obsolete generators |
| | | Cost per Unit |

| USHIO 4 Gen's 220V SOLD TO CHILE Generation II Unit 4 | USHIO 4 Gen's 220V SOLD TO CHILE Generation II Unit 5 | USHIO 4 Gen's 220V SOLD TO CHILE Generation II Unit 6 | Wood Wyant Generation II 5 Units | Totals | |
|---|---|---|---|---|---|
| 36,425.26 | 36,425.26 | 36,425.26 | | 145,701.04 | Paid 50% of this on 5/7/13, $88,515.78 on 7/1/13, and remaining $20,760 on 3/1/14 |
| 6,590.83 | 6,590.83 | 6,590.83 | | 26,363.32 | Paid 50% of this on 5/7/13, remaining $19,772.50 on 7/31/13 |
| 1,189.64 | 1,189.64 | 1,189.64 | | 4,758.57 | Paid $3,681.83 on 7/1/13, remaining $3,456.04 on 3/1/14 |
| - | - | - | | 21,800.00 | Unit is being used in lab and can/will be sold |
| 13,200.00 | 13,200.00 | 13,200.00 | | 24 | Denver Air UV ozone generators @ $4,400/generator; 3 generators for each Canadian spec conversion |
| | | | | 105,600.00 | or 13,200/system |
| | | | | (26,400.00) | To upgrade existing Gen II to Gen III |
| 845.73 | 845.73 | 845.73 | | 3,382.90 | Eccsensors  will be loaded into existing units $3,382.90 |
| 56.82 | 56.82 | 56.82 | | 227.26 | |
| 2,699.94 | 2,699.94 | 2,699.94 | | 8,099.82 | (3) 220v scrubbers ordered for the 220v unit (converted from 110 existing) to be sent to EMC and QPS |
| 3,600.00 | 3,600.00 | 3,600.00 | | 32,400.00 | 9 generators at $3,600 = $32,400  (3 generators for each Canadian spec conversion)  = 2/3 of payment to USHIO |
| 314.62 | 314.62 | 314.62 | | 943.85 | |
| 14.93 | 14.93 | 14.93 | | 44.79 | |
| 51.48 | 51.48 | 51.48 | | 154.43 | |
| 14.17 | 14.17 | 14.17 | | 42.51 | |
| 454.52 | 454.52 | 454.52 | | | |
| | | | | 1,363.57 | |
| 99.57 | 99.57 | 99.57 | | 298.70 | |
| | | | | 4,231.17 | 1 @ 3600 plus tax and shipping |
| 892.02 | 892.02 | - | | | Third one is ordered and will be sent to Chile |
| | | | | 1,784.03 | |
| | | | | 671.06 | |
| | | | | 104.93 | |
| | | | | 576.39 | |
| | | | | 175.61 | |
| 187.03 | 187.03 | 187.03 | | 561.00 | |
| | | | | (1,143.74) | |
| | | | | (4,592.13) | |
| | | | | (21,800.00) | |
| (66,636.54) | (66,636.54) | (65,744.52) | | (199,017.60) | |
| | | | | 529.69 | |
| | | | | 11.57 | |
| | | | | 2,699.94 | |
| | | | 1,712.01 | 1,712.01 | |
| | | | 125,000.00 | 125,000.00 | |
| | | | 291.60 | 291.60 | |
| | | | 268.49 | 268.49 | |
| | | | 2,026.36 | 2,026.36 | |
| | | | 16.38 | 16.38 | |
| | | | 235.10 | 235.10 | |
| | | | 598.00 | 598.00 | |
| | | | 985.19 | 985.19 | |
| | | | 100.53 | 100.53 | |
| | | | 70,884.90 | 70,884.90 | |
| | | | 345.35 | 345.35 | |
| | | | | (22,000.00) | |
| (0.00) | (0.00) | - | 202,483.91 | 290,056.68 | Total Inventory |
| | | | | 190,056.68 | TB |
| | | | | - | Diff |

# EXHIBIT B

# EXHIBIT B

MEDIZONE INTERNATIONAL, INC.
AMORTIZATION SCHEDULE - TRADEMARKS AND PATENTS
March 31, 2018

| DESCRIPTION | METHOD | LIFE (yrs) | COST | DEPR PER MONTH | ACC. DEPR 12/31/17 | AMORTIZATION EXPENSE 3/31/18 | ACC. DEPR 3/31/18 |
|---|---|---|---|---|---|---|---|
| AsepticSure trademark - filing fees | S/L | 7 | 495.00 | 5.89 | 495.00 | - | 495.00 |
| AsepticSure trademark - filing fees | S/L | 7 | 275.00 | 3.27 | 275.00 | - | 275.00 |
| AsepticSure trademark - Robert Hirons stock | S/L | 7 | 14,750.00 | 175.60 | 14,750.00 | - | 14,750.00 |
| Prior year - overstatement (50,000 shares issued to Robert Hirons) | S/L | 7 | (4,750.00) | (56.55) | (4,750.00) | - | (4,750.00) |
| Cassan Maclean - application fees | S/L | 7 | 1,348.68 | 16.06 | 1,348.68 | - | 1,348.68 |
| Xavier Morales - legal and filing fee | S/L | 7 | 250.00 | 2.98 | 250.00 | - | 250.00 |
| Cottspat Corporation - patent application review | S/L | 7 | 10,212.50 | 121.58 | 10,212.50 | - | 10,212.50 |
| Cottspat Corporation - 250,000 options granted | S/L | 7 | 67,465.21 | 803.16 | 67,465.21 | - | 67,465.21 |
| Cassan Maclean - patent fees | S/L | 7 | 235.93 | 2.81 | 235.93 | - | 235.93 |
| Cottspat Corporation - patent application review | S/L | 7 | 7,837.50 | 93.30 | 7,837.50 | - | 7,837.50 |
| Cottspat Corporation - patent application review | S/L | 7 | 7,825.45 | 93.16 | 7,825.45 | - | 7,825.45 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 419.40 | 4.99 | 419.40 | - | 419.40 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 6,579.00 | 78.32 | 6,579.00 | - | 6,579.00 |
| Cassan Maclean - patent application (Bio-Terrorism Counteraction) | S/L | 7 | 4,519.00 | 53.80 | 4,519.00 | - | 4,519.00 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) | S/L | 7 | 1,313.92 | 15.64 | 1,313.92 | - | 1,313.92 |
| Cassan Maclean - patent application (Combating Insect Infections) | S/L | 7 | 1,324.92 | 15.77 | 1,324.92 | - | 1,324.92 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) | S/L | 7 | 1,329.13 | 15.82 | 1,329.13 | - | 1,329.13 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 463.00 | 5.51 | 463.00 | - | 463.00 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 390.50 | 4.65 | 385.85 | 4.65 | 390.50 |
| Cottspat Corporation - patent application review | S/L | 7 | 2,625.00 | 31.25 | 2,593.75 | 31.25 | 2,625.00 |
| Cassan Maclean - patent application (Bio-Terrorism Counteraction) | S/L | 7 | 453.50 | 5.40 | 442.70 | 10.80 | 453.50 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 2,597.00 | 30.92 | 2,504.25 | 92.75 | 2,597.00 |
| Cassan Maclean - patent application (Process for Sterilization of Air Spaces and Surfaces) | S/L | 7 | 3,138.94 | 37.37 | 3,026.84 | 112.11 | 3,138.94 |
| Cassan Maclean - patent application (Process for Sterilization of Air Spaces and Surfaces) | S/L | 7 | 1,379.41 | 16.42 | 1,330.15 | 49.26 | 1,379.41 |
| Cassan Maclean - patent application (Bio-Terrorism Counteraction) | S/L | 7 | 586.08 | 6.98 | 558.17 | 20.93 | 579.10 |
| Cottspat Corporation - patent application review | S/L | 7 | 4,425.00 | 52.68 | 3,950.89 | 158.04 | 4,108.93 |
| Cassan Maclean - patent application review and consulting (Healthcare Facility Disinfecting Process) | S/L | 7 | 6,783.40 | 80.75 | 6,056.61 | 242.26 | 6,298.87 |
| Cassan Maclean - international (PCT) application (Process for Sterilization of Air Spaces and Surfaces) | S/L | 7 | 6,442.97 | 76.70 | 5,752.65 | 230.11 | 5,982.76 |
| Cassan Maclean - international (PCT) application (Sports Equipment and Facility Disinfection) | S/L | 7 | 6,140.38 | 73.10 | 5,482.48 | 219.30 | 5,701.78 |
| Cassan Maclean - international (PCT) application (Combating Insect Infestations) | S/L | 7 | 6,813.43 | 81.11 | 6,083.42 | 243.34 | 6,326.76 |
| Cassan Maclean - international (PCT) application (Food-Handling Facility Disinfection Treatment) | S/L | 7 | 6,601.50 | 78.59 | 5,894.20 | 235.77 | 6,129.96 |
| Cassan Maclean - international (PCT) application (Food-Handling Facility Disinfection Treatment) | S/L | 7 | 218.15 | 2.60 | 192.18 | 7.79 | 199.97 |
| Cassan Maclean - international (PCT) application (Combating Insect Infestations) | S/L | 7 | 218.15 | 2.60 | 192.18 | 7.79 | 199.97 |
| Cassan Maclean - international (PCT) application (Sports Equipment and Facility Disinfection) | S/L | 7 | 218.15 | 2.60 | 192.18 | 7.79 | 199.97 |
| Cassan Maclean - international (PCT) application (Process for Sterilization of Air Spaces and Surfaces) | S/L | 7 | 218.15 | 2.60 | 192.18 | 7.79 | 199.97 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Korea | S/L | 7 | 1,327.12 | 15.80 | 1,121.73 | 47.40 | 1,169.13 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Brazil | S/L | 7 | 6,290.50 | 74.89 | 5,316.97 | 224.66 | 5,541.63 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - US application | S/L | 7 | 1,838.57 | 21.89 | 1,554.03 | 65.66 | 1,619.69 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Singapore | S/L | 7 | 2,342.28 | 27.88 | 1,979.78 | 83.65 | 2,063.44 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Mexico | S/L | 7 | 7,665.40 | 91.25 | 6,479.09 | 273.76 | 6,752.85 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - China | S/L | 7 | 7,395.08 | 88.04 | 6,250.60 | 264.11 | 6,514.71 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Japan | S/L | 7 | 1,328.18 | 15.81 | 1,122.63 | 47.44 | 1,170.06 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Cottpat Corporation - patent application review | S/L | 7 | 3,300.00 | 39.29 | 2,789.29 | 117.86 | 2,907.14 |
| Cassan Maclean - International (PCT) application (Combating Insect Infestations) | S/L | 7 | 480.18 | 5.72 | 400.15 | 17.15 | 417.30 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - China | S/L | 7 | 78.61 | 0.94 | 65.51 | 2.81 | 68.32 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Singapore | S/L | 7 | 382.19 | 4.55 | 318.49 | 13.65 | 332.14 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Korea | S/L | 7 | 5,955.53 | 70.90 | 4,962.94 | 212.70 | 5,175.64 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Europe | S/L | 7 | 8,534.28 | 101.60 | 7,111.90 | 304.80 | 7,416.70 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 2,619.30 | 31.18 | 2,182.75 | 93.55 | 2,276.30 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - India | S/L | 7 | 3,581.78 | 42.64 | 2,984.82 | 127.92 | 3,112.74 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Japan | S/L | 7 | 1,470.00 | 17.50 | 1,190.00 | 52.50 | 1,242.50 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - China | S/L | 7 | 10,426.52 | 124.13 | 8,440.52 | 372.38 | 8,812.89 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 332.48 | 3.96 | 269.15 | 11.87 | 281.02 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 473.07 | 5.63 | 377.33 | 16.90 | 394.23 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 265.00 | 3.15 | 208.21 | 9.46 | 217.68 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) | S/L | 7 | 2,498.42 | 29.74 | 1,933.30 | 89.23 | 2,022.53 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) | S/L | 7 | 1,728.86 | 20.58 | 1,337.81 | 61.75 | 1,399.55 |
| Cassan Maclean - int'l patent application (Process for Sterilization of Air Spaces and Surfaces) | S/L | 7 | 910.54 | 10.84 | 704.58 | 32.52 | 737.10 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 745.18 | 8.87 | 576.63 | 26.61 | 603.24 |
| Cassan Maclean - International (PCT) application (Food-Handling Facility Disinfection Treatment) | S/L | 7 | 2,646.29 | 31.50 | 2,047.72 | 94.51 | 2,142.23 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - India | S/L | 7 | 1,146.13 | 13.64 | 886.89 | 40.93 | 927.82 |
| Cassan Maclean - International (PCT) application (Sports Equipment and Facility Disinfection) | S/L | 7 | 2,648.41 | 31.53 | 2,049.36 | 94.59 | 2,143.95 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - India | S/L | 7 | 603.78 | 7.19 | 467.21 | 21.56 | 488.77 |
| Cassan Maclean - International (PCT) application (Food-Handling Facility Disinfection Treatment) | S/L | 7 | 1,176.53 | 14.01 | 882.40 | 42.02 | 924.42 |
| Cassan Maclean - International (PCT) application (Sports Equipment and Facility Disinfection) | S/L | 7 | 438.38 | 5.22 | 328.79 | 15.66 | 344.44 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) | S/L | 7 | 7,750.83 | 92.27 | 5,813.12 | 276.82 | 6,089.94 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) | S/L | 7 | 2,428.75 | 28.91 | 1,792.65 | 86.74 | 1,879.39 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Brazil | S/L | 7 | 588.58 | 7.01 | 434.43 | 21.02 | 455.45 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) | S/L | 7 | 2,457.79 | 29.26 | 1,814.08 | 87.78 | 1,901.86 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Singapore | S/L | 7 | 1,900.00 | 22.62 | 1,402.38 | 67.86 | 1,470.24 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Singapore | S/L | 7 | 932.69 | 11.10 | 655.10 | 33.31 | 688.41 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Europe | S/L | 7 | 1,140.75 | 13.58 | 801.24 | 40.74 | 841.98 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | 58.54 | 0.70 | 41.12 | 2.09 | 43.21 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Europe | S/L | 7 | 111.51 | 1.33 | 78.32 | 3.98 | 82.31 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - US | S/L | 7 | 3,631.22 | 43.23 | 2,507.27 | 129.69 | 2,636.96 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) | S/L | 7 | 589.31 | 7.02 | 406.90 | 21.05 | 427.95 |
| Cassan Maclean - patent application (Combating Insect Infections) | S/L | 7 | 1,253.41 | 14.92 | 835.61 | 44.76 | 880.37 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) | S/L | 7 | 1,253.41 | 14.92 | 835.61 | 44.76 | 880.37 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - Canada | S/L | 7 | 206.00 | 2.45 | 132.43 | 7.36 | 139.79 |
| Cassan Maclean - patent application (Healthcare Facility Disinfecting System) - US | S/L | 7 | 2,523.50 | 30.04 | 1,622.25 | 90.13 | 1,712.38 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) | S/L | 7 | 257.50 | 3.07 | 162.47 | 9.20 | 171.67 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | 2,051.86 | 24.43 | 1,294.63 | 73.28 | 1,367.91 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - India | S/L | 7 | 1,044.73 | 12.44 | 659.17 | 37.31 | 696.49 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Hong Kong | S/L | 7 | 2,057.06 | 24.49 | 1,297.91 | 73.47 | 1,371.37 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 8,258.34 | 98.31 | 5,210.62 | 294.94 | 5,505.56 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 6,736.97 | 80.20 | 4,170.51 | 240.61 | 4,411.11 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Japan | S/L | 7 | 3,189.96 | 37.98 | 1,974.74 | 113.93 | 2,088.66 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Brazil | S/L | 7 | 2,555.22 | 30.42 | 1,551.38 | 91.26 | 1,642.64 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Europe | S/L | 7 | 1,475.25 | 17.56 | 895.69 | 52.69 | 948.38 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - India | S/L | 7 | 569.64 | 6.78 | 345.85 | 20.34 | 366.20 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 5,089.03 | 60.58 | 3,029.18 | 181.75 | 3,210.94 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | 1,602.92 | 19.08 | 954.12 | 57.25 | 1,011.37 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Europe | S/L | 7 | 1,501.98 | 17.88 | 894.04 | 53.64 | 947.68 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | 653.20 | 7.78 | 381.03 | 23.33 | 404.36 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Canada | S/L | 7 | 243.50 | 2.90 | 139.14 | 8.70 | 147.84 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | 3,861.80 | 45.97 | 2,206.74 | 137.92 | 2,344.66 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 434.05 | 5.17 | 248.03 | 15.50 | 263.53 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Canada | S/L | 7 | (23.75) | (0.28) | (13.57) | (0.85) | (14.42) |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | (376.60) | (4.48) | (215.20) | (13.45) | (228.65) |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | (42.33) | (0.50) | (24.19) | (1.51) | (25.70) |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - China | S/L | 7 | 2,716.15 | 32.34 | 1,519.75 | 97.01 | 1,616.76 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - India | S/L | 7 | 328.50 | 3.31 | 183.80 | 11.73 | 195.54 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - US | S/L | 7 | 608.91 | 7.25 | 340.70 | 21.75 | 362.45 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) - Canada | S/L | 7 | 1,805.00 | 21.49 | 988.45 | 64.46 | 1,052.92 |
| Cassan Maclean - patent application (Combating Insect Infections) - Canada | S/L | 7 | 1,805.00 | 21.49 | 988.45 | 64.46 | 1,052.92 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) - Canada | S/L | 7 | 1,805.00 | 21.49 | 988.45 | 64.46 | 1,052.92 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 1,731.85 | 20.62 | 927.78 | 61.85 | 989.63 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - India | S/L | 7 | 222.63 | 2.65 | 119.27 | 7.95 | 127.22 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Brazil | S/L | 7 | 279.35 | 3.33 | 149.65 | 9.98 | 159.63 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Europe | S/L | 7 | 659.21 | 7.85 | 337.45 | 23.54 | 361.00 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) - Canada | S/L | 7 | 342.36 | 4.08 | 175.26 | 12.23 | 187.48 |
| Cassan Maclean - patent application (Combating Insect Infections) - Canada | S/L | 7 | 340.52 | 4.05 | 174.31 | 12.16 | 186.48 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) - Canada | S/L | 7 | 342.36 | 4.08 | 175.26 | 12.23 | 187.48 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) - Canada | S/L | 7 | 4,923.02 | 58.61 | 2,461.51 | 175.82 | 2,637.33 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) - Canada | S/L | 7 | 234.64 | 2.79 | 117.32 | 8.38 | 125.70 |
| Cassan Maclean - patent application (Combating Insect Infections) - Canada | S/L | 7 | 234.64 | 2.79 | 117.32 | 8.38 | 125.70 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) - Canada | S/L | 7 | 234.64 | 2.79 | 117.32 | 8.38 | 125.70 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Singapore | S/L | 7 | 774.69 | 9.22 | 378.12 | 27.67 | 405.79 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 105.06 | 1.25 | 51.28 | 3.75 | 55.03 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Europe | S/L | 7 | 2,129.97 | 25.35 | 1,014.27 | 76.07 | 1,090.34 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - India | S/L | 7 | 614.20 | 7.31 | 292.48 | 21.94 | 314.41 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Europe | S/L | 7 | 2,096.23 | 24.96 | 998.20 | 74.87 | 1,073.07 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - China | S/L | 7 | 5,354.98 | 63.75 | 2,486.24 | 191.25 | 2,677.49 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - Japan | S/L | 7 | 5,356.32 | 63.77 | 2,423.10 | 191.30 | 2,614.39 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 148.32 | 1.77 | 65.33 | 5.30 | 70.63 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) - US | S/L | 7 | 1,104.00 | 13.14 | 486.29 | 39.43 | 525.71 |
| Cassan Maclean - patent application (Food-Handling Facility Disinfection Treatment) - Canada | S/L | 7 | 379.44 | 4.52 | 162.62 | 13.55 | 176.17 |
| Cassan Maclean - patent application (Combating Insect Infections) - Canada | S/L | 7 | 380.37 | 4.53 | 163.02 | 13.58 | 176.60 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 378.51 | 4.51 | 162.22 | 13.52 | 175.74 |
| Cassan Maclean - patent application (Combating Insect Infections) - Canada | S/L | 7 | 3,566.41 | 42.46 | 1,486.00 | 127.37 | 1,613.38 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) - US | S/L | 7 | 571.95 | 6.81 | 238.31 | 20.43 | 258.74 |
| Cassan Maclean - patent application (Combating Insect Infections) - Canada | S/L | 7 | 462.54 | 5.51 | 181.71 | 16.52 | 198.23 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Europe | S/L | 7 | 3,451.29 | 41.09 | 1,355.86 | 123.26 | 1,479.12 |
| Cassan Maclean - patent application (Sports Equipment and Facility Disinfection) - US | S/L | 7 | 490.41 | 5.84 | 192.66 | 17.51 | 210.18 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 1,433.76 | 17.07 | 546.19 | 51.21 | 597.40 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 291.45 | 3.47 | 111.03 | 10.41 | 121.44 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 2,664.24 | 31.72 | 951.51 | 95.15 | 1,046.67 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 5,021.29 | 59.78 | 1,673.76 | 179.33 | 1,853.10 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 578.68 | 6.89 | 186.00 | 20.67 | 206.67 |
| Cassan Maclean - patent services (Food-Handling Facility) | S/L | 7 | 785.18 | 9.35 | 252.38 | 28.04 | 280.42 |
| Cassan Maclean - patent services (Combating Insect Infestations) | S/L | 7 | 1,515.58 | 18.04 | 487.15 | 54.13 | 541.28 |
| Cassan Maclean - patent services (Sports Equipment & Facility) | S/L | 7 | 207.50 | 2.47 | 66.70 | 7.41 | 74.11 |
| Cassan Maclean - patent services (Sports Equipment & Facility) | S/L | 7 | 6,268.90 | 74.63 | 1,716.48 | 223.89 | 1,940.37 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 1,391.00 | 16.56 | 331.19 | 49.68 | 380.87 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Europe | S/L | 7 | 2,905.44 | 34.59 | 691.77 | 103.77 | 795.54 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 309.60 | 3.69 | 66.34 | 11.06 | 77.40 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Europe | S/L | 7 | 2,106.00 | 25.07 | 426.21 | 75.21 | 501.43 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 4,959.67 | 59.04 | 944.70 | 177.13 | 1,121.83 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 712.43 | 8.48 | 127.22 | 25.44 | 152.66 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - France/Germ/UK | S/L | 7 | 2,325.91 | 27.69 | 415.34 | 83.07 | 498.41 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 3,420.28 | 40.72 | 529.33 | 122.15 | 651.48 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Mexico | S/L | 7 | 1,395.88 | 16.62 | 216.03 | 49.85 | 265.88 |
| Cassan Maclean - patent services (Sports Equipment and Facility Disinfection) | S/L | 7 | 160.00 | 1.90 | 24.76 | 5.71 | 30.48 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 5,298.80 | 63.08 | 756.97 | 189.24 | 946.21 |
| Cassan Maclean - patent services (Sports Equipment & Facility) | S/L | 7 | 265.60 | 3.16 | 37.94 | 9.49 | 47.43 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 3,172.32 | 37.77 | 84.53 | 113.30 | 197.83 |
| Cassan Maclean - patent services (Sports Equipment & Facility) | S/L | 7 | 701.10 | 8.35 | 83.46 | 25.04 | 108.50 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Mexico | S/L | 7 | 1,791.78 | 21.33 | 191.98 | 63.99 | 255.97 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Mexico | S/L | 7 | 1,705.06 | 20.30 | 142.09 | 60.90 | 202.98 |
| Cassan Maclean - patent services (TDMI Environment) | S/L | 7 | 1,240.00 | 14.76 | 88.57 | 44.29 | 132.86 |
| Cassan Maclean - patent services (Food-Handling Facility) | S/L | 7 | 392.00 | 4.67 | 28.00 | 14.00 | 42.00 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 2,570.88 | 30.61 | 153.03 | 91.82 | 244.85 |
| Cassan Maclean - patent services (Healthcare Facility Disinfecting System) | S/L | 7 | 3,588.78 | 42.72 | 170.89 | 128.17 | 299.07 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Mexico | S/L | 7 | 2,509.91 | 29.88 | 119.52 | 89.64 | 209.16 |
| Cassan Maclean - patent services (Sports Equipment & Facility) | S/L | 7 | 309.60 | 3.69 | 11.06 | 11.06 | 22.11 |
| Cassan Maclean - patent services (Bio-Terrorism Counteraction) - Mexico | S/L | 7 | 366.66 | 4.37 | - | 13.10 | 13.10 |

| Totals | | | 430,075.28 | | 312,459.51 | 10,929.29 | 323,388.80 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Accum Amort | 312,459.51 |
| Amt to record | 10,929.29 |

# EXHIBIT "3"

Jason A. Imes, Esq., NV Bar No. 7030
Schwartzer & McPherson Law Firm
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146-5308
Telephone:    (702) 228-7590
Facsimile:    (702) 892-0122
E-Mail:bkfilings@s-mlaw.com
*Attorneys for Lenard E. Schwartzer, Trustee*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No. BK-S-18-12662-LEB |
| MEDIZONE INTERNATIONAL, INC., | Chapter 7 |
| Debtor. | **[ PROPOSED ] ORDER GRANTING MOTION FOR APPROVAL OF BID PROCEDURES AND TO APPROVE SALE OF ESTATE PROPERTY FREE AND CLEAR OF ANY INTEREST**<br><br>Hearing Date:<br>Hearing Time: |

The Trustee's *Motion For Approval of Bid Procedures to Approve Sale of Estate Property Free and Clear of Any Interest* (the "Motion") [ECF No. ___] having come before this Court on the ____ day of July, 2018; Lenard E. Schwartzer, Chapter 7 Trustee (the "Trustee") appearing by and through his counsel, Jason A. Imes., Esq., of the Schwartzer & McPherson Law Firm, and other parties appearing as noted on the record; the Court finding that notice has been given to all creditors and parties in interest as required by law, there being no opposition, the Court having jurisdiction to consider the Motion and requested relief in accordance with 28 U.S.C. §§157 and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 1334, and this being a core proceeding pursuant to 28 U.S.C. §157(b); the Court have determined

2 that the Bidding Procedures as set forth in the Motion are fair, reasonable and appropriate, reflect

3 the Trustee's exercise of prudent business judgment consistent with his fiduciary duties, and

4 designed to maximize the value to be obtained by the bankruptcy estate for the assets; the Court

5 having made its findings of fact and conclusions of law upon the record which are incorporated

6 herein pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7052, and for good cause

7 appearing,

8        **IT IS HEREBY ORDERED** that the Trustee's Motion is GRANTED; and

9        **IT IS FURTHER ORDERED** that the Sale Agreement (as that term is defined in the

10 Trustee's Motion) is hereby approved pursuant to Sections 363(b) and (f) of the Bankruptcy Code,

11 and the Trustee is hereby authorized to take all necessary steps to complete and close the sale

12 contemplated therein, and to transfer the Assets (as that term is defined in the Sale Agreement) to

13 Edwin G. Marshall and Jill C. Marshall, N.M.D., or their nominees (the "Buyer"), free and clear of

14 all liens, encumbrances, interests and claims, in accordance with the terms of the Sale Agreement,

15 subject to any qualified and accepted overbids made in a manner consistent with the BID

16 PROCEDURES approved herein; and

17        **IT IS FURTHER ORDERED** that the following BID PROCEDURES are approved for

18 the proposed sale of substantially all of the Debtor's assets as detailed in the Motion:

19     a.    Any overbid incorporates all other terms of the Purchase Agreement (except as to

20            purchase price), including without limitation the absence of any financing or due

21            diligence contingency;

22     b.    Any overbid must be accompanied by a good-faith cash deposit in an amount no

23            less than $100,000.00, delivered to the Trustee by certified funds no less than three

24            (3) business days prior to the auction; and

25     c.    Any overbid must offer a cash purchase price that is at least $575,000.00, and is at

26            least $35,000 greater than any preceding overbid accepted by Trustee; and

27     d.    The Marshalls have the right to match any overbid accepted by the Trustee as to

28            purchase price, upon the same terms as the Purchase Agreement in all other

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

respects, in which event the Marshalls shall become the accepted bidder, subject to further overbids; and

e.      In the event that the Assets are sold to a purchaser other than the Marshalls, the Trustee shall pay the Marshalls a breakup fee in the amount of $35,000.00, at the close of such sale from the sales proceeds; and

f.      The Trustee shall obtain Bankruptcy Court approval of an overbid/auction process that includes each of the foregoing terms, including without limitation the Marshalls' right to the breakup fee, prior to such overbids and auction occurring.

g.      In the event any party intends to overbid, the Trustee proposes that said auction be conducted in open court and under the supervision of the Bankruptcy Court, and that the second highest bidder be designated as the backup bidder.

**IT IS FURTHER ORDERED** that a SALE HEARING shall be held before this Court on **August 7, 2018, at 2:30 p.m.,** for the purpose of conducting the proposed auction in open court and under the supervision of the Bankruptcy Court, to confirm the results of said auction, for final approval of the sale free and clear of all liens, encumbrances, interests and claims, to determine if the sale has been conducted in good faith for purposes of 11 U.S.C. §363(m), and to consider waiving any stay of the order pursuant to Fed.R.Bankr.P. 6004.

**IT IS SO ORDERED.**

Submitted by:

_____
Jason A. Imes, Esq.
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Blvd., Suite 1
Las Vegas NV  89146
*Attorneys for Lenard E. Schwartzer, Trustee*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## **Local Rule 9021 CERTIFICATION**

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐    The court waived the requirement of approval under LR 9021(b)(1).

☐    No party appeared at the hearing or filed an objection to the motion.

☐    I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated above.

☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objection to the form or content of the order.

_____
Jason A. Imes, Esq.
SCHWARTZER & MCPHERSON LAW FIRM

### # #

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122