Jason A. Imes, Esq., NV Bar No. 7030
Schwartzer & McPherson Law Firm
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146-5308
Telephone:    (702) 228-7590
Facsimile:    (702) 892-0122
E-Mail:    bkfilings@s-mlaw.com
*Attorneys for Lenard E. Schwartzer, Trustee*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. BK-S-18-12662-ABL |
| MEDIZONE INTERNATIONAL, INC., | Chapter 7 |
| Debtor. | **MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT (FRBP 9019)** |
| | Hearing Date:    March 21, 2019 |
| | Hearing Time:    11:00 a.m. |

LENARD E. SCHWARTZER, Chapter 7 Trustee (the "Trustee"), by and through his

counsel, Schwartzer & McPherson Law Firm, hereby files this *Motion for Approval of Settlement*

*Agreement* (the "Motion") pursuant to Fed.R.Bankr.P. 9019.

The Trustee seeks approval of a Settlement Agreement he has negotiated with Edwin G.

Marshall, Jill C. Marshall, and AsepticSure Scientific, LLC (purchasers of substantially all of the

assets of this bankruptcy estate). The terms are set forth with more particularity in the Settlement

Agreement attached to this Motion as **Exhibit "1."** In general terms, these parties have agreed

that ASL owns any claims, rights, causes of action, damages, liens and all other charges against all

former officers, directors, representatives, agents, employees, counsel and other insiders of the

Debtor (the "Subject Claims"), and that ASL will assign such claims to the Marshalls to

investigate and pursue, and in the event of any recovery, and after payment of the Marshall's

attorney's fees and expenses, the net proceeds will be divided with 25% to the Trustee, and 75% to

the Marshalls.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

The Motion is supported by the *Declaration of Lenard E. Schwartzer* (the "Schwartzer Declaration") filed concurrently with this Motion, and the following Points and Authorities.

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

A.      **Case History and Asset Sale**

1.      On April 18, 2018, creditors Edwin G. Marshall and Dr. Jill C. Marshall (collectively, the "Marshalls"), and creditors Ushio America, Inc. and Engineering CPR, Inc. (together with the Marshalls, the "Petitioning Creditors"), filed an involuntary petition under Chapter 11 the Bankruptcy Code against Debtor MEDIZONE INTERNATIONAL, INC. (the "Debtor") in Reno, Nevada, thereby commencing bankruptcy case number 18-50412-GWZ (the "Involuntary Chapter 11 Case").

2.      On May 8, 2018, the Debtor filed its voluntary petition pursuant to Chapter 7 of the Bankruptcy Code in Las Vegas, Nevada, and Trustee Schwartzer was appointed to administer the Chapter 7 estate.  The Involuntary Chapter 11 Case was subsequently dismissed.

3.      The Trustee was authorized to operate the business for approximately 90 days from June 1, 2018 through August 31, 2018 [ECF No. 36], and was authorized to borrow up to $200,000.00 from the Marshalls [ECF No. 40] to fund said operation pending sale of the estate's assets.

4.      As of August 31, 2018, the Trustee sold and transferred substantially all of the assets of the estate to ASEPTICSURE SCIENTIFIC, LLC ("ASL") as nominee of the Marshalls, for the sum of $500,000.00 pursuant to a Purchase and Sale Agreement dated May 17, 2018 (the "PSA"), which was approved and authorized by the Bankruptcy Court under its *Order Approving And Confirming Sale Of Estate Property Free And Clear Of Any Interest*, entered on August 10, 2018 [ECF No. 85].  A copy of the PSA is attached to this Motion as **Exhibit "2."**

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

5.     Pursuant to the PSA, the assets sold included all assets used for the operation of Debtor's business, including but not limited to the intellectual property, real property, fixtures, tangible and intangible personal property, inventory, goodwill, and other assets of the business (the "Assets").

6.     Pursuant to Section 1.1 of the PSA, the property of the estate transferred to ASL included "all of [the Trustee's] right, title and interest in and to all of the assets used by Debtor in connection with the operation of the [business of the Debtor]."

7.     The bill of sale (the "Bill of Sale") executed by the Trustee and delivered to ASL as of August 31, 2018 included the following language identifying the Estate property transferred to ASL pursuant to the PSA, among other assets:

> All of the Estate's right, title, ownership and interest in and to claims, causes of action, damages, liens and all other charges against third parties, including without limitation any and all causes of action and claims against former officers and directors of [the Debtor].

**B.     Dispute and Proposed Settlement**

8.     Based on the PSA, the Bill of Sale and the Marshalls' recollection of the expressed intent of the parties to the PSA, ASL claims ownership of the Subject Claims, among other claims, rights and assets transferred by the Trustee to ASL.

9.     The Trustee also claims ownership of the Subject Claims, contending that the PSA approved by the Bankruptcy Court did not provide for transfer of such claims to ASL, that the parties did not express any intention of transferring the ownership of the Subject Claims, and that the Bill of Sale erroneously identifies the Subject Claims among the transferred assets. *See* Schwartzer Declaration.

10.     The Trustee and the Marshalls and ASL have resolved their dispute as to the ownership of the Subject Claims, subject to Court approval, in accordance with the terms and conditions set forth in the Settlement Agreement attached as **Exhibit "1."** The Settlement Agreement confirms the Subject Claims were purchased from the bankruptcy estate and are now held by ASL. However, in light of ASL's present inability to fund the investigation of and, if

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

appropriate, prosecution of the Subject Claims, ASL will transfer its ownership of the Subject

Claims to the Marshalls. The Marshalls are willing to accept such transfer, based on their

agreement with their counsel with respect to the funding of such investigation and prosecution.

*See* Schwartzer Declaration.

11. The Trustee and the Marshalls and ASL have negotiated the Settlement Agreement

so that the Marshalls and ASL may fund the investigation of the Subject Claims, and potential

related litigation, and the bankruptcy estate will share the net benefit from any recovery (25%)

without incurring the expense of the investigation and litigation. *See* Schwartzer Declaration.

12. The Trustee believes the proposed terms of the Settlement Agreement are justified,

and in his business judgment he has concluded this proposed compromise is in the best interest of

the estate and creditors. *See* Schwartzer Declaration.

### III.  MEMORANDUM OF LAW

A.      **Standard for Approval of the Settlement.**

Fed.R.Bankr. P. 9019(a) provides that, after notice and a hearing, a Court may approve a

Trustee's proposed settlement of a claim. Whether a compromise should be accepted or rejected

lies within the sound discretion of the Court. In re Carson, 82 B.R. 847 (Bankr. S.D. Ohio 1987);

In re Ericson, 6 B.R. 1002 (D. Minn. 1980); Knowles v. Putterbaugh (In re Hallet), 33 B.R. 564

(Bankr. D. Me. 1983); In re Mobile Air Drilling Co., Inc., 53 B.R. 605 (Bankr. N.D. Ohio 1985);

In re Hydronic Enterprise, Inc., 58 B.R. 363 (Bankr. D. R.I. 1986).

The Ninth Circuit in Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th

Cir. 1986), cert. denied, 479 U.S. 854 (1986) has stated:

> In determining the fairness, reasonableness and adequacy of
> a proposed settlement agreement, the court must consider:
> (a) the probability of success in the litigation; (b) the
> difficulties, if any, to be encountered in the matter of
> collection; (c) the complexity of the litigation involved, and
> the expense, inconvenience and delay necessarily attending
> it; (d) the paramount interest of the creditors and a proper
> deference to their reasonable views in the premises.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 - Fax: (702) 892-0122

1   Id. (quoting In re Flight Transportation Corp. Securities Litigation, 730 F.2d 1128, 1135 (8th Cir.

2   1984)(citations omitted), cert. denied, 105 S.Ct. 1169 (1985)).

3          Notably, a court should refrain from substituting its own judgment for the judgment of the

4   party charged with operation and maintenance of the estate.  In re Carla Leather, Inc., 44 B.R. at

5   465.  As the Second Circuit has stated, in reviewing a proposed settlement a court should not

6   "decide the numerous questions of law and fact . . . but rather canvass the issues and see whether

7   the settlement falls below the lowest point in the range of reasonableness."  In re W.T. Grant &

8   Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 822 (1983).  A "mini-trial" on the

9   merits of the underlying cause of action is not required and should not be undertaken by the

10  bankruptcy court.  In re Blair, 538 F.2d 849 (9th Cir. 1976); In re Walsh Construction, Inc., 669

11  F.2d 1325 (9th Cir. 1982).

12  **B.      Application of *A&C Properties* Factors**

13          **1.      Probability of Success**

14          The Trustee believes that, if litigated, the Court would agree that the Subject Claims were

15  not transferred to the Marshalls or ASL pursuant to the Purchase and Sale Agreement since those

16  assets were never identified in the PSA (**Exhibit "2"**), were never discussed in the Motion to

17  approve the asset sale, and the Subject Claims are not "assets used by the Debtor connection with

18  the operation of the [business of the Debtor]."  Nevertheless, the Trustee recognizes there is

19  ambiguity in some of the settlement negotiation communications, and recognizes the importance

20  in this particular case of resolving this issue to clarify which party may pursue the Subject Claims.

21  After consideration of the economics of the situation, and evaluation of currently available

22  information supporting the Subject Claims, the Trustee believes it is in the best interest of the

23  estate to have the Marshalls and/or ASL fund the investigation and litigation of the Subject Claims

24  rather than the bankruptcy estate.  The Trustee has concluded that it is in the best interests of the

25  estate to avoid placing the entire expense and risk of investigation and litigation of the Subject

26  Claims on the bankruptcy estate when other parties are motivated to fund and pursue such activity,

27  while still retaining a potential benefit to the bankruptcy estate in the event of recovery.  *See*

28  Schwartzer Declaration.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**2.      Difficulty of Collection**

The Trustee has not identified collection expense as a basis for proposing this Settlement Agreement with the Marshalls and ASL.  The Trustee is not attempting to collect from the Marshalls or ASL.  This Settlement Agreement resolves any ambiguity regarding ownership of the Subject Claims, and also provides a mechanism ensuring the estate will still benefit from any recovery relating to the Subject Claims.  *See* Schwartzer Declaration.

**3.      Complexity of Litigation and Expense, Inconvenience, and Delay**

The Trustee has determined that investigation of the Subject Claims against the Debtor's former officers and related parties will necessarily be an expensive endeavor requiring substantial attorney's fees and costs, and out-of-state travel, and that pursuing the Subject Claims will likely involve protracted discovery and litigation.  In the Trustee's experience, claims against former directors and officers are inherently expensive and complex to investigate and to litigate.  The Settlement Agreement will help preserve the bankruptcy estate's current holdings by shifting the investigative and litigation expense to the Marshalls and/or ASL, while at the same time confirming that the Marshalls and/or ASL are the party in interest to pursue the Subject Claims, and ensuring that the estate will receive a meaningful benefit in the event there are net proceeds recovered from these claims.  *See* Schwartzer Declaration.

**4.      Paramount Interest of Creditors**

The Trustee has determined in this business judgment that the proposed Settlement Agreement (**Exhibit "1"**) is in the best interest of the estate and creditors because it will allow the Marshalls and/or ASL to investigate and pursue the Subject Claims which may provide a substantial benefit to the bankruptcy estate (25% of any net recovery) without any additional expense to the bankruptcy estate.  *See* Schwartzer Declaration.

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.  CONCLUSION

Based upon the foregoing, the Trustee requests entry of an Order of this Court pursuant to Fed.R.Bankr.P 9019 approving his proposed settlement agreement with Edwin G. Marshall, Jill C. Marshall, and AsepticSure Scientific, LLC, pursuant to the terms set forth with more particularity in the Settlement Agreement attached to this Motion as **Exhibit "1."**

A proposed form of Order is attached to this Motion as **Exhibit "3."**

Dated: February 19, 2019

_____
Jason A. Imes, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones, Blvd., Suite 1
Las Vegas, NV 89146
*Counsel for Lenard E. Schwartzer, Trustee*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is entered into as of January 29, 2019 by and among (a) LENARD E. SCHWARTZER, as trustee (the "Trustee") of the chapter 7 estate of Medizone International, Inc., a Nevada corporation (the "Debtor"); (b) EDWIN G. MARSHALL and JILL C. MARSHALL, individuals (the "Marshalls"); and (c) ASEPTICSURE SCIENTIFIC, LLC, a Delaware limited liability company ("ASL," and collectively with the Marshalls and the Trustee, the "Parties"); as follows:

## RECITALS

A.    The Debtor filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), on May 8, 2018 (the "Petition Date"), commencing the case of *In re Medizone International, Inc.,* case no. 18-12662 (the "Chapter 7 Case").

B.    On or shortly after the Petition Date, the Trustee was appointed as the chapter 7 trustee of the estate (the "Estate") of the Debtor.

C.    As of August 31, 2018, the Trustee sold and transferred to ASL (as nominee of the initial buyers) certain property of the Estate, pursuant to a *Purchase and Sale Agreement* dated as of May 17, 2018 (the "PSA"), which sale and transfer was approved and authorized by the Bankruptcy Court under its *Order Approving And Confirming Sale Of Estate Property Free And Clear Of Any Interest,* entered on August 10, 2018 (docket no. 85).

D.    Pursuant to Section 1.1 of the PSA, the property of the Estate transferred to ASL included "all of [the Trustee's] right, title and interest in and to all of the assets used by Debtor in connection with the operation of the [business of the Debtor]."

E.    The members of ASL are the Marshalls and Maximillian Smereka. The Marshalls are the sole managers of ASL, hold a majority of membership interests in ASL, and have the requisite authority to enter into and perform this Agreement on behalf of ASL. Each of the Marshalls also holds a general unsecured claim against the Estate.

F.    The bill of sale (the "Bill of Sale") executed by the Trustee and delivered to ASL as of August 31, 2018 included the following language in identifying the Estate property transferred to ASL pursuant to the PSA, among other assets:

> All of the Estate's right, title, ownership and interest in and to claims, causes of action, damages, liens and all other charges against third parties, including without limitation any and all causes of action and claims against former officers and directors of [the Debtor].

G.    Based on the PSA, the Bill of Sale and the Marshalls' recollection of the expressed intent of the parties to the PSA, ASL claims ownership of all claims, rights, causes of action, damages, liens and all other charges against all former officers, directors, representatives, agents, employees, counsel and other insiders of the Debtor (the "Subject Claims"), among other claims, rights and assets transferred by the Trustee to ASL.

31547.DOC/20140 (rev.012819JAJ)

1

H.    The Trustee also claims ownership of the Subject Claims, contending that the PSA did not provide for transfer of such claims to ASL, that the parties did not express any intention of transferring the ownership of the Subject Claims, and that the Bill of Sale erroneously identifies the Subject Claims among the transferred assets.

I.    The Parties now wish to resolve their dispute as to the ownership of the Subject Claims in accordance with the terms and conditions set forth below.  In addition, in light of its present inability to fund the investigation and, if appropriate, prosecution of the Subject Claims, ASL wishes to transfer its ownership of the Subject Claims to the Marshalls.  The Marshalls are willing to accept such transfer, based on their agreement with their counsel with respect to the funding of such investigation and prosecution.

## AGREEMENT

NOW, THEREFORE, THE PARTIES HEREBY AGREE, COVENANT AND STIPULATE, FOR ADEQUATE CONSIDERATION HEREBY RECEIVED AND ACKNOWLEDGED, as follows:

1.    Recitals Incorporated.  Each of the facts set forth in the foregoing recitals is known to the Parties to be true and correct, and each such recital is incorporated herein.

2.    Conditions to Effectiveness.  The effectiveness of this Agreement is conditioned upon (a) entry of an order (the "Settlement Order") of the Bankruptcy Court approving this Agreement, pursuant to the provisions of Rule 9019 of the Federal Rules of Bankruptcy Procedure.  The Trustee shall use his best efforts to obtain entry of the Settlement Order, in form and substance acceptable to the Marshalls, as soon as possible.  The Agreement shall become effective on the fifteenth (15th) day following entry of the Settlement Order (the "Effective Date").

3.    Ownership of Subject Claims as of August 31, 2018.  The Parties hereby acknowledge and confirm that as of August 31, 2018, ownership of the Subject Claims was transferred to ASL, as reflected in the Bill of Sale, and that all terms of the Bill of Sale are accurate and in full force and effect.

4.    Transfer of Subject Claims.  ASL hereby transfers to the Marshalls all right, title and ownership of the Subject Claims, as of the Effective Date.  Pursuant thereto, and notwithstanding the Trustee's right to a portion of net proceeds (if any) of the Subject Claims, pursuant to the terms of paragraph 5 herein, the Marshalls and their counsel shall have sole and absolute discretion to make all decisions with respect to the investigation, prosecution, non-prosecution, litigation, enforcement and resolution of the Subject Claims, without the necessity of consent of the Trustee or approval of the Bankruptcy Court (other than the Settlement Order approving this Agreement).

5.    Documents and Transcripts.  In any litigation in which the Subject Claims are litigated by the Marshalls, the Marshalls shall provide to the Trustee's counsel, on a current basis, all documents that are filed in court and all transcripts of hearings or depositions received by the Marshalls, other than any documents or transcripts sealed or identified as confidential by a court.

31547.DOC/20140 (rev.012819JAI)

6.    Objection to Claims.  The Marshalls, as general unsecured creditors of the Estate, shall also be entitled, and are hereby authorized to the extent necessary, to file, prosecute, settle or otherwise resolve objections to any and all claims filed against the Estate by any former officer, director, representative, agent, employee, counsel or other insider of the Debtor, without the consent of the Trustee or approval of the Bankruptcy Court.

7.    Distribution of Proceeds of Subject Claims.  The Parties hereby agree upon the following order of distributions of any and all proceeds, whether in the form of money, notes, tangible or intangible property, obligations or other consideration, arising from the prosecution, settlement, enforcement, release, assignment or other disposition of any of the Subject Claims:

(a)    First, fees and reimbursable costs owing to the Marshalls' counsel with respect to the investigation and, if deemed appropriate by the Marshalls and their counsel in their sole and absolute discretion, prosecution, of the Subject Claims, upon such engagement terms as the Marshalls may agree upon with such counsel.

(b)    Second, all remaining proceeds net of payments to MLG shall be divided and distributed as follows:  Twenty-five percent (25%) thereof shall be disbursed to the Trustee on behalf of the Estate; and seventy-five percent (75%) thereof shall be disbursed to the Marshalls.

(c)    Any recovery of proceeds or benefit arising from the Subject Claims shall be immediately reported to the Trustee and the Trustee's portion shall be distributed to the Trustee no later than thirty (30) days after receipt by MLG or the Marshalls.

8.    Expenses.  In the event that, after a default by one of the Parties in performing its respective obligations hereunder, any motion, contested matter, complaint, answer, counterclaim, cross-claim or other action, in or out of court, is taken by any of the other Parties in order to enforce, interpret, implement or prosecute any of the terms of this Agreement, the prevailing Parties shall be entitled to recover from the non-prevailing Parties all reasonable costs incurred in doing so, including reasonable attorneys' fees and expenses.

9.    Construction.  This Agreement shall not be construed more strictly against any of the Parties merely by virtue of the fact that the document has been prepared by one of the Parties or his counsel, it being recognized that each of the Parties has contributed substantially and materially to the preparation of this Agreement, with active consultation by the Parties' respective counsel.

10.    Consideration.  Each of the Parties acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by any of the other parties hereto in entering into this Agreement.

11.    Entire Agreement.  The Parties each acknowledge that there are no other agreements or representations, either oral or written, express or implied, not embodied in this Agreement, which represents a complete integration of all prior and contemporaneous agreements and understandings of the Parties.

12.    Benefit.  Except as provided herein, this Agreement shall be binding upon and, shall inure solely to the benefit of the Parties, and their respective successors, estates, assigns, grantees, heirs, executors, personal representatives and administrators.

13.    Counterparts.  It is understood and agreed that this Agreement may be executed in several counterparts and may be transmitted by electronic mail or by original signature, each of which shall, for all purposes, be deemed an original and all of such counterparts, taken together, shall constitute one and the same Agreement, even though all of the Parties hereto may not have executed the same counterpart of this Agreement.

14.    Authority.  Each of the Parties represents that it has all necessary right, power and authority to enter into and perform this Agreement under all applicable laws, and that upon execution and the satisfaction of any and all applicable condition precedent set forth in Section 2 above, this Agreement shall be binding on such party in accordance with its terms.

15.    Further Assurances.  Each of the Parties agrees to execute such documents, and take such actions, as may be reasonably requested by the other party to this Agreement in order to effectuate the terms of this Agreement.

16.    Jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any disputes as to the enforcement, interpretation or implementation of this Agreement.

17.    Time is of Essence.  Time is of the essence in this Agreement, and any timeliness stated herein may be strictly enforced.

WHEREFORE, the Parties have executed this Agreement as of the Effective Date upon the terms and conditions set forth above.

ASEPTICSURE SCIENTIFIC, INC., a Delaware limited liability company

By: _____

_____
LENARD E. SCHWARTZER, as Trustee

Edwin G. Marshall, Member and Manager

Jill C. Marshall, Member and Manager

_____
EDWIN G. MARSHALL, an individual

JILL MARSHALL, an individual

31547.DOC/20140 (rev.012819JAI)

12.     Benefit.  Except as provided herein, this Agreement shall be binding upon and, shall inure solely to the benefit of the Parties, and their respective successors, estates, assigns, grantees, heirs, executors, personal representatives and administrators.

13.     Counterparts.  It is understood and agreed that this Agreement may be executed in several counterparts and may be transmitted by electronic mail or by original signature, each of which shall, for all purposes, be deemed an original and all of such counterparts, taken together, shall constitute one and the same Agreement, even though all of the Parties hereto may not have executed the same counterpart of this Agreement.

14.     Authority.  Each of the Parties represents that it has all necessary right, power and authority to enter into and perform this Agreement under all applicable laws, and that upon execution and the satisfaction of any and all applicable condition precedent set forth in Section 2 above, this Agreement shall be binding on such party in accordance with its terms.

15.     Further Assurances.  Each of the Parties agrees to execute such documents, and take such actions, as may be reasonably requested by the other party to this Agreement in order to effectuate the terms of this Agreement.

16.     Jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any disputes as to the enforcement, interpretation or implementation of this Agreement.

17.     Time is of Essence.  Time is of the essence in this Agreement, and any timeliness stated herein may be strictly enforced.

WHEREFORE, the Parties have executed this Agreement as of the Effective Date upon the terms and conditions set forth above.


_____
LENARD E. SCHWARTZER, as Trustee

ASEPTICSURE SCIENTIFIC, INC., a Delaware limited liability company

By:     _____
        Edwin G. Marshall, Member and Manager

        _____
        Jill C. Marshall, Member and Manager


_____
EDWIN G. MARSHALL, an individual

_____
JILL MARSHALL, an individual


31547.DOC/20140 (rev 012819JAI)

4

# EXHIBIT "2"

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of May 17, 2018 by and between LENARD SCHWARTZER, as trustee ("Seller") of the chapter 7 estate of MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "Debtor"), and EDWIN G. MARSHALL and JILL C. MARSHALL, N.M.D., individuals (collectively, the "Marshalls," and together with their nominees or assignees, "Buyer"), based upon the following:

## RECITALS

A.      Seller is the trustee of the chapter 7 estate of the Debtor (the "Estate"), in the chapter 7 case of *In re Medizone International, Inc.*, Case No. 18-12662 (the "Chapter 7 Case"), pending before the United States Bankruptcy Court for the District of Nevada, Las Vegas Division (the "Bankruptcy Court"). The Chapter 7 Case was commenced by the Debtor's filing of a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") on May 8, 2018 ("Petition Date").

B.      Prior to the Petition Date, the Debtor was engaged in business, primarily in a laboratory located at Medizone International Laboratories, Innovation Park, 245 Princess Street, Kingston, Ontario, Canada K7L 3N6 (the "Laboratory"), in which the Debtor developed disinfection solutions for use in hospitals, other healthcare facilities and other institutions (the "Business"). In particular, without limiting the foregoing, within the Business is a patented disinfection system named AsepticSure®, which utilizes hydrogen peroxide vapor and ozone in a process that achieves dramatic reductions of bacterial and viral pathogens.

C.      Edwin and Jill Marshall, N.M.D., are the former Chairman/C.E.O. and Director of Operations, respectively, of the Debtor. The Marshalls retired from those positions in February 2017, and entered into separation agreements with the Debtor pursuant to which the Debtor modified existing unsecured promissory notes owing to the Marshalls in an aggregate amount in excess of $1,500,000, to require monthly payments. The notes are in substantial default, for lack of monthly payments owed to the Marshalls in 2017 and 2018.

D.      Following the Marshalls' retirement, new management was hired by the Debtor: David A. Esposito became the Chairman, and David A. Dodd became the C.E.O.

E.      As of the Petition Date, the president of the Debtor was Dr. Michael E. Shannon ("Dr. Shannon"). Dr. Shannon had been employed by the Debtor since 2002 and was also the company's Chief Scientific Officer and its Director of Medical Affairs.

F.      On April 18, 2018, prior to the Petition Date, the Marshalls filed an involuntary chapter 11 petition (the "Involuntary Petition") against the Debtor, in the Reno Division of the Bankruptcy Court. The Debtor answered the Involuntary Petition, contesting material allegations. Buyer and Seller (collectively, the "Parties") anticipate jointly stipulating to the dismissal of the Involuntary Petition, upon mutually agreeable terms, in deference to the

1

31429.DOC

pendency of the Chapter 7 Case.

G.    Seller intends to request authority of the Bankruptcy Court to operate the Business, on a limited basis and for a limited period of time, pursuant to Section 721 of the Bankruptcy Code (the "Section 721 Motion").

H.    The Marshalls have agreed to lend to Seller, on a secured basis, funds sufficient for such limited operations of the Business, under certain terms and conditions, as set forth in a Loan Agreement and related documents (the "Loan"), and Seller intends to request authority of the Bankruptcy Court to borrow the Loan from the Marshalls pursuant to Section 364 of the Bankruptcy Code (the "Section 364 Motion").

I.    Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the assets of the Business, including the intellectual property, real property, fixtures, tangible and intangible personal property, inventory, goodwill, executory contracts (to the extent approved by Buyer as set forth below) and other assets of the Business, on the terms and conditions set forth in this Agreement.

J.    Buyer also desires to consider proposing a plan of reorganization in place of the sale contemplated in this Agreement, and Seller has agreed to terms, as described in this Agreement, that will allow Buyer a limited period of time to determine whether to pursue chapter 11 reorganization prior to any efforts by Seller to advance the sale or overbid process set forth in this Agreement.

K.    NOW, THEREFORE, in consideration of the mutual covenants, representations, and warranties contained in this Agreement, the Parties agree as follows:

1.    **ARTICLE 1. PURCHASE AND SALE OF ASSETS**

1.1    Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, at Closing (as defined below), all of Seller's right, title, and interest in and to all of the assets used by Debtor in connection with the operation of the Business (the "Assets"), including, without limitation, the following:

(a)    All tangible personal property, furnishings, fixtures, equipment, machinery, parts, accessories, inventory, including without limitation any and all personal property presently located or used in the Laboratory (the "Personal Property");

(b)    All contracts, agreements, equipment leases, warranties, and other rights or agreements, whether written or oral, and all executory contracts (as that term is used in Section 365 of the Bankruptcy Code) to which the Debtor is a party, but only to the extent approved by Buyer in a writing delivered to Seller no later than June 30, 2018 (the "Assumed Contracts");

(c)    All real estate leases to which the Debtor is a party, but only to the extent approved by Buyer in a writing delivered to Seller no later than June 30, 2018, together with all of Debtor's interest in any security deposits, prepaid rent, leasehold improvements, and appurtenances to the leased property (the "Real Property Leases");

31429.DOC

(d)    All of Seller's or Debtor's right, title, and interest in and to the trade names, logos, copyrights, service marks, trademarks, patents, patent applications, licenses, and goodwill associated with the Business, including without limitation those listed on Schedule 1.1(d) attached hereto (the "Intangible Property"); and

(e)    All of Debtor's books and records, accounting records and other financial or transactional documents, to the extent available to Seller with reasonable effort (the "Records").

1.2    Seller shall convey title to the Assets to Buyer free and clear of all liens, security interests, and encumbrances of any kind or nature.

1.3    Seller assumes all risk of loss or damage to the Assets prior to the Closing.  In the event there is any material loss or damage to all or any portion of the Assets prior to the Closing, Buyer may either terminate this Agreement pursuant to Article 13, or negotiate with Seller for a proportionate reduction in the Purchase Price to reflect the loss or damage.  For the purposes of this provision, the term "material loss or damage" shall mean any loss or damage to the Assets with an aggregate cost of $5,000.00.

## 2.    ARTICLE 2. ASSUMPTION OF LIABILITIES

2.1    Effective as of the Closing Date (as defined below), Buyer shall assume responsibility for the performance and satisfaction of all of the executory obligations and liabilities of Debtor under the Assumed Contracts (the "Assumed Liabilities").

2.2    Except as expressly provided in this Agreement, Buyer shall not assume or become liable for any obligations, commitments, or liabilities of Seller or Debtor, whether known or unknown, absolute, contingent, or otherwise, and whether or not related to the Assets, including, without limitation, any employment, business, sales, or use tax relating to Seller's or Debtor's operation of the Business and use and ownership of the Assets prior to the Closing.

## 3.    ARTICLE 3. PURCHASE PRICE

3.1    The purchase price to be paid by Buyer to Seller for the Assets (the "Purchase Price") shall be $500,000.00.

3.2    Buyer shall pay the Purchase Price to Seller at Closing in cash or immediately available funds, less the full amount of all principal, interest, fees and other charges owing as of the Closing under the Loan, which shall be deducted from the Purchase Price.

3.3    The Purchase Price shall be allocated among the Assets as designated in writing by Buyer within sixty (60) days following the Closing. The Parties agree to be bound by Buyer's allocation and to report these items for federal income tax purposes as allocated. The parties agree to execute and deliver Internal Revenue Service Form 8594 reflecting this allocation.

3.4    The parties agree to abide by the allocation of the Purchase Price specified in this Agreement, and agree to report the transaction as so allocated for income tax purposes.

3

4.    **ARTICLE 4. CLOSING**

4.1     The closing for the purchase and sale of the Assets (the "Closing") shall be held at the office of Seller, located at 2850 S. Jones Blvd., Suite 1, Las Vegas, Nevada 89146, on a date mutually agreed upon as soon as practicable following satisfaction of all conditions precedent to the Closing, or at such other time and place as the Parties may mutually agree in writing (the "Closing Date"). At Closing, Seller shall transfer and convey title to the Assets to Buyer as provided in this Agreement, free and clear of all liens, security interests and other encumbrances of any kind.

4.2     At the Closing, Seller shall execute, acknowledge, and deliver, as appropriate, each of the following items:

(a)     A duly executed bill of sale (the "Bill of Sale"), in form and substance acceptable to Buyer, conveying all of Seller's and Debtor's right, title, and interest in and to the Personal Property to Buyer.

(b)     A duly executed assignment of the Assumed Contracts (the "Assignment of Contracts"), in form and substance acceptable to Buyer, pursuant to which Seller shall assign to Buyer all of Seller's and Debtor's right, title and interest in and to the Assumed Contracts.

(c)     A duly executed assignment of leases (the "Assignment of Leases"), in form and substance acceptable to Buyer, pursuant to which Seller shall assign to Buyer all of Seller's and Debtor's right, title, and interest in and to the Real Property Leases.

(d)     A duly executed assignment of intangible property (the "Assignment of Intangible Property") in form and substance acceptable to Buyer,, assigning all of Seller's and Debtor's right, title, and interest in the Intangible Property to Buyer.

(e)     All other deeds, bills of sale, motor vehicle titles, warranty deeds, assignments, endorsements, licenses, and other good and sufficient instruments and documents of conveyance and transfer as shall be necessary and effective to transfer, convey, and assign to Buyer at the Closing all of Seller's and Debtor's right, title, and interest in and to the Assets, free and clear of any liens or encumbrances, as required by the terms of this Agreement.

4.3     At the Closing, Buyer shall execute, acknowledge, and deliver, as appropriate, each of the following items:

(a)     The amount of the Purchase Price, less the full amount of all principal, interest, fees and other charges owing as of the Closing under the Loan, in cash or immediately available funds, together with any funds as may be necessary to comply with Buyer's obligations regarding the payment of prorations, costs, and expenses under this Agreement.

(b)     Executed counterparts of any documents required to be signed by Buyer pursuant to this Agreement, including, but not limited to, the Assignment of Contracts and Assignment of Leases.

4.4     The expenses of Closing shall be paid as follows:

4

(a)     Buyer shall pay all sales and use taxes arising out of the transfer of the Assets, if any.

(b)     Except as otherwise expressly provided in this Agreement, all other Closing fees and costs, including, but not limited to, legal fees, accounting fees, consulting fees, and other incidental expenses in connection with the transactions contemplated by this Agreement shall be borne by the party that incurs the expenses.

(c)     Except as otherwise expressly provided in this Agreement, all expenses associated with the Assets being conveyed to Buyer, including, but not limited to, taxes, rent, insurance premiums, and utility charges, shall be apportioned ratably between the parties as of the Closing Date on the basis of a 30-day month. This obligation to make apportionments shall survive the Closing.

5.     **ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF SELLER**

5.1     Seller makes the following representations and warranties to Buyer, each of which is true and correct as of the date of this Agreement, and will be true and correct as of the Closing Date:

(a)     Seller is the duly appointed and qualified trustee of the Debtor's Estate, and has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms, subject to Bankruptcy Court approval as set forth elsewhere in this Agreement.

(b)     The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Debtor is a party, or any law, judgment, or order of which Seller is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

(c)     There are no actions, suits, proceedings, or claims now pending, or, to the best of Seller's knowledge, threatened against Seller or the Assets that would affect Seller's ability to fulfill its obligations under this Agreement or that would impair the value of the Assets.

(d)     No representation or warranty of Seller in this Agreement or any other information furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, and other information provided by Seller to Buyer shall be true and correct on and as of the Closing Date as though made on that date.

(e)     Seller will not begin any efforts to obtain approval or implementation of any sale or overbid process with respect to the Assets, including without limitation the filing of any motion for approval of any of the transactions contemplated herein, until July 1, 2018 at the earliest. Seller understands and approves that until June 1, 2018, Buyer will devote substantial time and effort to determining whether conversion of the Chapter 7 Case to chapter 11 of the Bankruptcy Code (with Seller remaining in place as trustee) is preferred, in which event Buyer may move the Bankruptcy Court for such conversion and will recommend and support the

5

appointment of Lenard E. Schwartzer as Chapter 11 Trustee for the estate. If such motion is pursued by Buyer, Seller's right to support or oppose conversion shall be preserved. Seller further understands and approves that at any time prior to the Closing Date, Buyer may contact and solicit third persons, including without limitation shareholders, vendors, creditors or business partners to determine whether any of those parties wish to provide funding either for Buyer's obligations hereunder or for a reorganization plan in a converted chapter 11 plan, and Seller agrees that such communications and solicitations shall not constitute collusion, bid-rigging or any other improper conduct, *provided* that Buyer shall cease any communication with any party upon written notice from Seller that such party has contacted Seller directly to express an interest in purchasing the Assets independently of Buyer.

(f)     Seller shall conduct an overbid/auction process with respect to the Assets only in strict conformity with the provisions of Article 9 below.

## 6.     ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF BUYER

6.1     Buyer makes the following representations and warranties to Seller, each of which is true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date:

(a)     Buyer has full legal power and authority to enter into and perform this Agreement, and this Agreement constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms.

(b)     The execution and delivery of this Agreement does not conflict with, violate, or constitute a default under the terms, conditions, or provisions of any agreement or instrument to which Buyer is a party, or any law, judgment, or order of which Buyer is aware, and will not result in the creation of any lien, security interest, or encumbrance on any of the Assets.

(c)     There is no action, proceeding, or claim pending, or, to Buyer's knowledge, threatened, against Buyer that would affect Buyer's ability to consummate the transactions contemplated by this Agreement.

(d)     No representation or warranty of Seller in this Agreement or any other information furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, and other information provided by Seller to Buyer shall be true and correct on and as of the Closing Date as though made on that date.

(e)     No representation or warranty of Buyer in this Agreement or any other information furnished by Buyer pursuant to this Agreement contains any untrue statement of material fact or fails to state any fact necessary in order to make the statements not misleading in any material respect. All statements, representations, exhibits, and other information provided by Buyer to Seller shall be true and correct on and as of the Closing Date as though made on that date.

6

31429.DOC

7.   **ARTICLE 7. SELLER'S PRE-CLOSING OBLIGATIONS**

7.1   At all times prior to the Closing Date, to the extent that funding is provided pursuant to the Loan, Seller shall continue to maintain the Assets and conduct operation of the Business in the same manner as they have been maintained and operated by Seller prior to the execution of this Agreement, and in full compliance with the terms and conditions of the Loan.

7.2   Seller shall promptly provide Buyer with all information concerning the Business and the Assets that Buyer may reasonably request, and Buyer and its attorneys and other representatives shall have access during normal business hours to all of the Assets and to the books and records of the Business.

7.3   Any and all liens, claims, charges, security interests, pledges, assignments, or encumbrances relating to the Assets shall be satisfied, terminated, and discharged by Seller on or prior to the Closing Date and evidence reasonably satisfactory to Buyer and its counsel of the satisfaction, termination, and discharge shall be delivered to Buyer at or prior to the Closing.

7.4   Seller shall terminate all of its employees working in the Business effective as of the Closing Date. Seller shall be responsible without exception for all compensation, taxes, insurance, and other benefits and amounts relating to its employees and shall indemnify and hold Buyer harmless from any claims made against Buyer with respect to the obligations. Buyer shall not assume or in any way become responsible or liable for any compensation, taxes, insurance, or other benefits and amounts payable by Seller on account of any of its employees.

7.5   Any claim by Buyer against the bankruptcy estate and/or Seller must be filed with the Bankruptcy Court within six (6) months following the Closing Date.

8.   **ARTICLE 8. MUTUAL COVENANTS**

8.1   Seller and Buyer shall, prior to Closing, execute any and all documents and perform any and all acts reasonably necessary, incidental, or appropriate to effect the transactions contemplated by this Agreement.

8.2   At any time after the Execution Date and prior to the Closing, if Seller becomes aware of any fact or circumstance that would materially change a representation or warranty made under this Agreement, or materially change the condition or value of the Business in any respect, Seller shall notify Buyer in writing as soon as possible after the discovery of the changed circumstances.

8.3   Each party represents and warrants that no broker, finder, or any other person or entity has any claim for any brokerage commissions or fees in connection with any of the transactions contemplated by this Agreement. Each party shall indemnify the other against any claim or loss suffered as a result of any claim for brokerage commissions or fees payable, or claimed to be payable, on the basis of any actions in connection with this Agreement.

31429.DOC

9.    **ARTICLE 9.  OVERBID/AUCTION PROCESS**

9.1    Seller may conduct an overbid and auction process to determine whether a higher or better bid than the Purchase Price may be obtained for the Assets, *provided* that Seller strictly complies with each of the following provisions:

    (a)    Seller shall accept no overbid that:

        (i)    does not conform to all substantive terms of this Agreement, including without limitation the absence of a financing or due diligence contingency;

        (ii)    is not accompanied by a good-faith cash deposit in an amount no less than $100,000.00, delivered to Seller no less than three (3) business days prior to an auction; and

        (iii)    does not include a proposed cash purchase price that is at least $575,000.00, and is at least $35,000 greater than any preceding overbid accepted by Seller.

    (b)    Seller shall allow Buyer to match any overbid accepted by Seller as to purchase price, upon the same terms as this Agreement in all other respects, in which event Buyer shall become the accepted bidder, subject to further overbids.

    (c)    In the event that the Assets are sold to a purchaser other than Buyer, Seller shall pay to Buyer a breakup fee in the amount of $35,000.00, at the close of such sale.

    (d)    Seller shall obtain Bankruptcy Court approval of an overbid/auction process that includes each of the foregoing terms, including without limitation Buyer's right to a breakup fee, no less than fourteen (14) days prior to such overbids and auction occurring.

10.    **ARTICLE 10.  CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

10.1    The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions:

    (a)    Orders of the Bankruptcy Court granting the Section 364 Motion and the Section 721 Motion, in forms and substance acceptable to Buyer, shall have been entered on or before May 31, 2018, and a final order granting the Section 364 Motion, in form and substance acceptable to Buyer, shall have been entered on or before June 22, 2018, and shall not be stayed or enjoined as of the Closing Date.

    (b)    An order of the Bankruptcy Court approving this Agreement and the transactions contemplated herein, and authorizing Seller to consummate all such transactions, and to transfer, sell and assign the Assets to Buyer free and clear of all liens, pursuant to Sections 363 and 365 of the Bankruptcy Code, in forms and substance acceptable to Buyer, shall have been entered on or before August 10, 2018, and shall not be stayed or enjoined as of the Closing Date.

(c)    No Event of Default shall have occurred under the Loan, except as may have been waived by Buyer in writing in its sole discretion.

(d)    The representations and warranties of Seller set forth in Article 5 shall be true and correct as of the Closing Date.

(e)    Seller shall have performed and complied with all of the agreements, covenants, and conditions required of Seller by this Agreement on or before the Closing Date.

(f)    No action, suit, or proceeding before any court or any governmental body or authority that would in any way affect the Assets or the ability of the parties to consummate the transactions contemplated by this Agreement shall have been instituted or threatened on or before the Closing Date.

(g)    The Assets shall be in substantially the same condition on the Closing Date as on the Execution Date, and there shall be no loss or damage to the property prior to the Closing.

10.2    Any of Buyer's conditions precedent may be waived in whole or in part by Buyer in writing at any time on or before the Closing Date. In the event all Buyer's conditions precedent have not been waived by Buyer or satisfied in full on or before the Closing Date, Buyer may elect to terminate this Agreement as provided in Article 13.

## 11.    ARTICLE 11. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

11.1    The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions:

(a)    Orders of the Bankruptcy Court granting the Section 364 Motion and the Section 721 Motion, in forms and substance acceptable to Buyer, shall have been entered on or before May 31, 2018, and shall not be stayed or enjoined as of the Closing Date.

(b)    An order of the Bankruptcy Court approving this Agreement and the transactions contemplated herein, and authorizing Seller to consummate all such transactions, and to transfer, sell and assign the Assets to Buyer free and clear of all liens, pursuant to Sections 363 and 365 of the Bankruptcy Code, in forms and substance acceptable to Buyer, shall have been entered on or before August 10, 2018, and shall not be stayed or enjoined as of the Closing Date.

(c)    Seller shall have received the amount of the Purchase Price in cash or immediately available funds at Closing.

(d)    The representations and warranties of Buyer set forth in Article 6 shall be true and correct as of the Closing Date.

(e)    Buyer shall have performed and complied with all of the agreements, covenants, and conditions required of Buyer by this Agreement on or before the Closing Date.

9

11.2    Any of Seller's conditions precedent may be waived in whole or in part by Seller in writing at any time on or before the Closing Date. In the event all Seller's conditions precedent have not been waived by Seller or satisfied in full on or before the Closing Date, Seller may elect to terminate this Agreement as provided in Article 13.

## 12.    ARTICLE 12. POST-CLOSING OBLIGATIONS

12.1    Each party agrees to do all acts and things and to make, execute, and deliver such written instruments as shall be reasonably necessary to carry out the terms and provisions of this Agreement. This covenant of further assurances shall survive the Closing.

## 13.    ARTICLE 13. TERMINATION

13.1    This Agreement may be terminated as follows:

(a)    By the mutual consent of Buyer and Seller at any time prior to the Closing.

(b)    By Buyer at any time prior to the Closing as expressly provided in this Agreement, or if any material condition precedent to Buyer's obligations set forth in Article 10 has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing.

(c)    By Seller at any time prior to the Closing as expressly provided in this Agreement, or if any material condition precedent to Seller's obligations set forth in Article 11 has not been satisfied in full or previously waived by Buyer in writing, at or prior to the Closing.

(d)    By either party if the Closing has not occurred on or before September 1, 2018.

13.2    In the event of the termination of this Agreement pursuant to the provisions of Section 13.1, this Agreement shall become void and have no effect, without any liability on the part of any of the parties.

13.3    The remedies set forth in this Agreement are cumulative and not exclusive of any other legal or equitable remedy otherwise available to any party.

## 14.    ARTICLE 14. INDEMNIFICATION

14.1    In addition to any other agreement on the part of Seller to indemnify Buyer set forth in this Agreement, Seller shall indemnify and hold Buyer harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorneys' fees and costs, in any way arising from or related to (a) Seller's ownership or use of the Assets, or Seller's operation of the Business, prior to the Closing Date, (b) the failure or falsity of any representation or warranty of Seller contained in this Agreement, or (c) the failure by Seller to observe or perform any other covenant or agreement to be observed or performed by Seller under this Agreement.

10

14.2    In addition to any other agreement on the part of Buyer to indemnify Seller set forth in this Agreement, Buyer shall indemnify and hold Seller harmless from and against any and all loss, cost, damage, claim, liability, or expense, including reasonable attorneys' fees and costs, in any way arising from or related to Buyer's ownership or use of the Assets from and after the Closing Date.

14.3    The mutual agreements to indemnify set forth in this Article 13 shall survive the Closing.

## 15.    ARTICLE 15. GENERAL PROVISIONS

15.1    The terms and provisions of this Agreement shall be binding on and inure to the benefit of the successors and assigns of the parties.

15.2    This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral and written, between the parties hereto with respect to the subject matter of this Agreement.

15.3    This Agreement may not be amended, modified, or supplemented except by written agreement signed by the party against which the enforcement of the amendment, modification, or supplement is sought. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision. No waiver shall be binding unless executed in writing by the party making the waiver.

15.4    If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in the action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

15.5    Except as otherwise specifically provided in this Agreement, Seller and Buyer shall pay their own fees and expenses in connection with the negotiation and consummation of the transactions contemplated by this Agreement.

15.6    All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be (a) delivered in person or by courier, (b) mailed by first class registered or certified mail, or (c) delivered by facsimile transmission, as follows, or to such other address as a party may designate to the other in writing:

(a)    If to Seller:  Lenard E. Schwartzer, Chapter 7 Trustee, 2850 S. Jones Blvd., Suite 1, Las Vegas, NV 89146, email to: trustee@s-mlaw.com; with a copy to Schwartzer & McPherson Law Firm, 2850 S. Jones Blvd., Suite 1, Las Vegas, NV 89146, email to: bkfilings@s-mlaw.com.

(b)    If to Buyer: Edwin and Jill Marshall, 144 Buena Vista, Stinson Beach, CA 94970, email:  medoz3int@yahoo.com; with a copy to:  Meyers Law Group, P.C., Attn: Merle C. Meyers, Esq., 44 Montgomery Street, Suite 1010, San Francisco, CA 94104, email: mmeyers@meyerslawgroup.com.

11

(c)    If delivered personally or by courier, the date on which the notice, request, instruction, or document is delivered shall be the date on which the delivery is made, and if delivered by facsimile transmission or email as aforesaid, the date on which the notice, request, instruction, or document is received (unless a Federal holiday or weekend, in which event the next weekday that is not a Federal holiday) shall be the date of delivery.

15.7    All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement, and shall not affect in any way the meaning or interpretation of this Agreement.

15.8    This Agreement may be executed in two (2) or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one counterpart has been signed by each party and delivered to the other party hereto.

15.9    Time shall be of the essence with respect to the obligations of the parties to this Agreement.

15.10    This Agreement shall be governed by and construed under the laws of the State of California.

15.11    In the event any provision of this Agreement is deemed to be invalid, illegal, or unenforceable, all other provisions of the Agreement that are not affected by the invalidity, illegality, or unenforceability shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date of this Agreement.

SELLER:

_____
LENARD SCHWARTZER, as Trustee of
the chapter 7 estate of Medizone
International, Inc.

BUYER:

_____
EDWIN G. MARSHALL

_____
JILL C. MARSHALL, N.M.D.

12

**SCHEDULE 1.1(d)**

**LIST OF PATENTS**

<u>United States:</u>

§ Patent No. 5,052,382 – Apparatus for the Controlled Generation and Administration of Ozone

§ Patent No. 6,073,627 – External Application of Ozone/Oxygen for Pathogenic Conditions, a process patent for the treatment of external afflictions. This patent also describes equipment evolutions and treatment envelope design for external medical applications.

§ Provisional Patent Application serial no. 10/002943, for Method and Apparatus for Ozone Decontamination of Biological Liquids. This application deals with protocols for biological liquid decontamination as well as the devices for conducting decontamination.

§ Patent No. 8,551,399 – Healthcare Facility Disinfecting System (Oct 2013).

§ Patent No. 8,636,951 – Bio-terrorism Counteraction Using Ozone and Hydrogen Peroxide (Jan 2014).

§ Patent No. 8,992,829 – Sports Equipment and Facility Disinfection.

§ Patent No. 13/821,483 – Food Handling Disinfection Treatment covering the use of AsepticSure® in food processing plants and related facilities for the sterilization of food-borne pathogens such as Listeria, Salmonella, and other human harmful, food-poisoning-causing bacteria.

<u>Europe:</u>

§ Patent No. 252583B - Bio-Terrorism Counter Measures Using Ozone and Hydrogen Peroxide (June 2016).

Healthcare Facility Disinfection System (Aug 2016)

<u>Canada:</u>

§ Patent No. 2735739 – Healthcare Facility Disinfection Process and System with Oxygen/Ozone (Nov. 2011)

§ Patent No. 2846256 – Sports Equipment and Facility Disinfection

<u>China:</u>

§ Patent No. ZL 201080030657.2 - Healthcare Facility Disinfection System (Nov 2015)

13

31429.DOC

<u>Singapore:</u>

§ Patent No.176977 – Healthcare Facility Disinfecting Process and System with Oxygen/Ozone Mixture (Feb 2013)

<u>Mexico:</u>

§ Patent (allowed, but awaiting issuance) Healthcare Facility Disinfecting Process and System With Oxygen/Ozone Mixture (Nov 2016)

Applications are also pending in the 38 member countries that are parties to the EU Patent Treaty, as well as South Korea, India, Singapore, Brazil and Mexico.

14

# EXHIBIT "3"

1

2

3

4

5

6   Jason A. Imes, Esq., NV Bar No. 7030
7   Schwartzer & McPherson Law Firm
    2850 South Jones Blvd., Suite 1
8   Las Vegas NV  89146-5308
    Telephone:    (702) 228-7590
9   Facsimile:    (702) 892-0122
    E-Mail:       bkfilings@s-mlaw.com
10  *Attorneys for Lenard E. Schwartzer, Trustee*

11              **UNITED STATES BANKRUPTCY COURT**

12                    **DISTRICT OF NEVADA**

13  In re:                          Case No. BK-S-18-12662-ABL

14  MEDIZONE INTERNATIONAL, INC.,   Chapter 7

15                      Debtor.      **[ PROPOSED ] ORDER GRANTING**
16                                   **MOTION FOR APPROVAL OF**
                                     **SETTLEMENT AGREEMENT**
17                                   **(FRBP 9019)**

18                                   Hearing Date:   March 21, 2019
19                                   Hearing Time:   11:00 a.m.

20      The Trustee's *Motion for Approval of Settlement Agreement* (the "Motion") [ECF No.

21  ____ ] having come before this Court on the _____ day of _____, 2019;  LENARD E.

22  SCHWARTZER, Chapter 7 Trustee (the "Trustee"), appearing by and through his counsel, Jason

23  A. Imes., Esq., of the Schwartzer & McPherson Law Firm, and other parties appearing as noted on

24  the record; the Court finding that notice was given to all parties in interest as required, and having

25  reviewed and considered the Motion and also having reviewed the proposed settlement materials,

26  and there being no opposition;  the Court having made its findings of fact and conclusions of law

27  upon the record which are incorporated herein pursuant to Federal Rules of Bankruptcy Procedure

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9014(c) and 7052, and for good cause appearing,

**IT IS HEREBY ORDERED** that the Trustee's Motion is GRANTED; and

**IT IS FURTHER ORDERED** that the Trustee's proposed settlement agreement with Edwin G. Marshall, Jill C. Marshall, and AsepticSure Scientific, LLC, pursuant to the terms set forth with more particularity in the Settlement Agreement attached to this Order as **Exhibit "1,"** is hereby approved pursuant to Fed.R.Bankr.P 9019.

**IT IS SO ORDERED.**

Submitted by:

_____

Jason A. Imes, Esq.
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146
*Attorneys for Lenard E. Schwartzer, Trustee*

## LR 9021 CERTIFICATION

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐    The court waived the requirement of approval under LR 9021(b)(1).

☐    No party appeared at the hearing or filed an objection to the motion.

☐    I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objection to the form or content of the order.

_____

Jason A. Imes, Esq.
SCHWARTZER & MCPHERSON LAW FIRM

### # # #

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122