Jason A. Imes, Esq., NV Bar No. 7030
Schwartzer & McPherson Law Firm
2850 South Jones Blvd., Suite 1
Las Vegas NV  89146-5308
Telephone:     (702) 228-7590
Facsimile:     (702) 892-0122
E-Mail:        bkfilings@s-mlaw.com
*Attorneys for Lenard E. Schwartzer, Trustee*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No. BK-S-18-12662-ABL |
| MEDIZONE INTERNATIONAL, INC., | Chapter 7 |
| Debtor. | **OBJECTION TO PROOF OF CLAIM NO. 42 (L2 CAPITAL, LLC)** |
| | Hearing Date:   June 25, 2020<br>Hearing Time:   11:00 a.m. |

LENARD E. SCHWARTZER, Chapter 7 Trustee (the "Trustee"), by and through his

counsel, Schwartzer & McPherson Law Firm, objects to Proof of Claim No. 42 filed herein on

July 18, 2018, by L2 CAPITAL, LLC asserting an unsecured claim in the sum of $1,095,899.31.

The Trustee has concluded this proof of claim significantly overstates the debt owed to this

creditor as of the Petition Date and it improperly claims post-petition interest and penalties.  The

Trustee moves this Court pursuant to 11 U.S.C. §502 and FRBP 3007 for an order that the claim

instead be deemed allowed in the reduced sum of **$155,775.62** as a non-priority unsecured claim

against this bankruptcy estate to be paid pro-rata with other similarly situated claims.

The Motion is supported by the *Declaration of Lenard E. Schwartzer* (the "Schwartzer

Declaration") filed concurrently with this Motion, and the following Points and Authorities.

**I. JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is

a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## II. BACKGROUND

**A.   Case History**

1.      On April 18, 2018, creditors Edwin G. Marshall and Dr. Jill C. Marshall, Ushio America, Inc., and Engineering CPR, Inc., filed an involuntary petition under Chapter 11 the Bankruptcy Code against the Debtor MEDIZONE INTERNATIONAL, INC. (the "Debtor") in Reno, Nevada, thereby commencing bankruptcy case number 18-50412-GWZ (the "Involuntary Chapter 11 Case").  The Involuntary Chapter 11 Case was subsequently dismissed on July 16, 2018, prior to entry of an order for relief, and no Trustee was appointed in the case.

2.      On May 8, 2018, the Debtor filed its voluntary petition pursuant to Chapter 7 of the Bankruptcy Code in Las Vegas, Nevada, commencing this instant case, and Trustee Schwartzer was appointed to administer the Chapter 7 estate.

3.      The Trustee was authorized by this Court to continue operation of Debtor's business for approximately 90 days post-petition [ECF No. 36] and was authorized to borrow funds for the continued operation of the business [ECF No. 40] pending sale of the bankruptcy estate's assets.

4.      The Trustee completed the necessary operation of the business and sale of the assets [ECF No. 85] for $500,000.00 and the post-petition loan was fully repaid from those sales proceeds. The remaining funds are expected to be sufficient for payment of estate administrative expenses in full, and a meaningful distribution to non-priority unsecured creditors of this estate. The Trustee is currently holding approximately $195,000.00 in the estate (*See* Schwartzer Declaration.)

**B      The Disputed Proof of Claim**

5.      On July 18, 2018, creditor L2 Capital, LLC ("L2C"), filed Proof of Claim No. 42 in this case (the "L2C Claim") asserting an unsecured claim in the sum of $1,095,899.41 for "money loaned" to the Debtor approximately four months prior to the Petition Date in the principal sum of $152,500.00.   A copy of the L2C Claim is attached as **Exhibit "1."**

6.       L2C also provided supporting documents with its proof of claim including a spreadsheet explaining how L2C calculated its claim total (**Exhibit "2"**), a copy of the underlying

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Convertible Promissory Note in the principal sum of $152,500.00 (attached to this Objection as

2  **Exhibit "3"**), and a copy of a wire transfer receipt indicating payment of $125,000.00 from L2C

3  to the Debtor on January 31, 2018 (**Exhibit "4"**).  It should be noted that Proof of Claim No. 43

4  filed on the same date by SBI Investments, LLC, 2014-1, is nearly identical and is the subject of a

5  separate objection.

6        7.     The Convertible Promissory Note indicates a non-default rate of 8% per annum,

7  and the principal sum of the loan was $152,500.00. However, L2C only disbursed $125,000.00 to

8  the Debtor on January 31, 2018, due to an Original Issue Discount (OID) of $17,500.00, and a

9  credit of $10,000.00 deducted for lender L2C's "legal expenses."  *See* **Exhibit "3,"** page 1 and 2.

10        8.     Pursuant to the Convertible Promissory Note, the maturity date was six (6) months

11  from the issue date of January 31, 2018 (which is presumably on or about July 31, 2018), at which

12  point all unpaid principal and interest was due, and no payments were due prior to said six-month

13  maturity date. *See* **Exhibit "3,"** page 1.

14        9.     The Convertible Promissory Note also states that any amounts due that are not paid

15  by the six-month maturity date (presumably July 31, 2018) bear default interest at the lesser of

16  24% or the maximum allowed by law. *See* **Exhibit "3,"** page 1.

17       10.    In addition to the 24% default interest, however, Article III of the Convertible

18  Promissory Note lists 19 different possible situations that may be deemed "Events of Default"

19  which add additional interest and penalties. Many of these discrete "events of default" overlap and

20  include: a failure to pay (¶3.1); breach of covenants (¶3.3); appointment of a receiver or trustee

21  (¶3.5); filing bankruptcy (¶3.7); and liquidation (¶3.10).  *See* **Exhibit "3,"** pages 9-12.

22       11.    According to the Convertible Promissory Note, if any one of these 19 listed "events

23  of default" occur, then the note is deemed in default and becomes immediately due and payable in

24  an amount equal to 140% of the balance due, **plus** an additional 5% "for each additional Event of

25  Default that occurs," **multiplied by** the outstanding balance due under the note, **plus** the default

26  interest at 24%, and then this aggregated total (referred to in the note as the "Default Sum") is to

27  be "MULTIPLIED BY (Z) TWO (2)." *See* **Exhibit "3,"** pages 9-12.

28       12.    L2C asserts in its accounting spreadsheet (**Exhibit "2"**) that 10 of the 19 possible

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   distinct events of default have occurred (each adding an additional 5% on top of the 140% "default

2   sum," which is then multiplied by 2, plus 24% default interest), and therefore the original

3   $152,500.00 principal (of which $125,000.00 was wired to the Debtor) ballooned to a debt of over

4   $1 million in less than six months. *See* L2C's supporting spreadsheet attached as **Exhibit "2."**

5        13.     Debtor filed its voluntary petition on May 8, 2018, less than four months after the

6   L2C loan funded with a wire transfer of $125,000.00, and over two months prior to the note's 6-

7   month maturity date (presumably July 31, 2018).

8        14.     The Trustee has determined that the L2C Claim improperly seeks payment for

9   unmatured post-petition interest, and for pre-petition interest/penalties that were not actually owed by

10  Debtor on the Petition Date. (*See* Schwartzer Declaration.)

11       15.     The Trustee has  also concluded that the note's default  provisions  (including

12  immediate escalation to 140% of the balance due, plus 5% compounding for each of the overlapping

13  "events of default," plus  24% default interest) appear to be unenforceable penalties under state law

14  rather than reasonable compensation for actual loss. The Trustee believes that terms that purportedly

15  balloon an unsecured debt from $152,500.00 to over $1 million in less than 5 months do not appear to

16  be an accurate reflection of the relative risk. (*See* Schwartzer Declaration.)

17       16.     The loan was still in its initial 6-month term, and since no payments were due until

18  the maturity date (presumably July 31, 2018), the Debtor had not defaulted on this loan as of the

19  Petition Date.

20       17.     The Trustee does not believe unsecured creditors of this estate will be paid in full,

21  so creditor L2C is not entitled to post-petition interest or penalties. (*See* Schwartzer Declaration.)

22       18.     The Trustee therefore requests that the L2C Claim should be limited to the principal

23  balance ($152,500.00) plus the non-default interest at a rate of 8.0% accrued from January 31, 2018

24  through the Petition Date.

25             Principal Sum                 $152,500.00
               8% interest for 98 days       $   3,275.62

26             Claim total as of Petition Date   $155,775.62

27       19.     Rather than disallow the L2C Claim in its entirety, the Trustee proposes to allow the

28  L2C Claim as a general non-priority unsecured claim, but only in the total sum of **$155,775.62**, and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 • Fax: (702) 892-0122

1   that any amount in excess of that sum should be disallowed.

2            **III.  MEMORANDUM OF LAW**

3   A.     <u>**Burden for Objections to Proof of Claim**</u>

4        Pursuant to 11 U.S.C. §502(a), a proof of claim is deemed allowed unless a party in

5   interest objects. The Ninth Circuit has stated that to defeat a claim, the objecting party must

6   produce sufficient evidence and "show facts tending to defeat the claim by probative force equal

7   to that of the allegations of the proofs of claim themselves." <u>Wright v. Holm (In re Holm )</u>, 931

8   F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, Collier on Bankruptcy § 502.02, at 502–22 (15th

9   ed.1991)); see also <u>Ashford v. Consolidated Pioneer Mort. (In re Consol. Pioneer Mort.)</u>, 178 B.R.

10   222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996).

11        "If the objector produces sufficient evidence to negate one or more of the sworn facts in

12   the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a

13   preponderance of the evidence." <u>In re Consol. Pioneer</u>, 178 B.R. at 226.

14        In this case, the necessary evidence is available in the L2C Claim and its supporting

15   documents submitted by L2C's representatives under penalty of perjury, and the Debtor's

16   voluntary Chapter 7 petition, and this Court may take judicial notice of both. Federal Rule of

17   Evidence 201(b)(1) and (b)(2) allow the Court to take judicial notice of facts that, "(1) [are]

18   generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

19   determined from sources whose accuracy cannot be reasonably questioned." The L2C Claim and

20   the Debtor's petition [ECF No. 1] are both part of this Court's docket and public filings.

21        The Convertible Promissory Note attached as a supporting document to the L2C Claim

22   (*see* **Exhibit "3"**) under penalty of perjury states on its face that no payments were due during the

23   initial 6-month period following the loan (January 31, 2018 through July 31, 2018).  As of the

24   Petition Date (May 8, 2018), the loan was still in its initial 6-month term, and no payments were

25   due until the maturity date  at the end of the 6-month term (presumably July 31, 2018), so the loan

26   was not in default on the Petition Date for missed payments.

27        The spreadsheet attached to the L2C Claim as a supporting document (**Exhibit "2"**),

28   however, indicates L2C has not limited its claim to the amount due on the Petition Date (principal

plus non-default interest at 8%), but rather inflated its claim by asserting a host of default interest, penalties and multipliers that were not owed by the Debtor on the Petition Date.

**B.    Purported Pre-Petition "Events of Default" Are Not Valid Claims Against Estate**

It appears from the spreadsheet attached to the L2C Claim that L2C asserts six (6) distinct pre-petition "events of default" (*see* **Exhibit "2"**) that purportedly entitle L2C to claim a number of stacking "Accrued Interest/Penalties" that occurred prior to the Petition Date:

| | |
|---|---|
| Default Section 3.7 – Bankruptcy – 4/18/2018 | $ 71,294.79 |
| Default Section 3.1 – Failure to Pay Principal or Interest – 4/18/2018 | $  8,911.85 |
| Default Section 3.3 – Breach of Covenants – 4/18/2018 | $  8,911.85 |
| Default Section 3.5 – Receiver or Trustee – 4/18/2018 | $  8,911.85 |
| Default Section 3.15 – Cross Default – 4/18/2018 | $  8,911.85 |
| Default Section 3.19 – Failure to file reg state... – 4/18/2018 | $  8,911.85 |
| Default Section 3.2 - Conversion and the Shares - 4/24/2018 | $590,502.55 |

To facilitate reference, the following discussion of the line items for each of these purported "events of default" will follow the order of the purported defaults as listed in the L2C Claim spreadsheet (**Exhibit "2"**).

**1.    Defaults 3.7 (bankruptcy) and 3.5 (receiver or trustee) did not occur prior to Petition Date and are also prohibited *ipso facto* clause penalties.**

L2C claims $71,294.79 accrued as an additional interest/penalty due to a bankruptcy filing on April 18, 2018 (under default section 3.7). L2C likewise claims an additional $8,911.85 for appointment of a receiver or trustee on April 18, 2018 (under default section 3.5). These two purported "events of default" are apparently both based solely on the filing of the Involuntary Chapter 11 Case on April 18, 2018, by the Debtor's creditors.

The default claimed for appointment of a receiver or trustee (default section 3.5) cannot be allowed because no receiver or trustee was appointed in the Chapter 11 Involuntary Case. More importantly, these two alleged defaults would both constitute *ipso facto* clauses which cannot be used to assert claims in bankruptcy.

*Ipso facto* clauses are provisions in executory contracts and unexpired leases which result in a breach solely due to the financial condition or bankruptcy filing of a party. In re Peaches Records and Tapes, Inc., 51 B.R. 583, 587 at n. 6 (9th Cir. BAP 1985). Pursuant to 11 U.S.C.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

§365(e), *ipso facto* clauses that automatically modify a contract upon a bankruptcy filing to the detriment of other creditors are prohibited in bankruptcy because they lead to the forfeiture of valuable assets and hamper the debtor's rehabilitation or liquidation. H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 59.

Both line items purport to modify the Debtor's payment obligations simply due to the fact of a bankruptcy filing. If a contract was not breached prior to the petition date, it may not be modified for claim purposes after the petition date simply because of the bankruptcy filing. Furthermore, even if these were not impermissible *ipso facto* events, the Involuntary Chapter 7 Case was dismissed prior to entry of an order for relief, so that filing cannot be invoked to increase the accrued interest and penalties claimed.

Accordingly, the line item in L2C's claim for $71,294.79 accrued as an additional interest/penalty due to a bankruptcy filing on April 18, 2018 (under default section 3.7), and the line item for $8,911.85 for appointment of a receiver or trustee on April 18, 2018 (under default section 3.5), should not be allowed as claims against this bankruptcy estate.

### 2. Defaults 3.1, 3.3, and 3.15 (various loan breaches) did not occur prior to Petition Date because filing of Involuntary Chapter 11 Case was not a default.

L2C claims $8,911.85 as an additional interest/penalty for failure to pay principal or interest on April 18, 2018 (default section 3.1), $8,911.85 for breach of covenants on April 18, 2018 (default section 3.3), $8,911.85 for cross-default on April 18, 2018 (default section 3.15). These dates again all correspond to the filing of the Involuntary Chapter 11 Case by the Debtor's creditors, but no order for relief was ever entered in that case, no trustee was ever appointed, and the involuntary case was dismissed. No payments were due or owing under the Convertible Promissory Note as of April 18, 2018 (or any time prior to the Petition Date), and no payments were missed prior to the Petition Date.

Each of these three "events of default" require the Debtor to miss payments prior to the Petition Date, but no payments were due, so no payments were missed prior to the Petition Date. The Debtor had not breached the terms of the loan on April 18, 2018 by missing any payment. The Court should therefore disallow the line item in L2C's claim for $8,911.85 as an additional

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   interest/penalty for failure to pay principal or interest on April 18, 2018 (default section 3.1), the

2   line item for $8,911.85 for breach of covenants on April 18, 2018 (default section 3.3), and the

3   line item for $8,911.85 for cross-default on April 18, 2018 (default section 3.15).

4       **3.      Default 3.19 (failure to file registration statement) did not occur when**

5                       **Involuntary Chapter 11 Case was filed.**

6          L2C claims an additional $8,911.85 for failure to file a registration statement on April 18,

7   2018 (default section 3.19). This purported "event of default" is apparently based on the filing of

8   the Involuntary Chapter 11 Case on April 18, 2018, by the Debtor's creditors. The Involuntary

9   Chapter 11 Case never resulted in an order for relief, no trustee was ever appointed, and the

10  involuntary case was dismissed.

11         The filing of the involuntary case had no impact on the filing of any registration statement,

12  and SEC records indicate the S1 registration was filed on or about April 13, 2018 with no

13  complaint from L2C. The Court should therefore disallow the line item in the L2C Claim for

14  $8,911.85 for failure to file a registration statement (default section 3.19).

15      **4.      Default 3.2 (conversion and the shares) did not occur prior to Petition Date.**

16         L2C claims an additional $590,502.55 (the largest of the purported default penalties) for

17  breach of the "Conversion and the Shares" provision of the Convertible Promissory Note on April

18  24, 2018 (default section 3.2). L2C gives no indication how it believes the Debtor breached this

19  lengthy requirement, or how this breach created an additional debt of $590,502.55 -- over 350% of

20  the original $152,500.00 loan principal -- after less than three months.

21         It does not appear L2C ever exercised any conversion rights, or that the Debtor refused

22  such a request on April 24, 2018. Additionally, this default section (3.2) is <u>not</u> included in the

23  note's list of "events of default" that add an additional 5% to the "Default Sum." The Court should

24  therefore disallow the line item in the L2C Claim for $590,502.55 (default section 3.19) because

25  no breach of this section occurred on April 24, 2018, or prior to the Petition Date, and there is no

26  basis or explanation for this penalty interest claim in excess of 350%.

27  ///

28  ///

**C.**     <u>Petition Date "Events of Default" and Post-Petition Interest/Penalties Not Allowed</u>

The L2C Claim also asserts the following line items for breaches that purportedly occurred on (or after) the May 8, 2018 Petition Date and also for post-petition interest through the date L2C filed its proof of claim:

| | |
|---|---|
| Default Section 3.10 – Liquidation – 5/8/2018 | $   44,724.50 |
| Default Section 3.11 – Cessation of Operations – 5/8/2018 | $   44,724.50 |
| Interest 5/8/2018 through 5/14/2018 | $     4,528.82 |
| Default Section 3.15 – Failure Comply with Exchange Act – 5/15/2018 | $   49,423.39 |
| Interest 5/15/2018 through current [July 18, 2018] | $   58,008.17 |

     **1.**     **Default 3.10 (liquidation) is another prohibited *ipso facto* clause penalty.**

L2C claims $44,724.50 as an additional interest/penalty due to Debtor's voluntary filing under Chapter 7 on May 8, 2018 (under default section 3.10). This is another stacked 5% "event of default." This one is notable because unlike prior 5% line items for $8,911.85 (based on 5% of $178,236.99 for accrued principal and interest), L2C claims $44,725.50 for this line item based on 5% of $894,490.03 which is the sum L2C claims had accumulated by that date due to the other compounding "events of default" discussed above.

Nevertheless, this line item is based solely on the fact that bankruptcy was filed, and therefore is another prohibited *ipso facto* clause penalty. The Debtor did not owe this amount before the Chapter 7 petition was filed because no payments were yet due per the terms of the loan. This exceeds the non-default interest of 8% of the $152,500.00 principal. Based on this, the $44,724.50 line item for "liquidation" on the Petition Date (default section 3.10) should be disallowed in its entirety.

     **2.**     **Default 3.11 (cessation of business) did not occur on or prior to Petition Date.**

L2C claims $44,724.50 as additional interest/penalty for cessation of business (default section 3.11). Once again, L2C claims $44,724.50 for this 5% "event of default" based on a compounding of the other objectionable line items discussed above.

Much like the claimed default for appointment of a receiver or trustee during the Chapter 11 petition date (which did not actually occur), this purported "event of default" did not occur pre-petition. The Trustee continued to operate the Debtor's business for another 90 days after the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Chapter 7 Petition Date (*see* [ECF No. 36]). L2C is padding its claim without regard to whether the purported events even occurred. Likewise, this is another impermissible *ipso facto* clause penalty since L2C is asserting it solely based on the fact of the bankruptcy filing, not on actual cessation of the business.

L2C's claimed line item for $44,724.50 for "cessation of business" on the Petition Date (default section 3.11) should be disallowed in its entirety.

**3.     Unsecured creditors cannot claim post-petition interest if estate is insolvent.**

L2C claims an additional $4,528.82 for interest for the first week after the Petition Date (May 8, 2018 through May 14, 2018) and claims an additional $58,008.17 for interest accrued from May 15, 2018, through July 18, 2018 (the date of L2C's proof of claim). These line items assert a claim for post-petition interest, but unsecured creditors cannot include post-petition interest in their proof of claim.

11 U.S.C. §502(b)(2) of the Bankruptcy Code explicitly disallows the inclusion of unmatured interest in an unsecured claim. 11 U.S.C. §502 provides in pertinent part:

> (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects….
>
> (b) [I]f such objection to a claim is made, the court … shall determine the amount of such claim … as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that….
>
> (2) **such claim is for unmatured interest**.

11 U.S.C. § 502 (emphasis added).

An unsecured proof of claim can only reflect the amount due as of the petition date, not some future amount of additional interest. L2C is not a secured creditor, and this estate is not expected to pay unsecured creditors 100% plus interest. As the Ninth Circuit has stated, "§502(b)(2) of the Bankruptcy Code permits parties in interest to object to unmatured interest as a claim against the estate (except for oversecured creditors)." In re Deitz, 760 F.3d 1038, 1055 (9th Cir. 2014). *See also:* In re Pardee, 218 B.R. 916, 921 (B.A.P. 9th Cir. 1998)("Section 502(b)(2)

1    clearly disallows recovery of unmatured interest from the bankruptcy estate"); In re SNTL Corp.,

2    571 F.3d 826, 842 (9th Cir. 2009); In re Del Mission Ltd., 130 B.R. 362 (B.A.P. 9th Cir. 1991),

3    aff'd, 998 F.2d 756 (9th Cir. 1993);

> Section 502(b)(2) provides that, upon objection, the court shall
> allow a claim except to the extent "such claim is for unmatured
> interest." 11 U.S.C. § 502(b)(2). **Interest is money "paid to**
> **compensate for the delay and risk involved in the ultimate**
> **repayment of monies loaned."** Texas Commerce Bank, N.A. v.
> Licht (In re Pengo Indus., Inc.), 962 F.2d 543, 546 (5th Cir.1992)
> ("Pengo"). **Interest is "unmatured" when it was not yet due and**
> **payable at the time the debtor filed its bankruptcy petition.**
> Joyce v. Fidelity Consumer Discount Co. (In re Joyce), 41 B.R. 249,
> 254 (Bankr.E.D.Pa.1984).9 Federal law, not state law, governs a
> creditor's entitlement to post-petition interest on a valid pre-petition
> claim. Vanston Bondholders Protective Comm. v. Green, 329 U.S.
> 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) ("Vanston").

12   Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003).

13            Accordingly, L2C's line item for $4,528.82 for interest for the first week after the Petition

14   Date (May 8, 2018 through May 14, 2018), and line item for an additional $58,008.17 for interest

15   accrued from May 15, 2018, through July 18, 2018 (the date of L2C's proof of claim), must be

16   disallowed as impermissible claims for post-petition interest.

17            Likewise, all of the other line items cited above must be disallowed because the claimed

18   interest was not due and payable at the time the Debtor filed its bankruptcy petition.

19            **4.       Default 3.15 (sic) (failure to comply with Exchange Act) is not supported by**
            **note and constitutes post-petition interest.**

20

21            L2C claims $49,423.49 as additional interest for "Failure to Comply with the Exchange

22   Act" on May 15, 2018 (default section 3.9 but cited by L2C as default section 3.15). Aside from

23   the fact there is no explanation or documentation of how Debtor failed to comply with the

24   Exchange Act, this purported "event of default" is claimed for another post-petition event. The

25   Debtor did not owe this interest on the Petition Date, so this additional 5% penalty (apparently

26   calculated against a compounded balance of $988,467.85) should not be allowed. L2C's unsecured

27   claim for interest must be limited to the balance owed by the Debtor as of the Petition Date.

28            L2C's line item for $49,423.49 in additional interest for "Failure to Comply with the

1  Exchange Act" on May 15, 2018 (default section 3.9 but cited by L2C as default section 3.15) is

2  for a purported breach that had not occurred until after the Petition Date, and therefore constitutes

3  post-petition unmatured interest and must be disallowed in its entirety.

4  **D.    Unenforceable Penalties Under State Law Are Disallowed in Proofs of Claim**

5          The fact that the L2C asserts that its $152,500.00 loan grew to a debt obligation of

6  $1,095,899.41 in less than five months demonstrates that these terms of the Convertible

7  Promissory Note are also unenforceable penalties under Nevada state law, not valid interest

8  provisions. To the extent this additional portion of the L2C Claim is not post-petition unmatured

9  interest, or not supported by the terms of the loan, or not supported by facts, these additional

10  interest charges must be disallowed as unenforceable penalties under Nevada state law.

11          The United States District Court for District of Nevada explained the unenforceable

12  penalty analysis as follows:

13              Although Nevada law permits parties to contractually agree to
                liquidated damages provisions, such provisions may become
14              unenforceable penalties. Mason v. Fakhimi, 109 Nev. 1153, 865
                P.2d 333, 335 (1993). A penalty:
15

16                  "is a sum inserted in a contract, not as the measure of
                    compensation for its breach, but rather as a punishment for
17                  default, or by way of security for actual damages which may
                    be sustained by reason of non-performance, and it involves the
18                  idea of punishment.... [The] distinction between a penalty and
                    liquidated damages is that a penalty is for the purpose of
19                  securing performance, while liquidated damages is the sum to
                    be paid in the event of non-performance."
20

21              Id. (quoting 22 Am.Jur.2d Damages § 684 (1980)). **To prove a
                provision is an unenforceable penalty, the challenging party**
22              **must show "the liquidated damages are disproportionate to the**
                **actual damages sustained by the injured party." Id.**
23

24  Guerra v. Hertz Corp., 504 F. Supp. 2d 1014, 1022 (D. Nev. 2007)

25          L2C's proof of claim demonstrates that the compounding default provisions in the

26  Convertible Promissory Note (**Exhibit "3"**) are grossly disproportionate to the actual damages

27  sustained by L2C. Pursuant to the loan with a principal sum of $152,500.00, L2C wired

28  $125,000.00 to the Debtor (after deducting $17,500 for OID, and $10,000.00 for "legal expenses")

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0022

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  on January 31, 2018. The Debtor filed its voluntary Chapter 7 petition on May 8, 2018 (less than

2  four months later), and L2C in turn filed a proof claim on July 18, 2018, asserting a debt

3  obligation of $1,095,899.41 based on "Accrued Interest/Penalties."

4      Even if the Court accepts the validity of the OID and "legal expense" pre-payments of

5  $27,500.00 and use the $152,500.00 loan principal as a guide, this claim still presents a 718%

6  increase over the original loan principal in a period of less than five months.  Whether these terms

7  were negotiated between the Debtor and L2C, or the Debtor agreed in anticipation of the

8  bankruptcy filing, a seven-fold recovery in five months is clearly intended to result in a massive

9  windfall to L2C, not a reasonable approximation of its damages in the event Debtor defaulted on

10  its loan for $152,500.00. This is greatly disproportionate and L2C has not demonstrated this

11  increase represents its actual damage as of the Petition Date (while no payments were due).

12                    **IV.  CONCLUSION**

13      None of the 10 "events of default" cited in the L2C Complaint occurred prior to the

14  Petition Date.  There was no bankruptcy prior to the Petition Date (except for the Involuntary

15  Chapter 11 Case which was dismissed without an order for relief). There was no receiver or

16  trustee appointed prior to the Petition Date (or ever in the Involuntary Chapter 11 Case). There

17  was no failure to pay or breach of covenants prior to the Petition Date. L2C asserts these

18  additional charges are the result of the various bankruptcy filings and other "events of default," but

19  this compounding after the fact is not allowed under the Bankruptcy Code.

20      The Trustee does not object to allowance of the loan principal ($152,500.00) and non-

21  default interest at 8% for 98 days from the loan date (January 31, 2018) to the Petition Date (May

22  8, 2018), for a total claim of $155,775.62. The Debtor genuinely had use of those funds during

23  that period. The other claimed interest and penalties, however, are not allowed claims under the

24  Bankruptcy Code. These additional charges are unmatured interest and/or prohibited *ipso facto*

25  clauses, are not supported by the loan terms, or constitute unenforceable penalties under Nevada

26  state law.

27      Based upon the foregoing, the Trustee requests entry of an Order of this Court that Proof of

28  Claim No. 42 filed by L2 Capital, LLC, on or about July 18, 2018, in the sum of $1,095,899.41 shall

be deemed an allowed non-priority unsecured claim but in the reduced sum of **$155,775.62** and that any amounts claimed in excess of this amount shall be disallowed.

A proposed form of Order is attached to this Motion as **Exhibit "5."**

Dated: May 11, 2020

/s/ Jason A. Imes
Jason A. Imes, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones, Blvd., Suite 1
Las Vegas, NV 89146
*Counsel for Lenard E. Schwartzer, Trustee*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "1"

<table>
<tr><td colspan="2">
<strong>Fill in this information to identify the case:</strong>

Debtor 1    MEDIZONE INTERNATIONAL, INC.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    <strong>District of Nevada</strong>

Case number:   <strong>18–12662</strong>
</td>
<td>
<strong>FILED</strong>

**U.S. Bankruptcy Court**
**District of Nevada**

7/18/2018

**Mary A. Schott, Clerk**
</td></tr>
</table>

## Official Form 410
# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1: Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | L2 CAPITAL, LLC<br><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**      **Where should payments to the creditor be sent?** (if different)<br><br>L2 CAPITAL, LLC<br>Name            Name<br><br>ATTN: ADAM LONG, MEMBER<br>2008 W. 81ST STREET<br>LEAWOOD, KS 66206<br><br>Contact phone    8169600100       Contact phone _____<br><br>Contact email    adam@ltwocapital.com    Contact email _____<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____ |
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____<br>MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ 1095899.41    **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>money loaned |

9. **Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.
   **Nature of property:**
   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*
   ☐ Motor vehicle
   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:** $ _____
   **Amount of the claim that is secured:** $ _____
   **Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:** $ _____

   **Annual Interest Rate** (when case was filed) _____ %

   ☐ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**
☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

11. **Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: _____

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies    $ _____

* Amounts are subject to adjustment on 4/1/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   7/18/2018
MM / DD / YYYY

/s/ Adam Rhodes Long

Signature

Print the name of the person who is completing and signing this claim:

Name   Adam Rhodes Long
First name   Middle name   Last name

Title   Managing Partner

Company   L2 Capital, LLC
Identify the corporate servicer as the company if the authorized agent is a servicer

Address   2008 w 81st Street
Number Street
Leawood, KS 66206
City State ZIP Code

Contact phone   8169600100    Email   adam@ltwocapital.com

# EXHIBIT "2"

**Medizone International, Inc.**                                         $152,500.00
Original Note Date: 1/31/2018
8% Interest Per Annum

| Date | note balance before conversion | Accrued Interest/Penalty | Conversion amount | Note Balance after conversion | Shares Converted |
|---|---|---|---|---|---|
| interest through 4/17/2018 | $152,500.00 | $25,736.99 | $0.00 | $178,236.99 | |
| Default Section 3.7 - Bankpuptcy - 4/18/2018 | $178,236.99 | $71,294.79 | $0.00 | $249,531.78 | |
| Default Section 3.1 - Failure to Pay Principal or Interest - 4/18/2018 | $249,531.78 | $8,911.85 | | $258,443.63 | |
| Default Section 3.3 - Breach of Covenants - 4/18/2018 | $258,443.63 | $8,911.85 | | $267,355.48 | |
| Default Section 3.5 - Receiver or Trustee - 4/18/2018 | $267,355.48 | $8,911.85 | | $276,267.33 | |
| Default Section 3.15 - Cross-Default - 4/18/2018 | $276,267.33 | $8,911.85 | | $285,179.18 | |
| Default Section 3.19 - Failure to File reg statement and Obtian effectiveness timely - 4/18/2018 | $285,179.18 | $8,911.85 | | $294,091.03 | |
| interest 4/18/2018 through 4/23/2018 | $294,091.03 | $1,160.25 | | $295,251.28 | |
| Default Section 3.2 - Conversion and the Shares - 4/24/2018 | $295,251.28 | $590,502.55 | | $885,753.83 | |
| interest 4/24/2018 through 5/7/2018 | $885,753.83 | $8,736.20 | | $894,490.03 | |
| Default Section 3.10 - Liquidation - 5/08/2018 | $894,490.03 | $44,724.50 | | $939,214.53 | |
| Default Section 3.11 - Cessation of Operations - 5/8/2018 | $939,214.53 | $44,724.50 | | $983,939.04 | |
| interest 5/8/2018 through 5/14/2018 | $983,939.04 | $4,528.82 | | $988,467.85 | |
| Default Section 3.15 - Failure to Comply with the Exchange Act - 5/15/2018 | $988,467.85 | $49,423.39 | | $1,037,891.24 | |
| interest 5/15/2018 through current | $1,037,891.24 | $58,008.17 | | $1,095,899.41 | |

# EXHIBIT "3"

**NEITHER THE ISSUANCE NOR SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

**Principal Amount: $152,500.00**                    **Issue Date: January 31, 2018**

## CONVERTIBLE PROMISSORY NOTE

**FOR VALUE RECEIVED, MEDIZONE INTERNATIONAL, INC.,** a Nevada corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **L2 CAPITAL, LLC,** a Kansas limited liability company, or registered assigns (the "Holder") the principal sum of $152,500.00 (the "Principal Amount"), together with interest at the rate of eight percent (8%) per annum, at maturity or upon acceleration or otherwise, as set forth herein (the "Note"). The consideration to the Borrower for this Note is $125,000.00 (the "Consideration") in United States currency, with an OID (as defined herein) of $17,500.00 and a credit of $10,000.00 for the Holder's legal expenses. The maturity date shall be six (6) months from the Issue Date (the "Maturity Date"), and on the Maturity Date, the principal of this Note, as well as any accrued and unpaid interest and other fees, shall be due and payable. This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein. Any amount of principal or interest on this Note, which is not paid by the Maturity Date, shall bear interest at the rate of the lesser of (i) twenty four percent (24%) per annum or (ii) the maximum amount allowed by law, from the due date thereof until the same is paid ("Default Interest"). Interest shall commence accruing on the date that the Note is fully paid and shall be computed on the basis of a 365-day year and the actual number of days elapsed. All payments due hereunder (to the extent not converted into the Borrower's common stock (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business

61953098.5                                        1

day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date. As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed.

This Note carries a prorated original issue discount of $17,500.00 (the "OID") and a credit of $10,000.00, to cover the Holder's accounting fees, due diligence fees, monitoring, and/or other transactional costs incurred in connection with the purchase and sale of the Note, which is included in the principal amount of this Note.

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following additional terms shall also apply to this Note:

ARTICLE I. CONVERSION RIGHTS

1.1     Conversion Right. The Holder shall have the right at any time to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock; provided further, however, that such 4.99% limit may be increased to a 9.99% limit upon sixty-one (61) calendar days prior written notice from the Holder to the Borrower. For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.3 below; provided that the

61953098.5                                                          2

Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 6:00 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) plus (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

12    Conversion Price.

(a) Calculation of Conversion Price. Except as provided below, the Conversion Price shall be equal to $0.05 (the "Fixed Conversion Price"). Notwithstanding anything to the contrary, at any time after the occurrence of any Event of Default (as defined herein), the Holder may require the Borrower to, at the Holder's option and otherwise in accordance with the provisions for conversion herein, convert all or any part of this Note into Common Stock at the Default Conversion Price (subject to adjustment as further described herein). The "Default Conversion Price" shall mean the lesser of (a) the Fixed Conversion Price and (2) the Variable Conversion Price. The "Variable Conversion Price" shall mean 60% multiplied by the Market Price (as defined herein) (representing a discount rate of 40%). "Market Price" means the lowest one (1) Trading Price (as defined below) for the Common Stock during the thirty (30) Trading Day period ending on the last complete Trading Day prior to the Conversion Date. "Trading Price" means, for any security as of any date, the lowest traded price on the Over-the-Counter Pink Marketplace, OTCQB, or applicable trading market (the "OTCQB") as reported by a reliable reporting service ("Reporting Service") designated by the Holder (i.e. www.Nasdaq.com) or, if the OTCQB is not the principal trading market for such security, on the principal securities exchange or trading market where such security is listed or traded or, if the lowest intraday trading price of such security is not available in any of the foregoing manners, the lowest intraday price of any market makers for such security that are quoted on the OTC Markets. If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Variable Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTCQB, or on the principal securities exchange or other securities market on which the Common Stock is then being traded. Each time an Event of Default (as defined herein) occurs while this Note is outstanding, an additional discount of five percent (5%) shall be factored into the Variable Conversion Price. All expenses incurred by Holder, for the issuance and clearing of the Common Stock into which this Note is convertible into, shall immediately and automatically be added to the balance of the Note at such time as the expenses are incurred by Holder.

Each time, while this Note is outstanding, the Borrower enters into a Section 3(a)(9) Transaction (as defined herein) (including but not limited to the issuance of new promissory

61953098.5                                    3

notes or of a replacement promissory note), or Section 3(a)(10) Transaction (as defined herein), in which any 3rd party has the right to convert monies owed to that 3rd party (or receive shares pursuant to a settlement or otherwise) at a discount to market greater than the Variable Conversion Price in effect at that time (prior to all other applicable adjustments in the Note), then the Variable Conversion Price shall be automatically adjusted to such greater discount percentage (prior to all applicable adjustments in this Note) until this Note is no longer outstanding. Each time, while this Note is outstanding, the Borrower enters into a Section 3(a)(9) Transaction (including but not limited to the issuance of new promissory notes or of a replacement promissory note), or Section 3(a)(10) Transaction, in which any 3rd party has a look back period greater than the look back period in effect under the Note at that time, then the Holder's look back period shall automatically be adjusted to such greater number of days until this Note is no longer outstanding. The Borrower shall give written notice to the Holder, with the adjusted Variable Conversion Price and/or adjusted look back period (each adjustment that is applicable due to the triggering event), within one (1) business day of an event that requires any adjustment described in the two immediately preceding sentences. So long as this Note is outstanding, if any security of the Borrower contains any term more favorable to the holder of such security or with a term in favor of the holder of such security that was not similarly provided to the Holder in this Note, then the Borrower shall notify the Holder of such additional or more favorable term and such term, at Holder's option, shall become a part of the transaction documents with the Holder.

If at any time the Variable Conversion Price as determined hereunder for any conversion would be less than the par value of the Common Stock, then at the sole discretion of the Holder, the Variable Conversion Price hereunder may equal such par value for such conversion and the Conversion Amount for such conversion may be increased to include Additional Principal, where "Additional Principal" means such additional amount to be added to the Conversion Amount to the extent necessary to cause the number of conversion shares issuable upon such conversion to equal the same number of conversion shares as would have been issued had the Variable Conversion Price not been adjusted by the Holder to the par value price.

      (b)   <u>Authorized Shares.</u> The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note. The Borrower is required at all times to have authorized and reserved three times the number of shares that is actually issuable upon full conversion of the Note (based on the Conversion Price of the Notes in effect from time to time)(the "Reserved Amount"). The Reserved Amount shall be increased from time to time in accordance with the Borrower's obligations hereunder. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non- assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Notes. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this

Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note.

13    Method of Conversion.

(a)    Mechanics of Conversion. Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time on or after an Event of Default under the Note occurs, by submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 6:00 p.m., New York, New York time) and (B) subject to Section 1.3(b), surrendering this Note at the principal office of the Borrower.

(b)    Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted. The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid principal amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c)    Payment of Taxes. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d)    Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of

61953098.5

5

communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.3, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within two (2) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof.

(e) <u>Obligation of Borrower to Deliver Common Stock</u>. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is received by the Borrower before 6:00 p.m., New York, New York time, on such date.

(f) <u>Delivery of Common Stock by Electronic Transfer</u>. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.3, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission ("DWAC") system.

(g) <u>Failure to Deliver Common Stock Prior to Deadline</u>. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $3,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock (unless such failure results from war, acts of terrorism, an epidemic, or natural disaster). Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder

(by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly the parties acknowledge that the liquidated damages provision contained in this Section 1.3(g) are justified.

       1.4    Concerning the Shares. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144 under the Act (or a successor rule) ("Rule 144") or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.4 and who is an Accredited Investor. Except as otherwise provided (and subject to the removal provisions set forth below), until such time as the shares of Common Stock issuable upon conversion of this Note have been registered under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for shares of Common Stock issuable upon conversion of this Note that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

> **"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

       The legend set forth above shall be removed and the Borrower shall issue to the

Holder a new certificate therefor free of any transfer legend if (i) the Borrower or its transfer agent shall have received an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be accepted by the Borrower so that the sale or transfer is effected or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold. In the event that the Borrower does not accept the opinion of counsel provided by the Holder with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

      1.5      [Intentionally Omitted].

      1.6      Status as Shareholder. Upon submission of a Notice of Conversion by a Holder, (i) the shares covered thereby (other than the shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies (including, without limitation, (i) the right to receive Conversion Default payments pursuant to Section 1.3 to the extent required thereby for such Conversion Default and any subsequent Conversion Default and (ii) the right to have the Conversion Price with respect to subsequent conversions determined in accordance with Section 1.3) for the Borrower's failure to convert this Note.

ARTICLE II.  CERTAIN COVENANTS

      2.1      Distributions on Capital Stock. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved

by a majority of the Borrower's disinterested directors.

       2.2    <u>Restriction on Stock Repurchases.</u> So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property   or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any  such shares.

## ARTICLE III. EVENTS OF DEFAULT

       The occurrence of each of the following events shall be deemed an event of default (each, an "Event of Default"), with no right to notice nor right to cure except as specifically provided:

       3.1    <u>Failure to Pay Principal or Interest.</u> The Borrower fails to pay the principal 4-18 hereof or interest thereon when due on this Note, which shall be due on the earlier of (i) the Maturity Date and (ii) upon acceleration or otherwise.

       3.2    <u>Conversion and the Shares.</u> The Borrower fails to reserve a sufficient 4-24 amount of shares of common stock as required under the terms of this Note (including Section 1.2 of this Note), fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will   not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note,  the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion.  It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion,  such advanced funds shall be paid by the Borrower to the Holder within five (5) business days, either in cash or as an addition to the balance of the Note,

61953098.5                                 9

and such choice of payment method is at the discretion of the Borrower.

        3.3    <u>Breach of Covenants</u>. The Borrower breaches any material covenant or other material term or condition contained in this Note, the Other Agreements or any collateral documents.      4-18

        3.4    <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith, shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note.

        3.5    <u>Receiver or Trustee</u>. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.      4-18

        3.6    <u>Judgments</u>. Any money judgment, writ or similar process (other than the default judgment in the litigation known as Rakas v. Medizone International, Inc.) shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of ten (10) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

        3.7    <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.      4-18

        3.8    <u>Delisting of Common Stock</u>. The Borrower shall fail to maintain the listing or quotation of the Common Stock on the OTCQB or an equivalent replacement exchange, the Nasdaq Global Market, the Nasdaq Capital Market, the New York Stock Exchange, or the NYSE MKT.

        3.9    <u>Failure to Comply with the Exchange Act</u>. The Borrower shall fail to comply with the reporting requirements of the Exchange Act (including but not limited to becoming delinquent in its filings), and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.      5-15

        3.10    <u>Liquidation</u>. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.      5-8

        3.11    <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern"      5-8

shall not be an admission that the Borrower cannot pay its debts as they become due.

3.12    _Financial Statement Restatement_. The Borrower replaces its auditor, or any restatement of any financial statements filed by the Borrower with the Securities and Exchange Commission (the "SEC") for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted an adverse effect on the Borrower or the rights of the Holder with respect to this Note.

3.13    _Reverse Splits_.  The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

3.14    _Replacement of Transfer Agent_. In the event that the Borrower replaces its transfer agent, and the Borrower fails to provide prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower that reserves the total amount of shares previously held in reserve for the Note with the Borrower's immediately preceding transfer agent.

3.15    _Cross-Default_. Notwithstanding anything to the contrary contained in this 4-18 Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the other agreements, documents or financial instruments, including but not limited to the (a) Equity Purchase Agreement between Holder, SBI Investments LLC, 2014-1 and the Borrower (the "EPA"), (b) the Securities Purchase Agreement between Holder, SBI Investments LLC, 2014-1, and the Borrower and (c) all convertible promissory notes, currently issued, or hereafter issued, by the Borrower, to the Holder or other 3rd party (the "Other Agreements"), shall, at the option of the Holder, be considered a default under this Note, in which event the Holder shall be entitled to apply all rights and remedies of the Holder under the terms of this Note by reason of a default under said Other Agreement or hereunder.

3.16    _Inside Information_. Any attempt by the Borrower or its officers, directors, and/or affiliates to transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date.

3.17    _No bid_. At any time while this Note is outstanding, the lowest Trading Price on the OTCQB or other applicable principal trading market for the Common Stock is equal to or less than $0.0001.

3.18    _Prohibition on Debt and Variable Securities_.  So long as the Note is outstanding, the Borrower shall not, without written consent of the Investor, issue any Variable

61953098.5                                          11

Security (as defined herein), unless (i) the Borrower is permitted to pay off the Note in cash at the time of the issuance of the respective Variable Security and (ii) the Borrower pays off the Note, pursuant to the terms of the Note, in cash at the time of the issuance of the respective Variable Security. A Variable Security shall mean any security issued by the Borrower that (i) has or may have conversion rights of any kind, contingent, conditional or otherwise in which the number of shares that may be issued pursuant to such conversion right varies with the market price of the common stock; (ii) is or may become convertible into common stock (including without limitation convertible debt, warrants or convertible preferred stock), with a conversion or exercise price that varies with the market price of the common stock, even if such security only becomes convertible or exercisable following an event of default, the passage of time, or another trigger event or condition; or (iii) was issued or may be issued in the future in exchange for or in connection with any contract, security, or instrument, whether convertible or not, where the number of shares of common stock issued or to be issued is based upon or related in any way to the market price of the common stock, including, but not limited to, common stock issued in connection with a Section 3(a)(9) exchange, a Section 3(a)(10) settlement, or any other similar settlement or exchange (unless, in each case above, the variable pricing feature of the Variable Security is subject to a hard floor of at least 50% of the market price of the Common Stock on the Issue Date (with no provisions for adjustment of such variable pricing feature below the hard floor)).

        3.19    <u>Failure to File Registration Statement and Obtain Effectiveness Timely</u>. The Borrower (i) fails to file the S-1 registration statement with the SEC within forty-five (45) calendar days after the Issue Date, (ii) to have such S-1 Registration Statement and any amendment thereto declared effective by the SEC within one hundred twenty (120) calendar days after the Issue Date, (iii) breaches representations or warranties, or fails to comply with a covenant, in that certain Registration Rights Agreement among the Borrower, the Holder and SBI Investments LLC, 2014-1 or (iv) fails to deliver the Commitment Shares (as defined in the EPA) in accordance with the EPA.

        UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence and during the continuation of any Event of Default specified in Sections 3.1, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16, 3.17, 3.18 and/or 3.19, the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to 140% (plus an additional 5% per each additional Event of Default that occurs hereunder) <u>multiplied by</u> the then outstanding entire balance of the Note (including principal and accrued and unpaid interest) <u>plus</u> Default Interest, if any, <u>plus</u> any amounts owed to the Holder pursuant to Sections 1.3(g) hereof (collectively, in the aggregate of all of the above, the "Default Sum"), and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount, then the Holder shall have the right at any time, to require the Borrower, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect, subject to issuance in tranches due to the beneficial ownership limitations contained in this Note.

## ARTICLE IV. MISCELLANEOUS

4.1     <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights  and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2     <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery, upon electronic mail delivery, or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Borrower, to:

MEDIZONE INTERNATIONAL, INC.
350 East Michigan Avenue, Suite 500
Kalamazoo, MI 49007
E-mail: phil.theodore@medizoneint.com

If to the Holder:

L2 CAPITAL, LLC
8900 State Line Rd., Suite 410
Leawood, KS 66206

61953098.5                                        13

e-mail: investments@ltwocapital.com

4.3     Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4     Assignability. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the 1933 Act). Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement.

4.5     Cost of Collection. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6     Governing Law. This Note shall be governed by and construed in accordance with the laws of the State of Kansas without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state and/or federal courts of Johnson County, Kansas. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. The Borrower and Holder waive trial by jury. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

4.7     Certain Amounts. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the

sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

4.8    Remedies. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

4.9    Repayment. Notwithstanding anything to the contrary contained in this Note, the Borrower may repay the amount outstanding under this Note, at any time after the Issue Date, by making a payment to the Holder of an amount in cash equal to 130% multiplied by the total outstanding amount owed under the Note at such time of repayment. In order to pay this Note in full, the Borrower shall provide notice to the Holder ten (10) business days prior to such respective repayment date, and the Holder must receive such repayment within twelve (12) business days of the Holder's receipt of the respective repayment notice, but not sooner than ten (10) business days from the date of notice (the "Repayment Period"). The Holder may convert the Note in whole or in part at any time during the Repayment Period, subject to the terms and conditions of this Note.

4.10    Section 3(a)(10) Transactions. If at any time while this Note is outstanding, the Borrower enters into a transaction structured in accordance with, based upon, or related or pursuant to, in whole or in part, Section 3(a)(10) of the Securities Act (a "3(a)(10) Transaction"), then a liquidated damages charge of 100% of the outstanding principal balance of this Note at that time, will be assessed and will become immediately due and payable to the Holder, either in the form of cash payment, an addition to the balance of the Note, or a combination of both forms of payment, as determined by the Holder.

4.11    Restriction on Section 3(a)(9) Transactions. So long as this Note is outstanding, the Borrower shall not enter into any 3(a)(9) Transaction with any party other than the Holder, without prior written consent of the Holder. In the event that the Borrower does enter into, or makes any issuance of Common Stock related to a 3(a)(9) Transaction while this Note is outstanding, a liquidated damages charge of 25% of the outstanding principal balance of this Note, but not less than $15,000, will be assessed and will become immediately due and payable to the Holder at its election in the form of cash payment or addition to the balance of this Note.

61953098.5                                              15

4.12     [Intentionally Omitted].

    4.13     <u>Terms of Future Financings.</u> So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any security with any term more favorable to the holder of such security or with a term in favor of the holder of such security that was not similarly provided to the Holder in this Note (except with respect to any other security issued to, or any other agreement with, the Holder), then the Borrower shall notify the Holder of such additional or more favorable term and such term, at Holder's option, shall become a part of the transaction documents with the Holder. The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, repayment rate, conversion look back periods, interest rates, original issue discounts, stock sale price, private placement price per share, and warrant coverage.

    4.14     <u>Usury</u>. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Borrower covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Borrower from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note, and the Borrower (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

    4.15     <u>Right of First Refusal</u>. If at any time while this Note is outstanding, the Borrower has a bona fide offer of capital or financing from any 3rd party, that the Borrower intends to act upon, then the Borrower must first offer such opportunity to the Holder to provide such capital or financing to the Borrower on the same terms as each respective 3rd party's terms. Except as otherwise provided in this Note, should the Holder be unwilling or unable to provide such capital or financing to the Borrower within 10 trading days from Holder's receipt of written notice of the offer (the "Offer Notice") from the Borrower, then the Borrower may obtain such capital or financing from that respective 3rd party upon the exact same terms and conditions offered by the Borrower to the Holder, which transaction must be completed within 30 days after the date of the Offer Notice. Borrower shall, within two (2) business days of the respective closing, utilize 50% of all proceeds received by Borrower by each respective 3rd party that provides capital or financing to the Borrower, to repay this Note. If the Borrower does not receive the capital or financing from the respective 3rd party within 30 days after the date of the respective Offer Notice, then the Borrower must again offer the capital or financing opportunity to the Holder as described above, and the process detailed above shall be repeated. The Offer Notice must be sent via electronic mail to investments@ltwocapital.com.

    4.16     (A)    THIS IS THE FINAL EXPRESSION OF THE AGREEMENT

61953098.5

16

BETWEEN THE BORROWER AND THE HOLDER, AND THIS NOTE MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR ORAL AGREEMENT OR OF A CONTEMPORANEOUS ORAL AGREEMENT BETWEEN THE BORROWER AND THE HOLDER.

(B)     THE BORROWER AND THE HOLDER ACKNOWLEDGE THAT ALL NONSTANDARD TERMS OF THIS NOTE AND ALL PRIOR ORAL AGREEMENTS AND CONTEMPORANEOUS ORAL AGREEMENTS BETWEEN THEM ARE SUFFICIENTLY SET FORTH HEREIN EXCEPT (IF NONE, WRITE "NONE"):

NONE.

THE BORROWER AND THE HOLDER FURTHER ACKNOWLEDGE THAT THE ABOVE SPACE IS SUFFICIENT FOR DISCLOSURE OF TERMS AND AGREEMENTS, IF ANY, NOT SET FORTH IN THIS NOTE.

(c)     THE BORROWER AND THE HOLDER AFFIRM THAT NO UNWRITTEN ORAL AGREEMENT BETWEEN THEM EXISTS.

BORROWER'S INITIALS: _____

HOLDER'S INITIALS:_____

*[signature page to follow]*

BETWEEN THE BORROWER AND THE HOLDER, AND THIS NOTE MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR ORAL AGREEMENT OR OF A CONTEMPORANEOUS ORAL AGREEMENT BETWEEN THE BORROWER AND THE HOLDER.

(B)   THE BORROWER AND THE HOLDER ACKNOWLEDGE THAT ALL NONSTANDARD TERMS OF THIS NOTE AND ALL PRIOR ORAL AGREEMENTS AND CONTEMPORANEOUS ORAL AGREEMENTS BETWEEN THEM ARE SUFFICIENTLY SET FORTH HEREIN EXCEPT (IF NONE, WRITE "NONE"):

NONE.

THE BORROWER AND THE HOLDER FURTHER ACKNOWLEDGE THAT THE ABOVE SPACE IS SUFFICIENT FOR DISCLOSURE OF TERMS AND AGREEMENTS, IF ANY, NOT SET FORTH IN THIS NOTE.

(c)   THE BORROWER AND THE HOLDER AFFIRM THAT NO UNWRITTEN ORAL AGREEMENT BETWEEN THEM EXISTS.

BORROWER'S INITIALS:   _____

HOLDER'S INITIALS: _____

*[signature page to follow]*

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this January 31, 2018.

MEDIZONE INTERNATIONAL, INC.

By: _David A. Dodd_
Name: David A. Dodd
Title: Chief Executive Officer

**EXHIBIT A -- NOTICE OF CONVERSION**

The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of MEDIZONE INTERNATIONAL, INC., a Nevada corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of January 31, 2018 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[  ]  The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

[  ]  The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

L2 CAPITAL, LLC
8900 State Line Rd., Suite 410
Leawood, KS 66206
e-mail: investments@ltwocapital.com

Date of Conversion: _____
Applicable Conversion Price: $_____
Number of Shares of Common Stock to be Issued
   Pursuant to Conversion of the Notes: _____
Amount of Principal Balance Due remaining
   Under the Note after this conversion: _____

L2 CAPITAL, LLC

By:_____
Name:_____
Title:_____
Date: _____

# EXHIBIT "4"



CHASE ONLINE℠ Thursday, February 01, 2018

 LOG OFF

Payments & Transfers > Wire Activity > Wire Detail

# Wire Detail

▶ Print  ▶ Help with this page

## Review this request — Read and confirm the details for this wire request. Click "Wire Activity" to go back on the Activity page.

### I'd like to...
▸ Schedule a wire transfer
▸ See wire activity
▸ See pending wire activity
▸ See more choices

| **Wire Details** | |
|---|---|
| **Account Details** | |
| Wire to | Medizone International, Inc.(...6737) |
| Wire from | PLAT BUS CHECKING (...8067) |
| **Wire Details - Sender** | |
| Wire amount | 125000.00 U.S. Dollars (USD) |
| Scheduled On | 01/31/2018 at 04:20 PM ET |
| Wire date | 01/31/2018 |
| Message to recipient | debt investment |
| Message/instructions to recipient bank | |
| Memo | MZEI debt investment |
| Transaction number | 5032122111 |
| Fed reference number | 0131B1QGC03C014161 |
| Status | Completed |
| Submitted by | Administrator on 1/31/2018 4:20:21 PM |
| Last modified by | Not Available on 1/31/2018 6:20:33 PM |
| Approved by | Not Available |

 **Wire Activity**

Security | Terms of Use | Legal Agreements and Disclosures | AdChoices

Chase's website terms, privacy and security policies don't apply to the site you're about to visit. Please review its website terms, privacy and security policies to see how they apply to you. Chase isn't responsible for (and doesn't provide) any products, services or content at this third-party site, except for products and services that explicitly carry the Chase name.

© 2018 JPMorgan Chase & Co.

# EXHIBIT "5"

Jason A. Imes, Esq., NV Bar No. 7030
Schwartzer & McPherson Law Firm
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146-5308
Telephone:     (702) 228-7590
Facsimile:     (702) 892-0122
E-Mail:         bkfilings@s-mlaw.com
*Attorneys for Lenard E. Schwartzer, Trustee*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

MEDIZONE INTERNATIONAL, INC.,

Debtor.

Case No. BK-S-18-12662-ABL

Chapter 7

**[ PROPOSED ] ORDER SUSTAINTING OBJECTION TO PROOF OF CLAIM NO. 42 (L2 CAPITAL, LLC)**

Hearing Date:   June 25, 2020
Hearing Time:   11:00 a.m.

The Trustee's *Objection to Proof of Claim No. 42 (L2 Capital, LLC)* (the "Objection")

[ECF No. ___ ] having come before this Court on _____, 2020;  Lenard E. Schwartzer

(the "Trustee"), Chapter 7 Trustee, appearing by and through his counsel, Jason A. Imes., Esq., of

the Schwartzer & McPherson Law Firm;  other parties appearing as noted on the record;  the Court

finding that notice has been given to all creditors and parties in interest as required by law, there

being no opposition, the Court having made its findings of fact and conclusions of law upon the

record which are incorporated herein pursuant to Federal Rules of Bankruptcy Procedure 9014(c)

and 7052, and for good cause appearing,

**IT IS HEREBY ORDERED** that the Trustee's Objection is GRANTED; and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    **IT IS FURTHER ORDERED** that for purposes of distribution of the assets of this

2  bankruptcy estate that Proof of Claim No. 42 filed by L2 Capital, LLC, on or about July 18, 2018,

3  in the sum of $1,095,899.41 shall be deemed an allowed non-priority unsecured claim but in the

4  reduced sum of **$155,775.62** and that any amounts claimed in excess of this sum are disallowed.

5  Submitted by:

6

7  _____

8  Jason A. Imes, Esq.
   Schwartzer & McPherson Law Firm

9  2850 South Jones Blvd., Suite 1
   Las Vegas NV  89146

10  *Attorneys for Lenard E. Schwartzer, Trustee*

11

12

13

14

15  <u>**Local Rule 9021 CERTIFICATION**</u>

16    In accordance with LR 9021, counsel submitting this document certifies that the order
   accurately reflects the court's ruling and that (check one):

17

18    ☐  The court waived the requirement of approval under LR 9021(b)(1).

19    ☐  No party appeared at the hearing or filed an objection to the motion.

20    ☐  I have delivered a copy of this proposed order to all counsel who appeared at
   the hearing, and any unrepresented parties who appeared at the hearing, and each has
21  approved or disapproved the order, or failed to respond, as indicated above.

22    ☐  I certify that this is a case under Chapter 7 or 13, that I have served a copy of
   this order with the motion pursuant to LR 9014(g), and that no party has objection to
23  the form or content of the order.

24

25

26  _____
   Jason A. Imes, Esq.
27  Schwartzer & McPherson Law Firm

                        # # #
28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122